UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | 1:18-cv-2350-MHC-JSA |
| | ) | |
| FRANK JONES, et al., | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

William Robinson alleges that four Fulton County deputies participate in an incident in which one of them repeatedly punched, kicked, and tased him while he was handcuffed. The evidence supports his claim. Taser logs show a taser belonging to one of the deputies was discharged *eight* times. Jail video shows Robinson being dragged into a room of jail, while handcuffed, by three officers and later being dragged out of the room, unconscious, by four officers.

Defendants are two of the deputies involved in the incident. Both were present, but deny that any force was used against Robinson. When faced with evidence—taser logs, video surveillance, and medical records—they appear to backtrack, and claim that only Deputy Fuqua (who is not a party here) used force

1

against Robinson, and therefore they cannot be held liable for Robinson's injuries.

The problem is that Robinson unequivocally testified that Deputy Frank Jones was the one who tased, punched, and kicked him. While Deputy Jones disputes this testimony, the dispute must be resolved by a jury. Defendant Saunders' defense fairs no better. Robinson testified that Saunders stood by while during the attack ready to serve as extra muscle if Robinson resisted. The Eighth Amendment does not allow a jailer cannot stand idly by while another brutally attack a handcuffed inmate and do nothing.

### a.   Statement of facts

#### 1.   *Initial time in the jail*

During his initial time in the jail, jailers then placed Robinson in a restraint chair for many hours. Robinson Dep. 27:3–9.1 Jailers then removed Robinson from the restraint chair and moved him into a padded room. *Id.* 27:16–21. Robinson's shoulder was injured during his initial time in the jail. *Id.* 26:10–27:28. Robinson believed that his arm was broken, and asked for medical attention. *Id.* 27:10–15. Eventually, jailers let Robinson out of the padded room and stated that they would take him to the medical unit. *Id.* 27:22–25.

### 2.   *Initial encounter with Frank Jones and the other deputies*

Robinson waited patiently for the shift change so that the incoming jailers would take him to the medical unit to have his shoulder checked. Robinson Dep. 28:1–11. After shift change, a jailer appeared and Robinson believed he was going to be taken to the medical unit. *Id.* 28:12–13. The jailer grabbed Robinson by the shoulder, which caused Robinson pain. As a result, Robinson pulled away. *Id.* 28:13–16. The jailer who grabbed Robinson was Deputy Frank Jones. Jones testified that when Robinson began to stand, Robinson "janked away like in an aggressive manner," and therefore "we placed him on the ground and put handcuffs on him." Jones Dep. 27:1–12. Robinson does not recall what happened next because he lost consciousness. Robinson Dep. 28:13–16, 49:23–50:22, 51:13– 52:10. The next thing Robinson remembers is being dragged on the floor by his ankles. *Id.* 28:12–20, 51:24–52:10.

### 3.   *Inside the property room*

The process at the jail is that new arrestees are typically taken for a medical screening before they are dressed out to go to general population. Jones Dep. 35:13–36. Robinson did not go through a medical screening before being taken to the property room. *Id.* The property room is the location where inmates are dressed

out after being processed in booking. Jones Dep. 19:14–15. Three jailers then stopped dragging Robinson and told him to get up and walk. Robinson Dep. 28:16–20. Robinson attempted to do so, but he was in a great deal of pain. Robinson Dep. 28:16–20. After a few steps, Robinson said that he could not walk and fell to the ground. *Id.*

The jailers proceeded to drag Robinson, face down on the ground, into the property room of the jail. Robinson Dep. 28:21–29:2; PelcoExport~40964792.exe at 7:29:30–7:29:47. The three deputies then dragged Robinson into the shower area of the property room. Robinson Dep. 52:11–25. The three deputies who dragged Robinson into the shower were Rafferty Fuqua, Markennis Jackson, and Frank Jones. See Saunders Dep. 38:14–17 (stating that he saw Fuqua dragging Robinson), 42:21–24 (stating that Fuqua, Jones, Saunders, and Jackson were present during the incident); PelcoExport~40964792.exe at 7:29:30–7:29:47 (showing Robinson being dragged by three officers); Robinson Dep. 47:13–23, 53:23–54:19 (identifying Jones as one of the three officers who dragged him into the property room).

There are no cameras in the shower area of the property room. Saunders Dep. 45:5–10. Both Defendants know there are no cameras in that area of the jail.

4

Jones Dep. 19:16–19; Saunders Dep. 45:5–10.

After reaching the shower area, the Frank Jones slapped Robinson. Robinson Dep. 29:8–15. At this point, Robinson's hands were handcuffed behind him and his feet were shackled. Robinson Dep. 29:11–15. This attack angered Robinson and he said "my old lady his harder than you." Robinson Dep. 29:11–19. After Robinson said that, the Jones punched Robinson. Robinson Dep. 29:20–30:4. This prompted Robinson to call Jones a coward for punching another person who is handcuffed. Robinson Dep. 30:1–4. At that point, Jones dragged Robinson into the shower and began punching and tasing him. Robinson Dep. 30:5–12. While in the shower area, Robinson was punched and kicked by Frank Jones. Robinson Dep. 65:11–12. Robinson was kicked twice in the face by Frank Jones. Robinson Dep. 84:16–20. Frank Jones punched was a closed fist. Robinson Dep. 84:6–20. Jones hit Robinson and, at that point, Robinson felt his teeth crush down. Robinson Dep. 30:13–18. The assault continued after that. Id.

### 4.    *Frank Jones repeatedly tases Robinson.*

Jones did not have a taser assigned to him on May 3, 2016, but Fuqua did. Jones Dep. 17:6–8. Taser logs for the taser assigned to Rafferty Fuqua show his taser was discharged eight times in the span of 5 minutes at the time of the assault.

Ex. 1 (showing eight "arc" events); Ex. 2 at 2 (explaining "arc" means "the arc switch was pressed and the duration or length"); Ex. 3, Plaintiff 00145 (showing taser assignments). The taser logs are approximately 8 minutes and 27 seconds ahead of the actual time. See Ex. 2 at 2 (explaining the time discrepancy). Based on the taser logs, the first time the taser was activated was 7:38:08 a.m. See Ex. 1 at 2. Correcting for the time discrepancy, the taser would have been deployed at 7:29:38 a.m. See Ex. 1 at 2, 2 at 2. The timestamp on the video surveillance shows that Robinson was dragged into the property room at 7:29 a.m. *See* PelcoExport~40964792.exe at 7:29:30–7:29:47. Frank Jones was the officer who used the taser. "Frank Jones was tasering me. That was not Fuqua at all. That was not Fuqua. That was Frank Jones with the taser." Robinson Dep. 44:7–15. *See also id.* 46:3–4. Robinson has a clear recollection of the facial appearance of each Defendant. *Id.* 54:9–19. Robinson did not do anything to justify being tased. Robinson did not show any aggression, and the tasing was not preceded by a command for Robinson to do anything. *Id.* 59:18–60:1.

### 5.   *The other deputies standby*

During the assault, Markennis Jackson and Defendant Saunders were standing nearby. Robinson Dep. 30:19–25. Saunders did not say anything, but

appeared to there as a sort of enforcement. "If I would have responded physically, then, you know, Saunders would have jumped in and Jackson would have jumped in." *Id.* 29:23–30:4, 44:8–15. A taser is audible when it is discharged. Saunders Dep. 49:20–50:16. During the incident with Robinson, Saunders was close enough to hear a taser being deployed. Saunders Dep. 50:21–51:3.

During the attack, two gold teeth Robinson had in his mouth were dislodged. The gold teeth were not temporary caps or a mouth piece. When placed in his mouth, Robinson's front teeth were shaved down and the gold teeth were glued in place. Robinson Dep. 126:2–8. When Robinson's gold caps fell out, one of the officers remarked "we got trophies." Robinson Dep. 125:19–126:1. Saunders was present during the attack and Robinson could see Saunders during the attack. *Id.* 122:22–5. Saunders acknowledges that he would have been able to hear a taser being activated from the place where he was getting Robinson's clothes. *See* IA Investigation Audio, Charolita Scandrett - Cadet Deputy Robert Saunders Followup.WMA at 11:48/19:58; Jones Dep. 38:15–20.

Robinson was handcuffed during the attack. Robinson Dep. 29:20–30, 124:6–13; IA Investigation Audio, Charolita Scandrett - Cadet Deputy Robert Saunders Followup.WMA at 06:57/19:58. At some point, Robinson lost

7

consciousness. Robinson Dep. 31:5–8. Robinson was then dragged from the

property room by four deputies. See PelcoExport~40964792 at timestamp 7:34:23

(showing Robinson being dragged from the property room, seemingly

unconscious, by four officers).

### 6.    *Medical screening*

After the incident in the property room, Plaintiff was taken for a medical

screening. At Plaintiff's medical screening the nurse noted that Robinson had a

loose tooth and other injuries from the attack. *See* Ex. 5, Medical Screening

Referral, at 1 ("mouth injuries from altercation"); *id.* at 2 (noting "body and head

injuries during altercation tased during altercation/hit in mouth with cut lips and

loose teeth"). The Jail's licensed nurse practitioner Ronald Sanders remembers

screening William Robinson on May 3, 2016. IA Investigation Audio, Charolita

Scandrett - Follow Up Interview with LPN Ronald Sanders.WMA at 00:34/05:35.

Robinson's Medical Prescreening Form notes: left shoulder injury, head injury,

injuries to hands, legs, and mouth, "tazed [sic] during altercation," cough blood,

mouth injury. Ex. 6, Medical Prescreening Form. Later, two of Robinson's teeth

fell out and the jail's dentist attempted to re-implant them. Sanders noticed that

Robinson had a lot of bruises. IA Investigation Audio, Charolita Scandrett - Follow

Up Interview with LPN Ronald Sanders.WMA at 03:09/05:35. There were bruises on Robinson's left arm and one to the cheek bone. IA Investigation Audio, Charolita Scandrett - Follow Up Interview with LPN Ronald Sanders.WMA at 03:23/05:35.

After the medical screening, Robinson was taken to the medical unit. Jones Dep. 15:24–16:2 (explaining that inmates move to a medical screening and then to the medical unit or the classification floor). Emzell Woods was in the medical unit for depression. Inmates came into the holding tank. Robinson began arguing with an older inmate and Woods tried to diffuse the argument. After that, both Robinson and the other inmate were trying to get the attention of the officer at the unit. IA Investigation Audio, Charolita Scandrett - Inmate Emzel Woods#16034.m4a at 00:40/06:21. Robinson became angry, swung on Emzell Woods, and hit Woods a couple times. IA Investigation Audio, Charolita Scandrett - Inmate Emzel Woods#16034.m4a at 01:43/06:21. At the time he was in medical, Robinson already had tissue in his mouth from a prior altercation in booking. IA Investigation Audio, Charolita Scandrett - Inmate Emzel Woods#16034.m4a at 02:05/06:21. Emzell Woods did not hit Robinson at all. IA Investigation Audio, Charolita Scandrett - Inmate Emzel Woods#16034.m4a at 03:18/06:21; Robinson

Dep. 72:12–15 (explaining that Woods "did not even get a lick in that fight").

### 7.    *Dental treatment*

Robinson was eventually taken to the dental clinic. Robinson came into the dentist as an emergency. IA Investigation Audio, Charolita Scandrett - Dr Valerie Smith Dental Director #16034.m4a at 02:26/08:25. Robinson went to the clinic sometime after 3:30 p.m. IA Investigation Audio, Charolita Scandrett - Dr Valerie Smith Dental Director #16034.m4a at 04:55/08:25. Robinson presented to the dental clinic with teeth number 8 and 9 in hand. IA Investigation Audio, Charolita Scandrett - Interview with Dr Joyce Cosby.WMA at 02:26/08:21. The jail staff was going to try to splint the teeth in by securing them to the adjacent teeth but the prognosis was poor and they felt teeth may not hold due to the damage to the area due to trauma to the area. IA Investigation Audio, Charolita Scandrett - Dr Valerie Smith Dental Director #16034.m4a at 01:46/08:25.

## b.    **Argument and Citation of Authority**

### 1.    *The Eighth Amendment*

Plaintiff brought claims against both Defendants under the Eighth Amendment. *See* Amend. Compl., Doc. 37 at 9. There are two aspects to the claim. First, the use of excessive force. Second, the failure to intervene in the use of force.

10

A.      *A jury could find Frank Jones used excessive force and acted with malicious and sadistic intent in violation of the Eighth Amendment*

The Eighth Amendment prohibits the use of force against a prisoner when that force is used "maliciously and sadistically." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). In determining whether force was used maliciously and sadistically, courts must consider: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury inflicted upon the prisoner"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quotation marks omitted). "From consideration of such factors, 'inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Skrtich v. Thornton*, 280 F.3d 1295, 1300–1301 (11th Cir. 2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

The core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So while the extent of injury is a factor to consider, the focus the inquiry is on the nature of the force applied, not on the extent of the injury inflicted. *Id.* "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38.

Finally, in assessing an officer's state of mind, courts also consider "threatening language as part of a totality of circumstances can be relevant to what is constitutionally reasonable or, as in this case, to the determination of reasonable inferences about the [o]fficers' subjective state of mind." *Bozeman v. Orum*, 422 F.3d 1265, 1272 n.11 (11th Cir. 2005), abrogated by *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

  i.  <u>A jury could find that Frank Jones was the assailant</u>

Robinson testified "that was Frank Jones holding that taser. Frank Jones was tasering me. That was not Fuqua at all. That was not Fuqua. That was Frank Jones with that taser." Robinson Dep. 44:8–15; 45:25–46:4; 47:24–48:4.

Defendants call this testimony "laughable" and "entirely refuted by the record before this Court." Doc. 112-1 at 16. They cite evidence that Fuqua was on duty during the incident and Fuqua's taser log showed the taser had been

12

discharged eight times. *Id.* That evidence is not disputed, but does not refute Robinson's testimony. Defendants seem to believe that it is impossible for one officer to use another officer's taser—implying the fact that a taser is assigned to one deputy means the taser cannot be handed to another.

Continuing their exaggeration, Defendants claim "Plaintiff has either continuously lied since he first complained about this incident or been completely mistaken since the beginning." Doc. 112-1 at 17–18. This is a blatant mischaracterization of the evidence. Robinson has been consistent in identifying Frank Jones as the primary assailant since he identified Jones in a court room on December 2, 2016.

The evidence shows that, on that date, the Fulton County Superior Court held a warrant application hearing at which each of the four assailants were present. Robinson specifically identified Frank Jones as officer who tased and kicked him. *See* Ex. 4, Warrant Application Transcript on 12-06-2016, at 3:20–24 ("Him right there in the middle, the one with the black. That's the one that kicked me in my face. That's the one that tased me."), ("THE COURT: What is your name? Is your name Fuqua? OFFICER JONES: My name is officer Jones, sir."). That identification followed a previous warrant application hearing at which

13

Rafferty Fuqua disclaimed that he used force on Robinson. *See* Doc. 112-10 at 4:14–20 ("Officer Jones was impersonating Officer Fuqua"), 7:3–9 (Fuqua stating "[Robinson] just said again it wasn't me"), 7:18–20 (Robinson stating that "[i]f Officer Jones had on the proper identification this man would not be here.").

Robinson has also maintained that he misidentified Rafferty Fuqua as his assailant since before this lawsuit was filed. *See* Doc. 112-10 at 4:14–20. And Robinson dismissed his case against Rafferty Fuqua on the basis of the strength of his identification of Frank Jones as his assailant. *See* Doc. 49 at 2.

Defendants argue that "Plaintiff himself acknowledges that any alleged excessive force used against him was by Officer Fuqua only." Doc. 112-1 at 18. This is a blatant misrepresentation of Robinson's testimony. In support, Defendants cite Robinson Dep. 119:5–123:23. In that span of testimony, Robinson stated: "I was in the shower being assaulted by Jones a/k/a Fuqua," *id.* 120:11–13; "and that's when Jones a/k/a Fuqua started hitting," *id.* 122:6–7; "[Q.] . . .So which deputy is the one that hit you and loosened your teeth? A. That would be Jones a/k/a Fuqua, fake name tag Fuqua Jones who was the only . . ." *id.* 84:1–5. Robinson's references to "Jones a/k/a Fuqua" stem from his initial confusion of the name of his assailant because, as Robinson testified, "Jones . . . [was] wearing Fuqua's

14

name tag. We just called him by Jones a/k/a Fuqua. That was Jones." *Id.* 49:16–19.

Robinson's other testimony is unequivocal: "Jones is the one that's dragging me," *id.* 47:22–23; "Jones is the only one that touched me," *id.* 48:1; "I remember Jones—let me tell you how I remember Jones's facial structure," *id.* 54:10–11; "that's when Frank Jones comes in and tases me in my back when I'm face down, out of it," id. 100:7–11.

Even opposing counsel, who now contends that Robinson testified that Fuqua was the assailant, acknowledged that Robinson named Jones as the assailant during her questioning. *Id.* 59:5–13 ("[Q.] Is there anything else beyond what you've already testified to which is that Jones was the one who tased you and he was the one that drug you . . ."). Any dispute over the identity of Robinson's assailant must be resolved by a jury.

ii.   A jury could find that Frank Jones acted with malicious and sadistic intent

Robinson testified that Frank Jones knocked him to the ground while handcuffed and dragged him into an area of the property room with no cameras. Then, while Robinson was still handcuffed, tased him eight times, including in the genitals, kicked him so hard that Robinson eventually lost two teeth. When they removed Robinson from the property room, the four deputies threw Robinson to

the floor while his hands were cuffed behind his back, causing Robinson to slam

face first into the floor. Apparently unconscious as a result, the deputies continued

to drag Robinson along the ground. *See* PelcoExport~40964792 at timestamp

7:34:23.

Robinson admits that, during the attack, he cursed at the deputies, and

challenged Frank Jones for being willing to attack a person who was handcuffed.

*See* Robinson Dep. 29:16–19 ("I said you hit like a bitch. My old lady hits harder

than you."), 30:1–4 ("I'm like, man, I'm handcuffed. You're a coward. You're a

coward with a badge on. You hit me while I'm handcuffed.").

The response to Robinson's statements were to drag him into the shower,

while still handcuffed, and begin to tase, punch, and kick him. Robinson 30:2–22.

During this time, the deputies present laughed and joked. *Id.* 30:19–23. Aside from

those statements, Robinson's narration of events shows that he did not engage in

disruptive conduct from the time he was knocked down and dragged to the

property room until the attack in the shower area.

After the incident, Frank Jones lied by stating to internal affairs that no

deputy used any force on Robinson. He claims he never heard a taser deployed

and never saw one brandished. *See* Jones Dep. 38:15–20. He claims this in spite of

16

clear evidence showing the use of a taser. Jones testified that "the only thing that happened inside the property room, we took the handcuffs off, made him take his cloths and put on the—the blue Fulton County uniform." Jones Dep. 36:18–21. A jury could find these statements are lies, and indicative of Jones' mental state during the incident.

By doubling down on the position that no force was used against Robinson, Defendants have admitted that Robinson did not do anything to justify any force against him. *See* Jones Dep. 36:22–25 ("the only thing that happened inside the property room, we took the handcuffs off, made him take his cloths and put on the —the blue Fulton County uniform."); Robinson Dep. 59:18–60:1 (testifying he did not do anything to justify being tased, and did show any aggression, and the tasing was not preceded by a command for him to do anything).

This evidence is sufficient for a jury verdict in Robinson's favor. *See, e.g.*, *McReynolds v. Alabama Dep't of Youth Servs.*, 204 F. App'x 819, 822 (11th Cir. 2006) (find the plaintiff "made sufficient allegations to allow the inference of malicious and sadistic intent . . . [where] [d]uring the assault, at least one defendant continued to strike the minor after he was injured . . . [and] one of the defendants made statements indicating that he derived pleasure from assailing the minor.").

17

Robinson describes a brutal attack. The taser log, medical records, and limited video surveillance support each of his allegations. A jury could easily find Frank Jones acted with malicious and sadistic intent when he dragged Robinson into an area of the jail without security camera, beat and tased Robinson, threw him to the ground, dragged him unconscious from the room, and then lied about it by claiming it never happened.

### B.   A jury could conclude that Deputy Saunders failed to intervene in the unjustified use of force

The Eighth Amendment's prohibition on the malicious and sadistic use of force concomitantly "imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099–1100 (11th Cir. 2014) (quoting *Farmer*, 511 U.S. at 832). Pursuant to this duty, "an officer can be liable for failing to intervene when another officer uses excessive force." *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]" (alteration in original) (quoting *Ensley v. Soper*, 142 F.3d 1402, 1407–08 (11th Cir. 1998))); *see also Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). "Even if an officer

18

personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'" *Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018) (per curiam) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).

This liability "arises when the officer is in a position to intervene and fails to do so." *Priester*, 208 F.3d at 924. A successful claim requires "facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct." *Keating v. City of Miami*, 598 F.3d 753, 764 (11th Cir. 2010). When events occur so quickly that the officer cannot intervene in the use of excessive force, he or she is not liable for another's constitutional violation. *Fils v. City of Aventura*, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011) (citing *Brown v. City of Huntsville*, 608 F.3d 724, 740 n.25 (11th Cir. 2010)).

> i.   <u>A jury could conclude that Deputy Saunders had knowledge of the attack, an opportunity to intervene, and failed to do so</u>

Defendants argue that "Plaintiff himself acknowledges that Deputy Saunders was not even in the room when any alleged gratuitous force was used against him." Doc. 112-1 at 3, 18. (citing Robinson Dep. 120:7–121:16). That is not an accurate

representation of the testimony.

Robinson testified that Saunders saw the beginning of the incident. *See* Robinson Dep. 122:1–11 (testifying "[h]alf of my body was inside the shower. My legs were in the shower. I'm face down and I'm looking up. I see Saunders on the right hand—the left-hand side and Jackson on the right-hand side. And that's when Jones a/k/a Fuqua started hitting and he started off with a slap fist. Then I commented he hits like a girl. And it turned into a punch and that was in front of Saunders and Jackson. That's when he gets behind me to my legs and drags me completely into the shower . . .").

Defendant cites Plaintiff's deposition testimony for the proposition that "Deputy Saunders was not even in the room when Officer Fuqua committed his alleged acts of force." Doc. 112-1 at 18 (citing Robinson Dep. 120:7–121:16). In that portion of the deposition, Plaintiff stated that Saunders and Jackson were "in an adjoining room" next to the shower where the assault occurred. *Id.* 121:4–11. Saunders could hear the punches and kicks. *Id.* 121:17–21. Saunders also acknowledges that he would have heard a taser being used. *See* IA Investigation Audio, Charolita Scandrett - Cadet Deputy Robert Saunders Followup.WMA at 11:48/19:58.

Robinson testified that Deputy Saunders acted as an overseer during the attack. Robinson Dep. 48:5–14. Saunders acted as a "bodyguard" and was laughing while Jones attacked Robinson. Robinson Dep 122:20–123:3. Robinson believes that if he "would have done something" in response to the attack, that "Saunders would have beat me." Robinson Dep 122:20–123:3. Defendants' theory is that Saunders cannot be held liable because he willfully decided not to observe an attack on a handcuffed inmate. That is not a defense to liability; that is the quintessential example of failing to intervene. Saunders had the opportunity to stop the attack, and instead he did nothing.

### C.   If a jury finds that Defendants violated the Eighth Amendment, they are not entitled to qualified immunity

Qualified immunity is not available to an officer who uses excessive force with malicious and sadistic intent. *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002). *See also Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs*, 456 F. App'x 845, 848 (11th Cir. 2012). Because a jury could find that both Defendants violated the Eighth Amendment, qualified immunity is not available as a defense. To whatever extent more clarity of the law is necessary, Plaintiff submits that the authority cited above clearly established that no reasonable officer could believe it was constitutional to beat a handcuffed inmate senseless and tase him eight times,

or to stand around and do nothing while another officer did it.

### 2.     *Plaintiff suffered great physical injury and is entitled to recover compensatory damages under the PLRA*

The Eleventh Circuit recently addressed the issue of when an injury is more

than de minimus under the PLRA. In *Thompson v. Smith*, 805 F. App'x 893, 904

(11th Cir. 2020), the court held that being pepper sprayed, which resulted in only a

temporary injury, was more than de minimus. In doing so, it noted types of injuries

which were more than de minimus. *See id.* at 904 (citing *Irving v. Dormire*, 519

F.3d 441, 448 (8th Cir. 2008) for the proposition that "a punch resulting in

loosened teeth and two months of breathing difficulties was greater than de

minimis physical injury within the meaning of § 1997e(e)."). *Thompson* also

reiterated that "routine discomforts" associated with confinement do not cross the

physical injury threshold. *Thompson*, 805 F. App'x at 904.

Here, a jury could find that the use of force resulted in the loss of Plaintiff's

two front teeth. Immediately after the attack, Plaintiff was taken to a medical

screening. That medical screener noted that Robinson had a loose tooth and other

injuries from the attack. *See* Ex. 5, Medical Screening Referral, at 1 ("mouth

injuries from altercation"); *id.* at 2 (noting "body and head injuries during

altercation tased during altercation/hit in mouth with cut lips and loose teeth"). *See*

22

*also* Interview with Dr Joyce Cosby.WMA at 02:26/08:21; Ex. 7, Dental Treatment Note ("exam shows the pt. Was hit in the mouth and tooth #8 and #9 were avulused [sic], recommended splinting the teeth . . . the prognois [sic] of the teeth is poor.").

Defendants blame the injuries to Robinson's teeth on an altercation which later in the medical unit. This encounter occurred between the time of Robinson's initial medical screenings and his visit to the dentist. Defendants argue that this second altercation is the one which "resulted in . . . Plaintiff's teeth being knocked out." Doc. 112-1 at 12. Defendants are correct that was a subsequent, and short-lived, scuffle in the medical unit. But there is ample evidence to show that the injuries to Robinson's mouth did not stem from that incident. The name of the other inmate involved is Emzell Woods. At the time Emzell Woods saw Robinson, Robinson already had a tissue in his mouth. *See* IA Investigation Audio, Charolita Scandrett - Inmate Emzel Woods#16034.m4a at 02:05/06:21. And Woods stated to the jail's investigator that he never hit Robinson. *Id.* at 03:18/06:21.

Robinson also testified that "Woods didn't really even get a lick in that fight." Robinson Dep. 72:12–15. And that the injuries to his mouth had occurred in the earlier attack. *Id.* 72:19–25. Thus, there is an issue of fact as to whether Defendants were responsible for the loss of Plaintiffs' teeth. A jury could also find

that Plaintiff suffered ongoing physical injuries from the attack. The injuries described by Plaintiff are far more than a "routine discomfort."

### 3. *Plaintiff's state law claims against Deputy Jones must proceed to trial*

The Georgia Constitution states that government employees are liable for torts committed in the performance of their official duties if done "with actual malice or with actual intent to cause injury." Ga. Const. art. I, § II, ¶ IX(d); *Gilbert v. Richardson*, 264 Ga. 744 (1994). "Actual malice" requires "a deliberate intention to do a wrongful act." *Adams v. Hazelwood*, 271 Ga. 414 (1999). In *Bateast v. DeKalb County*, 258 Ga. App. 131, 132–33 (2002), the court held that a jury could make a reasonable inference that police officers falsified evidence, and arrested the plaintiff despite knowing that she did not commit the crimes of which they accused her, and therefore would not protected by official immunity. *See also City of Atlanta v. Shavers*, 326 Ga. App. 95, 98, 756 S.E.2d 204, 207 (2014) (same), *overruled on other grounds by Rivera v. Washington*, 298 Ga. 770, 784 S.E.2d 775 (2016). Here, a jury could find that both officers lied about participating in the assault and attempted to cover it up. The evidence which establishes the violation of the Eighth Amendment shows Defendant are not entitled to official immunity.

With regard to Saunders, it is correct that he did not commit an assault or

battery against Plaintiff. But Saunders can still be liable because the assault

constituted a civil conspiracy. "To recover damages based on a civil conspiracy, a

plaintiff must show that two or more persons combined either to do some act which

is a tort, or else to do some lawful act by methods which constitute a tort. The

conspiracy of itself furnishes no cause of action. The gist of the action is not the

conspiracy alleged, but the tort committed against the plaintiff and the resulting

damage." *McIntee v. Deramus*, 313 Ga. App. 653, 656 (2012) (citations,

quotations, and punctuation omitted). All that is required is that "two or more

persons in any manner, either positively or tacitly, arrive at a mutual understanding

as to how they will accomplish an unlawful design." *Id.* The evidence shows

Saunders knew there were no cameras in the area of the jail where Robinson was

beaten, Saunders lied about there being no taser used, and lied about Robinson

being dragged unconscious from the property room. This would permit a jury to

find an agreement among the deputies to injure Robinson and to cover it up.

　　　　Submitted this 2nd day of November, 2020.

Spears & Filipovits, LLC　　　　　　　**Jeff Filipovits**
1126 Ponce de Leon Ave.　　　　　　　Georgia Bar No. 825553
Atlanta, GA 30306
678.237.9302
jeff@civil-rights.law

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this motion has been filed

electronically via the CM/ECF system which will automatically serve the

document on all counsel of record.

This 2nd day of November , 2020.

Spears & Filipovits, LLC                    **<u>Jeff Filipovits</u>**
1126 Ponce de Leon Ave.                     Georgia Bar No. 825553
Atlanta, GA 30306
678.237.9302
jeff@civil-rights.law