1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF GEORGIA

 3                       ATLANTA DIVISION

 4

 5    CASE NUMBER:  1:18-cv-2350-MHC-JSA

 6

 7    WILLIAM ROBINSON,

 8              Plaintiff,

 9    vs.

10    FRANK JONES, et al.,

11              Defendants.

12

13

14

15                       DEPOSITION

16                          OF

17                    WILLIAM ROBINSON

18                     May 19, 2020

19

20

21    REPORTED BY:

22                    Jan A. Mann, CSR

23                   Bain & Associates

24              9 Dauphin Street, Suite 100

25                 Mobile, Alabama 36602
```

```
 1              S T I P U L A T I O N S

 2

 3              IT IS STIPULATED AND AGREED by and between the

 4    parties through their respective counsel, that the

 5    deposition of WILLIAM ROBINSON may be taken before

 6    Jan A. Mann, Commissioner, at the offices of 9 Dauphin

 7    Street, Suite 100, Mobile, Alabama, on the 19th day of

 8    May, 2020.

 9              IT IS FURTHER STIPULATED AND AGREED that the

10    signature to and the reading of the deposition by the

11    witness is waived, the deposition to have the same force

12    and effect as if full compliance had been had with all

13    laws and rules of Court relating to the taking of

14    depositions.

15              IT IS FURTHER STIPULATED AND AGREED that it

16    shall not be necessary for any objections except as to

17    form or leading questions, and that counsel for the

18    parties may make objections and assign grounds at the

19    time of the trial, or at the time said deposition is

20    offered in evidence or prior thereto.

21              IT IS FURTHER STIPULATED AND AGREED that the

22    notice of filing of the deposition by the Commissioner

23    is waived.

24

25
```

```
 1              A P P E A R A N C E S

 2

 3   APPEARING ON BEHALF OF THE PLAINTIFF (via video

 4   conference):

 5       FILIPOVITS LAW, P.C.

 6       Mr. Jeffrey R. Filipovits

 7       2900 Chamblee-Tucker Road, Building 1

 8       Atlanta, Georgia  30341

 9

10   APPEARING ON BEHALF OF THE DEFENDANT (via video

11   conference):

12       OFFICE OF FULTON COUNTY ATTORNEY

13       Ms. Ashley Palmer

14       141 Pryor Street, S.W., Suite 4038

15       Atlanta, Georgia  30303

16

17   ALSO PRESENT (via video conference):

18       Mr. Jonathan Loegel

19       Ms. Amelia Joiner

20       Ms. Nancy Rowan

21

22

23

24

25
```

1              I N D E X

2

3   EXAMINATION BY:                              PAGE

4   Ms. Palmer                                     5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           I, Jan A. Mann, CSR, a Court Reporter and

2   Notary Public of the State of Alabama, acting as

3   Commissioner, do certify that on this date, as provided

4   by the Federal Rules of Civil Procedure, and the

5   foregoing stipulation of counsel, there came before me

6   at the offices of Bain & Associates, 9 Dauphin Street,

7   Suite 100, Mobile, Alabama, on May 19, 2020, beginning

8   at 9:14 a.m. CST, WILLIAM ROBINSON, witness in the above

9   cause for oral examination, whereupon the following

10  proceedings were had:

11

12           WILLIAM ROBINSON,

13  being first duly sworn, was examined and testified as

14  follows:

15

16  EXAMINATION BY MS. PALMER:

17       Q.      This is the deposition of Mr. William

18  Robinson, the plaintiff in the matter of William

19  Robinson v. Fulton County, Georgia, a civil action.

20  File number 1:19 (sic) -c, as in cat, v, as in Victor,

21  02350.  It's currently pending in the United States

22  District Court for the Northern District of Georgia.

23           This deposition is being taken pursuant

24  to notice and for all lawful purposes allowed under the

25  Federal Rules of Civil Procedure.  Today's date is May

1    19, 2020.   The time is 10:14 a.m. Eastern Standard Time.

2    The time is 9:14 Central Standard Time, which will

3    become relevant in just a second.

4                    We are doing this deposition via video

5    conference to which counsel to the parties, myself and

6    Mr. Filipovits, previously stipulated.   Plaintiff is

7    located in Mobile, Alabama with the court reporter.   His

8    counsel is located at a location here in Metro Atlanta.

9    I'm in Cobb County where my home is located and we also

10   have my colleagues joining me from various locations,

11   Amelia Joiner, Jonathan Loegel and Nancy Rowan.

12                   Mr. Robinson, I believe as Mr. Filipovits

13   already advised you before we went on the record, my

14   name is Ashley Palmer and I am here representing the

15   remaining defendants in this matter.   That would be

16   Deputies Jones and Saunders.   The court reporter has

17   already sworn you in and so those are preliminary

18   matters though I would like to just make sure we cover

19   before we move forward with the deposition.

20                   MS. PALMER:   Mr. Filipovits, do you agree

21   to reserve all objections except as to form until first

22   use?

23                   MR. FILIPOVITS:   I do.

24        Q.        Okay.   So Mr. Robinson, these preliminary

25   matters that I spoke about, they are as follows.   Do you

1    understand I'm going to be asking you questions about

2    the subject of the lawsuit that you filed against my

3    clients?

4         A.    Yes, ma'am.

5         Q.    All right.  Can you hear me okay --

6         A.    Yes, ma'am.

7         Q.    -- from where you're located?

8         A.    Yes, ma'am.

9         Q.    All right.  All right.  If you don't hear

10   a question, please don't hesitate to ask me to repeat it

11   or if you don't understand the question, please let me

12   know and I will rephrase it so hopefully you do

13   understand.  Remember your answers have to be audible

14   and so the court reporter can only write down what you

15   actually say.  She can't report nodding and you shaking

16   your head.  So when answering, please use yes or no

17   instead of uh-huh or unh-unh which we tend to fall into

18   in common parlance.

19                Please speak clearly.  I will, too.  I

20   tend to speak a little fast but I'm going to try to slow

21   myself down but speak clearly and concisely so that the

22   court reporter can hear you and accurately record what

23   you say.  As I have said, I will do the same.

24                Please wait until I finish my question

25   before you answer.  It's difficult for the court

1   reporter to take down information when both of us are

2   speaking over each other and I in turn will wait until

3   you completely finish your answer before I ask you

4   another question.

5             If you need a break at any time, please

6   let me know.  I anticipate that this deposition is going

7   to go somewhere around between two and four hours and

8   typically we might break for lunch but we are not going

9   to do that because we are on this video deposition so

10   we're going to keep it moving.  If you need a break, you

11   let me know, okay?

12       A.     Okay.

13       Q.     And please answer my questions truthfully

14   and to the best of your ability.  I'm sure your attorney

15   has already told you please don't guess.  If you don't

16   know the answer, just say that.  It's not -- these

17   aren't trick questions.  Just want the answers

18   truthfully and honestly.  So other than your lawyer,

19   have you spoken to anyone else in preparation for this

20   deposition?

21       A.     No.  No.

22       Q.     Okay.  Did you review any documents in

23   preparation for this deposition?

24       A.     No.

25       Q.     Okay.  And there may be some documents

```
 1    that I share with you.  We're going to navigate through
 2    that.  I practiced for the first time sharing last
 3    weekend.  It went fairly flawlessly so we will hopefully
 4    see how that process works today.  Are you under the
 5    influence of any drugs including prescribed medication
 6    or any other intoxicant which would affect your memory
 7    or your ability to testify in this matter?
 8         A.     No.
 9         Q.     Okay.  Would you please state your full
10    name for the record?
11         A.     William Steven Robinson.
12         Q.     Okay.  And is that Steven, S-t-e-v-e-n,
13    or S-t-e-p-h-e-n?
14         A.     V-e-n.
15         Q.     Okay.  Have you ever gone by any other
16    name?
17         A.     No.
18         Q.     Have you ever used a nickname or --
19         A.     No.
20         Q.     -- have you booked into the jail, booked
21    you in under an alias of any kind?
22         A.     No, no nicknames or aliases.
23         Q.     Okay.  How old are you?
24         A.     Forty-four.
25         Q.     Okay.  And when is your birthday?
```

```
 1          A.       June 9, 1975.
 2          Q.       Okay.  What's your current address?
 3          A.       5191 Jonesboro Road, Union City,
 4   Georgia.
 5          Q.       Okay.  And you are currently in Mobile.
 6   Is that because you're visiting family and friends --
 7          A.       Yes, ma'am.
 8          Q.       -- or trying to relocate?  Okay.
 9          A.       My grandfather has terminal cancer,
10   Stage 4.
11          Q.       Okay.  So you're down there with your
12   family?
13          A.       Yeah.  Medical.
14          Q.       How long have you resided in Union City?
15   You said Union City, right?
16          A.       Yes, ma'am.
17          Q.       How long have you resided in Union City?
18          A.       Since before 2016.  Say maybe 2014 or
19   '15.
20          Q.       Okay.  So that's where you resided in
21   2016 when this --
22          A.       Yes, ma'am.
23          Q.       -- incident arose?
24          Q.       Okay.  Who did you live with in 2016?
25          A.       That was Sierra Langford.
```

```
 1          Q.      Okay.  And who's that person?
 2          A.      That was an ex-girlfriend.
 3          Q.      Okay.  You no longer reside with her?
 4          A.      No, ma'am.  We're separated right now.
 5          Q.      Okay.  But you resided with her in 2016,
 6  May of 2016?
 7          A.      Yes, ma'am.
 8          Q.      Is she the only person?
 9          A.      Well, her mother stays there.
10          Q.      Okay.  Mom is still -- your mom is still
11  there?
12          A.      Yeah.
13          Q.      Okay.  So when you return back, you will
14  be returning back -- you and your mom will be in the
15  house together?
16          A.      You and who?  Me and her mother?
17          Q.      You and your mother?
18          A.      No.  My mother has passed.  That's her
19  mother.
20          Q.      Oh, her mother resided in the house with
21  you all?
22          A.      Yes, yes.
23          Q.      I see.  Her mother still resides in that
24  house?
25          A.      Yes, ma'am, as far as I can tell.
```

1          Q.        Okay.  But when you return back to Union

2     City, you're going to a house where your ex-girlfriend's

3     mother resides?  That's where I'm confused.

4          A.        Possibly, if we reconcile.

5          Q.        Okay.  I understand.  All right.  So your

6     girlfriend that you're currently estranged from is in

7     the house, her mother is in the house, and you

8     anticipate going back to that house if you are able to

9     reconcile.  Is that right?

10         A.        Possibly, yes, ma'am.

11         Q.        Okay.  All right.  But y'all aren't

12    married?

13         A.        No, ma'am.

14         Q.        Do you have any children?

15         A.        Yes, I have three children.

16         Q.        Okay.  Are they adults or --

17         A.        Yes, they are.  Well, two of them are

18    adults and one of them is fifteen, fifteen this year.

19         Q.        Okay.  So the adults, do they live in

20    Georgia?

21         A.        One's in the Marines and in Florida.

22    One's in Georgia, yes, ma'am, one's in Georgia and the

23    other one is in, I believe, Las Vegas.

24         Q.        Okay.  The one that's in Georgia, is that

25    one of the adult children or is that the fifteen year

```
 1   old?
 2           A.      That's an adult child.
 3           Q.      Okay.  And is that adult child in Metro
 4   Atlanta?
 5           A.      I believe.
 6           Q.      Or outside of the metro?
 7           A.      Outside of Metro Atlanta.
 8           Q.      Okay.  All right.  I ask that question
 9   because if the case were to go to trial it's important
10   for us to know who's going to be on the jury pool and
11   obviously you can't have family members on the jury
12   pool, but if they're outside of Metro, they wouldn't be
13   called in to jury.  You know what I mean by outside the
14   Metro, right?
15           A.      Yes, ma'am.  Clayton County, Cobb
16   County.  Okay.
17           Q.      All right.  Got you.  Okay.  Other than
18   those three children of yours and your mother who's
19   deceased -- I'm very sorry about that -- do you have any
20   other living relatives in Georgia?
21           A.      No, ma'am.  My father is deceased also.
22           Q.      No siblings?
23           A.      Yes, but they are outside of Atlanta.
24           Q.      Okay.  Outside of Metro Atlanta?
25           A.      Yes, ma'am.
```

1      Q.      All right.  Where do they reside?

2      A.      Clayton County and --

3      Q.      That's still Metro so that's what I mean

4    by Metro because Northern District covers a whole bunch

5    of counties.  So all right.  Let's start there.  Let me

6    ask you specifically where does your adult child live in

7    Georgia?

8      A.      King -- her mother was staying on King

9    Arthur last time that -- King Arthur Court so I

10   don't --

11     Q.      And where is that?  Do you know what city

12   that is?

13     A.      Clayton, Clayton County.

14     Q.      That's in Clayton.  Okay.  What's your

15   adult child's name that lives in Clayton?

16     A.      Nadja Dean.

17     Q.      That's a young lady?

18     A.      Yes, ma'am.

19     Q.      Okay.  So Nadja is in Clayton and how

20   many siblings do you have in Georgia?

21     A.      Two other siblings.

22     Q.      Okay.  And they both live in Clayton?

23     A.      One of them stays in Clayton.  The

24   other one stays in College Park.

25     Q.      Okay.  And what are their names?

1          A.          Donald and Alexis Robinson.

2          Q.          Okay.  Both of them last name Robinson?

3          A.          Yes, ma'am.

4          Q.          Okay.  All right.  So how long have you

5    been down in Mobile with your grandfather?

6          A.          About two or three weeks.

7          Q.          Okay.  All right.  So I noted in your

8    responses to my interrogatories that I propounded upon

9    your counsel that you attended college for four years

10   but didn't graduate.  Is that true?

11         A.          Yes.

12         Q.          How far did you get in the four years?  I

13   mean were you a sophomore, junior?

14         A.          I was a junior, and at that time, my

15   mother came down with cancer.  She started with the

16   chemo so I started spending more time at home with Mom

17   and working.

18         Q.          Okay.  So you are lacking about a year

19   and a half worth of credit you'd say or do you know how

20   many credit hours --

21         A.          About a year and a half.  It depends on

22   where I go, what credits they accept so --

23         Q.          Understood.  Okay.  Can you give me a

24   brief synopsis of your employment history?  And I don't

25   mean like when you were sixteen and worked at Target.  I

```
 1    mean --
 2         A.      Yeah, yeah.
 3         Q.      Which is what I did but I mean like, you
 4    know, post high school.  Start there.
 5         A.      Okay.  After I got out of high school,
 6    went to college and I started out bartending.
 7    Hurricane Katrina hit and I came down here and I no
 8    longer wanted to bar tend because of the lifestyle so
 9    I got into towing and recovery.  I began towing and
10    recovery with Allstar Towing.  That was the one where
11    I towed the longest with.  I was on and off with them
12    for maybe seven or eight years.
13         Q.      In Atlanta?
14         A.      Yes, ma'am.
15         Q.      Or Metro?
16         A.      Metro Atlanta.  I worked with B&L
17    towing cars for the city.  Legacy Towing.  DJV Towing.
18    JB Towing.  I worked with a lot of black towing
19    companies in Atlanta.  And during the course of my
20    training, I learned how to unlock cars, jump start
21    cars, do small mechanics on cars.
22                 After I stopped working with towing and
23    recovery, I went into roadside on my own and opened up
24    285 Roadside.  My job description was to unlock cars,
25    jump start cars, fuel deliveries, tire changes,
```

```
 1    changing alternators and starters, small mechanics.
 2    Anything that you can do in less than an hour, that
 3    was my detail and I did that from when I quit towing
 4    in maybe 2013 or '14 up until 2017 where my body could
 5    no longer handle it because I got hurt and I could no
 6    longer lift the tires and turn the screws or get on my
 7    knees because everything was hurting so I took a
 8    break.
 9         Q.      And did you do anything employment-wise
10    post 2017?
11         A.      Yeah, I tried to work at Ted's Montana
12    Bar & Grill as a dishwasher to get my money back up to
13    go back to towing and recovery, unlocking cars but I
14    couldn't -- I didn't survive to even get a paycheck.
15    I worked maybe 40 or 50 hours and I couldn't -- I
16    couldn't -- I couldn't last.  So I was replaced, of
17    course, and I've been unemployed.
18         Q.      What kind of pain were you feeling as a
19    result of the towing that you had done over the numerous
20    years?
21         A.      I could no longer lift the chains or
22    get on my knees to properly secure the car and, you
23    know, you have to properly secure the cars or they
24    come off.  With the chains, I feel the pain in my
25    joints when I lift up the chains.  Not the pain in my
```

```
 1   arms but the pain in my joints where everything is

 2   flexing.  That's where I notice the majority of my

 3   pain at and in my joints.

 4        Q.     So when you say joints, like legs, not

 5   your arms?

 6        A.     Arms, arms, shoulders and knees and

 7   hips.  It creates a throbbing pain.

 8        Q.     So you said that you have been unemployed

 9   since the Ted Montana Grill stint?

10        A.     Yes, ma'am.

11        Q.     Do you collect unemployment?

12        A.     No, ma'am.

13        Q.     Okay.  Do you collect any form of

14   assistance?

15        A.     No, ma'am.

16        Q.     How do you support yourself?

17        A.     Honestly I try to cut grass.  I have

18   maybe one or two yards.  It takes me a week to cut one

19   yard doing one part here and doing a part there and

20   then I come back and do another part and I've been

21   basically surviving off of handouts really.

22        Q.     Okay.  The girlfriend that you mentioned

23   earlier, does she work?

24        A.     I don't -- yeah, I imagine she does.

25        Q.     Okay.  You don't know at this moment if
```

1    she's working?

2         A.      No, ma'am.  I disassociated with

3    everyone in Atlanta.

4         Q.      Understood.  So other than the 2011

5    aggravated assault charge, I know there are a couple of

6    other charges that went along with that.  Do you have

7    any other criminal charges other than those?

8         A.      No.

9         Q.      Have you ever been involved in any other

10   civil lawsuits either as a plaintiff or a defendant?

11        A.      Yes.  I've been involved in a lawsuit,

12   a car accident.  I remember -- recall one time when a

13   lady ran into the tow truck and that went on my DMV.

14        Q.      Okay.

15        A.      But she got the ticket though.

16        Q.      So that was a traffic citation type

17   situation?

18        A.      Yeah, she got the traffic citation and

19   all that.

20        Q.      Okay.  Did she sue or did you sue her or

21   did the company sue her?

22        A.      The company had to sue.  Yeah, the

23   company had to sue for -- to get the tow truck fixed.

24   Yes, the company did sue.

25        Q.      Okay.  And were you a witness?  Were you

1    named?  You weren't named, were you?

2        A.      No.

3        Q.      You were just a witness?

4        A.      Yes, ma'am.

5        Q.      Okay.  All right.  So all the times that

6    you have been incarcerated -- I'm not trying to imply

7    it's a lot.  I'm just saying it's been more than one

8    time that you've been incarcerated -- it was because of

9    the 2011 case?

10       A.      You mean the 2016 case?

11       Q.      You had charges from 2011, your

12   aggravated assault --

13       A.      Yeah, yeah, yeah, that was revocations

14   when, when I went to prison.

15       Q.      So every time you've been in jail have

16   been a result of a revocation from the 2011 case?

17   Everything's been related to the 2011 case?

18       A.      Mostly all.  Me and Sierra, we did

19   argue a lot and I was taken down there for a simple

20   battery I remember, yeah.

21       Q.      Okay.  What happened with that?  Did it

22   get dismissed?

23       A.      Well, well, when I violated and went to

24   prison on a nolo contendere, and during the course of

25   me being in prison for the nolo contendere, the court

1   case came back up, and when I was in prison, they

2   issued a warrant.  So when I got out of the prison,

3   they notified me of the warrant and I went in to a

4   sergeant's office and we had supposedly taken care of

5   that.

6              When I requested for a court date, they

7   said that it was in limbo.  That's the exact

8   terminology, that that was in limbo right now.  So

9   that's the one that's still open and it's in limbo.

10  There's no court date or anything for it.

11       Q.       And what year was that when the simple

12  battery came about?

13       A.       That was in 2017 because we was arguing

14  and she had a cut on her finger or something and I

15  think -- yeah, yeah, I went to jail for it and I

16  bumped into Markennis Jackson inside the jailhouse and

17  that's how I get the terrorist threat thing because

18  they -- I guess they thought I didn't realize

19  Markennis Jackson because he didn't have on a name tag

20  at that time.  So they walked him in front of me and

21  that's how the terroristic threat thing -- because I'm

22  like, oh, I remember you, yeah.  So that's how the

23  simple battery and the terroristic wound up on that

24  same arrest ticket.

25       Q.       I see.  And those are both still open to

1  your knowledge?

2        A.      Yes, ma'am.

3        Q.      And how long were you in jail on those?

4        A.      When they realized that I recognized

5  Markennis Jackson, they kicked me out of the jailhouse

6  and gave me a citation.  I didn't -- I wasn't

7  incarcerated.  They just gave me a citation and told

8  me to come back at a late date which the date is --

9  you know, still don't know it.

10        Q.      That was in 2017?

11        A.      Yes, ma'am.

12        Q.      Okay.  Got you.  So other than the simple

13  battery we discussed, the 2011 case which was the agg

14  assault that you said you pled nolo to, you got ten

15  years probation on that?

16        A.      No, I didn't pled nolo.  I pled guilty

17  to the aggravated assault.

18        Q.      Okay.

19        A.      I got ten years probation because it

20  was really a weak case.  I pled out to it.  My mother

21  was dying of cancer so I wasn't even risking no time

22  with that.  So I pled out to it.

23              And the nolo came from me and my

24  daughter arguing.  She was beating my car and throwing

25  bricks and stuff through the window of my car.  So the

1    police come out and they asked me what's going on.

2    I'm like she's throwing bricks through the car, blase

3    blah blah.  He's like you want to work her.  I'm like

4    no, let her go.

5              And then she calls the police on me and

6    she says that I kicked her through a wall, but then

7    when we go to court, they change their lie because it

8    was a lie.  They changed it up and the judge like, no,

9    I'm throwing it out and he gave me the nolo

10   contendere.  It should have been a nolo prosecute but

11   it was a nolo contendere.  Even which ways, I signed

12   it which was a violation of the probation because I

13   could only take prosecute.  Nolo contenderes are not

14   acceptable as a guilty plea from what I've learned.

15        Q.    Got you.

16        A.    And that was the trigger for me to go

17   to prison because it was a violation of the probation

18   even though I didn't do anything wrong and I made the

19   wrong plea and I learned the hard way.

20        Q.    And what year was that when you got sent

21   to prison?

22        A.    That was I believe 2018.  It had to be

23   2017 or '18 --

24        Q.    Okay.

25        A.    -- when I was released.  I think it was

1  in September.

2        Q.        Okay.  And the charge with your daughter

3  that you pled nolo to, was it a cruelty to children?

4  Was she an adult or a child?

5        A.        A child.

6        Q.        Okay.

7        A.        She was sixteen.

8        Q.        Okay.

9        A.        Yeah.  It was a nolo case.  It wasn't

10  cruelty to children or anything like that.  I think it

11  was like trespassing or something but, yeah, I just

12  pled to it.

13        Q.        Okay.  Got you.  So tell me -- we're

14  going to move to the current lawsuit now so May 2016.

15  Tell me about the circumstances behind your

16  incarceration in the Fulton County Jail in May 2016.

17        A.        Okay.  Me and probation officer,

18  V. Mims, were not seeing eye to eye.  I kept asking

19  for a new probation officer and revocations because I

20  was working roadside.  And when I went into her

21  office, I had to pay for parking, right, and she never

22  kept a time of the probation.

23              So if I had to go in there at 12

24  o'clock, I wouldn't get seen until two, 2:30 and I'm

25  paying for parking and I'm losing calls on my job.  So

```
 1    finally I got frustrated with it and I'm, like, if
 2    revocation I'd rather do my time in jail to get it all
 3    out of the way and just be gone for one specific
 4    amount of time than to take off two times or how many
 5    ever many times to come into the office and still lose
 6    because I keep giving them excuses.  I'd rather give
 7    them one big excuse at one time.  So we went to the
 8    court.  The judge agreed and I went to jail from the
 9    courthouse, the judge -- fifteen days so --
10         Q.      Okay.
11         A.      So I go to the jailhouse and I put my
12    hands on the wall just like everybody would, you know,
13    hands on the wall.  And while my hands on the wall, a
14    deputy behind me grabs my arm, which causes the
15    shoulder injury, and he slams me on the ground.  As
16    soon as --
17         Q.      What date was this?  Do you remember what
18    date this was?
19         A.      This was -- this was as soon as I got
20    out of the court.  I was booked into the facility.  It
21    was not -- it's before even intake.  It's pat down,
22    pat down to intake.  They pat you down for weapons and
23    drugs.
24         Q.      I think May 2, 2016.  Does that sound
25    right?  Or if you can't remember, it's fine.
```

 1        A.        It's, it's right after I went to -- May

 2   2nd or May 3rd.

 3        Q.        Okay.

 4        A.        May 2nd or May 3rd.  It's like, you

 5   know, right after I went to court.  From the court,

 6   they put me in handcuffs from the courthouse to the

 7   jailhouse.

 8        Q.        Okay.  And you went to Rice Street?

 9        A.        Yes, ma'am.

10        Q.        Okay.  So the officers pat you down and

11   you say he injured your shoulder.  Was it on purpose or

12   was he just --

13        A.        It was intentionally -- it was

14   intentionally.  When he slammed me to the ground, he's

15   like what is that you have in your hand.  And by that

16   time, other deputies in black suits came in and I had

17   nothing in my hand at all.  I didn't have anything in

18   my hand.  There was no reason for him to touch me.  My

19   face was to the wall -- I mean my back was to him.  He

20   just grabbed my arm and commenced the breakage.

21             And when I hit the ground and it

22   started burning, I couldn't open up my arm.  And of

23   course they threw me in the chair and I'm screaming

24   like (deponent makes sound) in pain because it's

25   throbbing like real throb inside like a broken bone

1  throb type pain, throb with a heartbeat and I'm

2  basically hollering, like, hollering in pain.

3            I guess they think that's aggressive.

4  Throw me in the chair and they wheel me to a part of

5  the intake where there's just a hallway and there's a

6  padded room a little bit further down.  And I'm

7  strapped to a chair and I sit strapped to a chair for

8  hours and I'm, like, in pain, tears, pain like I need

9  help.

10           I realize that broken bones need to be

11  addressed immediately so I'm trying to get this

12  addressed immediately before it starts to heal.  They

13  think that I'm trying to demand that I be processed or

14  I'm bullying my way or whatnot.  I'm not bullying my

15  way.  I'm in pain and it needs to be addressed.

16           They say, all right, get out of the

17  chair.  They put me in this padded room.  You calm

18  down.  I'm like, man, this has nothing to do with

19  calm.  This is pain.  Right.  I need to get this --

20  this is pain.  And it's not thirty minutes.  This is

21  hours of it just paining, burning.

22           Finally they let me out of the room and

23  they say, okay, we're going to bring you to medical.

24  Okay.  Sit in that seat right there, and when shift

25  change comes through, we're going to take you to

1    medical.

2              I showed the guy that was at the desk

3    where they put a thumbprint in and I showed him where

4    the bone's sticking up.  And I'm like, man, this is

5    not right.  The bone is sticking out of my shoulder

6    and I compared it to the other shoulder.  I'm like

7    something is wrong with my shoulder.  It's hurting

8    bad, man.  I'm like -- he's like sit right there, man.

9    It don't look right.  It don't look right.  We're

10   going to take you to medical.  So I sat there

11   patiently.

12             Then finally shift change comes.  He

13   gets up and I think I'm going to medical.  The guy

14   grabs me and the pain struck again so I pull away.

15   When I pull away, blank period.  Blank period when I

16   pull away.  When I come to, I'm being drug by my

17   ankles and I'm handcuffed with my hands behind my back

18   towards the room where you see on video where their

19   faces are smudged out.  They stopped dragging me there

20   and they say get up and walk.

21             I tried to get up and walk, but by the

22   guy dragging me by my ankles, the shackles gripped

23   into my ankles.  I mean they're gripped into it.  They

24   are cutting into my ankles.  So I stand up.  I walk a

25   few paces and realize how tight they are.  I mean

```
 1    they're extremely tight, cutting tight and I'm like,

 2    man, I can't, I can't walk.  And that's when you see

 3    him drag me into the shower area.  He be dragging --

 4         Q.      Who is he?

 5         A.      Say --

 6         Q.      You say he drug you into a shower area.

 7    Who is he?

 8         A.      The tag that he named -- had on was

 9    Rafferty Fuqua but --

10         Q.      Okay.

11         A.      -- it was not Rafferty Fuqua.  Okay.

12    So he drags me into the shower, right, and I'm

13    cussing, blase blah.  He started with the hitting.

14    When he hit me, my hands were behind my back and my

15    feet were shackled.

16               First it started off as a slap and it

17    aggravated me so I taunted.  I said you hit like a

18    bitch.  My old lady hits harder than you.  When I said

19    that, the slap --

20         Q.      You said that to the man who had the tag

21    that said Rafferty Fuqua?

22         A.      Yes, to the man wearing the tag

23    Rafferty Fuqua.  That's when punches -- I mean that's

24    when slaps turned into punches and I'm, like, bitch,

25    I'm handcuffed.  I guess he thought that, like, that
```

1    if the handcuffs were off that I was going to fight.

2    I'm, like, man, I'm handcuffed.  You're a coward.

3    You're a coward with a badge on.  You hit me while I'm

4    handcuffed.

5              Drags me into the shower.  That's when

6    the assault and the tasing went on.  It was like --

7    when I looked in his eye, it seemed to me like he was

8    getting enjoyment out of it, like shocking me from one

9    part to the other.  Shock to the lower part, of

10   course.  And the whole time where he's shocking me,

11   when he -- he uncuffs my hands.  I'm still shackled by

12   the feet and he's hitting me.

13             And at some point when I was handcuffed

14   and shackled, I couldn't even block the hit.  I just

15   had to take the hit.  So as he's taking the handcuffs

16   off, like I said, he never -- he never took them both

17   off at the same time.  It was either one or the other.

18   It was accompanied with a hit, a kick or a tase.

19             So finally he hits me.  I remember when

20   the teeth crushed down, it tasted like hard rock and

21   hard shell when I bit down.  That's when I knew, like,

22   that he was really hurting me so I'm cussing.

23             They laugh and joke.  Markennis Jackson

24   is on the right-hand side.  Saunders is on the

25   left-hand side.  Saunders said absolutely nothing.  He

```
 1   just looked, but if I would have responded physically,
 2   then, you know, Saunders would have jumped in and
 3   Jackson would have jumped in.  So I knew it was a
 4   no-win situation.
 5            Whenever they're hitting me and I'm
 6   coming to, I don't remember how, how they knocked me
 7   out.  I don't remember that.  All I remember is coming
 8   to.
 9            Now after the incident in the shower,
10   right, teeth are out and I'm carried out.  I saw the
11   video.  I was carried to another cell.  When I came to
12   in that cell, I came to face down, half clothes,
13   handcuffed and shackled to a taser in the middle of my
14   back and I'm handcuffed face down.
15            And the guy that tasered me was the one
16   that had on the fake Fuqua tag on and I'm handcuffed
17   and face down.  So I get up.  My knees are hurting,
18   back hurting.  I believe I fell.
19            And a female guard walks by, but
20   understand, I'm half clothes so -- and my hands are
21   still behind my back and my legs are still shackled
22   and I ask for help and I'm half clothes, half naked,
23   right.  I mean everything is exposed.  She looks at me
24   and I guess she thought that I was one of those sexual
25   type inmates because she looked at me with disgust and
```

1    she kept going.

2              So we get to the medical part and it

3    seemed like a movie.  Like, it was surreal.  So I

4    asked -- I asked them what's your names.  All three of

5    them are leaning against the medical desk.  Kennis

6    Jackson is first, fake Fuqua second, and Saunders

7    third.  No one would give me a name.  I asked them, I

8    said, man, F-u-q-u-a.  Pronounce it for me.  He would

9    not say nothing and I was like I know why you're not

10   saying anything.  Got something for you.

11             So from there, we went to I believe it

12   was where you take your pictures and the shackles are

13   tight.  I'm asking him take these shackles off again.

14   These shackles are way too tight because they had

15   already been cutting in and they were still tight.

16             They huddled in a group, not Markennis

17   Jackson.  Saunders and fake Fuqua, they huddled in a

18   group.  They take my picture.  Then we go to medical.

19       Q.      Okay.  I have a bunch of questions to ask

20   you so I'm going to go back to after the incident with

21   the -- well, I want to start with the initial incident

22   that you referenced about the officer who threw you down

23   to the floor and you said broke your arm.  What's that

24   person's name?

25       A.      That guy, I have -- I don't know who

```
1    that guy was.  I tried to get his name, but after
2    everything that transpired, that was the last thing on
3    my mind was remembering his name.  I just remember he
4    was a dark-skinned guy around my height, low haircut.
5         Q.     Okay.  And so remind me how you first
6    interacted with these other officers who you say
7    assaulted you?  How did that interaction come about?
8         A.     You're talking about three officers,
9    the three unnamed officers?
10        Q.     You're saying three, and at the
11   preliminary hearing, I think you remember that you had,
12   Judge Schwall, apparently there were four identified.
13   So are you saying --
14        A.     Not --
15        Q.     -- it was just -- are you saying it was
16   just --
17        A.     There were three --
18        Q.     Okay.  Mr. Robinson, we're not talking
19   over each other, okay.
20        A.     Okay.
21        Q.     You may disagree with me but don't talk
22   over me.
23        A.     Okay.
24        Q.     I let you talk for like twenty minutes so
25   don't talk over me.
```

```
 1        A.        All right.  All right.  All right.
 2   Yes, ma'am.  I'm sorry.
 3        Q.        All right.  Thank you.  So going back to
 4   the preliminary hearing, do you recall that?
 5        A.        Yes.  Well, about the four officers?
 6        Q.        Right.
 7        A.        Okay.
 8        Q.        The preliminary hearing transcript said
 9   there were four officers.  Are you now testifying under
10   oath there were only three officers?
11        A.        There was never four officers.  It was
12   three officers.
13                  MR. FILIPOVITS:  Stop for a second.
14   Ashley, if you're going to ask him about the contents
15   of the document, can we show it to him so we can --
16                  MS. PALMER:  Certainly.  I'll pull it
17   up.
18                  MR. FILIPOVITS:  Thank you.
19                  MS. PALMER:  Give me a second to pull
20   it up, okay.
21                  MR. FILIPOVITS:  No problem.
22                  MS. PALMER:  Do a search to see how to
23   come up faster.  Can you see my screen, Mr. Robinson?
24                  MR. FILIPOVITS:  Right now, we've just
25   got a blank screen but like it went to the screen
```

 1 | sharing view.
 2 |            MS. PALMER:  You can't see anything?
 3 |            MR. FILIPOVITS:  Correct.
 4 |            MS. PALMER:  It says my -- oh, I know now
 5 | what I did.  All right.  You should be able to see it
 6 | now.
 7 |            MR. FILIPOVITS:  Yeah, the top of your
 8 | web browser.
 9 |            MS. PALMER:  Let me see if I can make
10 | this bigger.  Still just the top part of the web
11 | browser?
12 |            MR. FILIPOVITS:  Yeah.  Which transcript
13 | are you trying to pull up, Ashley?
14 |            MS. PALMER:  I am pulling up the one
15 | where Judge Schwall had Deputy Fuqua, the real one,
16 | under oath and asked him to identify who the people were
17 | on the video and he said there were four of them.
18 |            MR. FILIPOVITS:  Let me just -- are you
19 | using that Bates number version?
20 |            MS. PALMER:  Yes, the one that you sent
21 | me.  Let me go back to it.  Hold on one second.  So let
22 | me see.  I'm looking at Bates number 00847 right now.
23 | Let me scroll down and see where the specific
24 | information is about there being four individuals.
25 |            MR. FILIPOVITS:  And right now, we see

```
 1   your Gmail you've got opened up, the Zoom meeting link.
 2   I wanted to let you know just in case you accidentally
 3   open --
 4              MS. PALMER:  Oh, that shouldn't be
 5   sharing.  I don't know why it's not sharing this one.
 6              MR. FILIPOVITS:  I wanted to make sure.
 7              MS. PALMER:  I don't know why it's not
 8   sharing this screen.  You should be looking at the
 9   transcript but you're not seeing that at all?
10              MR. FILIPOVITS:  It's just like the
11   address bar, your tab bar on your browser.
12              MS. PALMER:  That is so weird.  All
13   right.  I'm going to stop share for a second.  Well, no,
14   I can't stop share because I have to keep looking at
15   this document.  Let me --
16              MR. FILIPOVITS:  Now we have your whole
17   browser so you got it --
18              MS. PALMER:  Yeah, my PDF is opening.
19   The PDF I'm trying to share with you is opening up in
20   the browser rather than opening up in the PDF document
21   and my tech support has gone back to work.  I need my
22   husband.
23              MR. FILIPOVITS:  I don't know if you're
24   going to need this for other stuff but if you want to
25   just read to him the transcript just so --
```

 1            MS. PALMER:  Sure.  Let's do that.  Let's

 2    do that.  The other documents because they were smaller

 3    I won't have the same issue sharing those but this had

 4    to download and it's giving me some problems so --

 5            Q.     All right.  So Mr. Robinson, I'm going to

 6    read to you a portion of a transcript that we were just

 7    talking about before Judge Schwall.  Let me go to the

 8    date of it to make sure that's perfected on the record.

 9    January 26th of 2017, present before Judge Small --

10    Judge Schwall, excuse me, with yourself, Robinson and

11    Rafferty Fuqua.

12            So this portion of this transcript was

13    produced to me by your counsel in response to discovery

14    that I had propounded upon him.  I'm going to refer you

15    to a particular Bates number.  I'm going to start with

16    plaintiff's Bates stamp 00854 and I'm going to start

17    with "The Court".

18            So it says, The Court:  All right, so

19    we're talking about two different dates?  Mr. Fuqua:  So

20    the incident -- The Court:  Is that right?

21    Mr. Robinson:  He is lying.  What is he lying about?

22    When I came in the jailhouse, I went straight from that

23    floor.  I was not there one day.  The Court:  You're not

24    saying that he physically -- Mr. Robinson --

25            A.     I'm listening.  I'm listening.  Hold

1   on.

2         Q.      Okay.

3         A.      Background noise.

4         Q.      I heard it so --

5         A.      Okay.

6         Q.      All right.  So I'll go back to what I'm

7   reading.  So the Court says you're not saying that he

8   physically abused you, he threatened you?  And when he's

9   saying that, I'm assuming he's referring to Mr. Fuqua

10  who's present in court with you.

11                You stated -- this is you, Mr.

12  Robinson -- the ones that drug me in intake had on

13  Fuqua's name tag.  That was Officer Jones.  The ones on

14  intake.  The Court:  You're not saying this man kicked

15  you in the teeth or knocked your teeth out or broke your

16  toe?  Mr. Robinson:  If his name is Fuqua, that is the

17  guy that assaulted me.

18                The Court:  You just told me he wasn't

19  the guy.  Mr. Robinson:  Fuqua.  And  then the Court

20  cuts you off and says you're telling me Jones is wearing

21  Fuqua's uniform.  He's wearing Fuqua's uniform?

22  Mr. Robinson:  No, it's not this man.

23                The Court:  She's going to let you write

24  that down, okay?  And then you say -- Mr. Robinson:

25  It's Jones because he was impersonating Fuqua.  It's

1   Jackson.  Jackson was making the jokes.  The other
2   fat-lipped guy who's the one he's talking -- the Court
3   said who's the guy?  Mr. Fuqua.  That's Saunders,
4   M. Jackson and DO Jones.  The Court said, all right,
5   she's writing that down for you and you can go to the
6   warrant office.
7                And then we're going to skip to another
8   part down part where Fuqua says -- I'll tell you the
9   Bates stamp number in a second.  Plaintiff's number
10  00857.  So you say -- the Court says I have ordered the
11  sheriff's department to give the names.  I can't do
12  anything further.  You said this man did not abuse you.
13  I don't condone any improper treatment or brutality and
14  these videos are in the record.  They are so admitted
15  and we are now adjourned.
16               You say, Your Honor, he said he was in
17  the video, didn't you?  The Court:  He said he was in
18  the video.  Mr. Robinson:  And then he did say he was
19  not there.  The Court said we're talking about two
20  different dates.  He sat there and lied.  And the Court
21  said it's two different dates?
22               And so in that hearing, Mr. Fuqua said he
23  was in the video.  So that's four people because you
24  said there was a fake Fuqua, there's a real Fuqua and
25  there's two other people?

```
 1          A.      No, no.

 2          Q.      (Inaudible).

 3          A.      Here's, here's what it was.  There was

 4    three people in the video.  Three people.

 5          Q.      I'm not talking about the video for a

 6    second.  I want to talk about who was physically

 7    present.

 8          A.      Physically present?

 9          Q.      Three --

10          A.      Two people, two people did not have on

11    a name tag and the other guy had on Fuqua's name tag

12    which turned out that it was not Fuqua.  So

13    technically it's, it's, it's four people because he's

14    impersonating Fuqua but realistically there was three

15    people there because one person, one -- it was three

16    people there.  One person is wearing the name tag that

17    if that person -- go ahead.

18          Q.      Deputy Fuqua in that hearing said he was

19    there.

20          A.      No.

21          Q.      That's on the record.  You're saying he's

22    lying, he was not there?

23          A.      No, he was -- he was -- he was never

24    there.  He was never there.  If you look at

25    LaShaundra, LaShaundra Childs's statement with the
```

1      department of whoever, she says that she recalls Frank

2      Jones because that's -- she says Frank Jones put me in

3      handcuffs and the guy that put me in handcuffs does

4      not have on Jones's name tag.  It's Fuqua.  Fuqua was

5      never there.  And then Saunders himself says that it's

6      Jones.

7                Fuqua was added because it's Fuqua's

8      name tag.  Fuqua was never there, ever.  He may have

9      been in the building, but if I can remember, Saunders

10     and Jackson, without a name tag, I remember your face.

11     I'm not good with names but I remember your face.  If

12     I can remember them, then I remember who put their

13     hands on me.

14                And Fuqua, he let them use the name tag

15     because if they would have been -- if they would have

16     been tagged up right, if all of them would have had on

17     name tags, there wouldn't be this issue of who was

18     what and what was where because we got -- we got your

19     name tags but they had on false identification.

20     That's how Fuqua comes in.

21          Q.     How do you know -- how do you know he let

22     them use the name tag?  What evidence do you have to

23     substantiate that?

24          A.     Well, well, you're right.  I don't have

25     evidence to say that, hey, I gave you the name tag but

1  no officer is going to let -- well, no sheriff's

2  deputy is going to let a detention officer impersonate

3  his being without -- that guy couldn't have got access

4  to Fuqua's name tag unless Fuqua gave it to him.  It's

5  impossible.

6          Police don't let corrections officers

7  use their name tags or anything.  The sheriff is

8  higher than the police.  It was impossible for Fuqua

9  to be there.  He said in court that he was not there.

10 Then he said in court that he was there.  I know that

11 you're not there because that's three people on that

12 tape that assaulted me.  I lived through it.  That

13 tape does not show the pain.  I was there.  I seen

14 three people, Jackson, Jones, fake Fuqua, a/k/a Fuqua,

15 and Saunders.

16      Q.     So when Fuqua walked into the hearing

17 that day back in January of 2017, you had no idea who he

18 was?  That was the first time you had seen him?

19      A.     All I was going off was Fuqua -- is

20 your name Fuqua?  Okay then.  You're Fuqua.  That,

21 that Fuqua?  I was going off the name tag.

22      Q.     You just said you were good with faces.

23 So I'm asking you was that the first time that you had

24 ever seen Mr. Fuqua or had you seen him before?

25      A.     That's my first time ever -- I believe

1    it was my second time.  During, during the thing with

2    the probation officer when I walked out the probation

3    officer's office, I noticed a deputy looked just like

4    Fuqua, the real Fuqua we're talking about.  When we

5    went to court, I'm like this got to be Fuqua but I

6    didn't realize that it was this thing where Fuqua

7    would let somebody else use his name tag because

8    Jones, Jones, Jones, Jones, Jones is, is clearly

9    identified by his peers in the statements that he

10   wrote.

11         We could -- we could set aside

12   everything that I'm saying and we could go strictly to

13   their paperwork.  Inside their paperwork in the OPS

14   investigation, it's clearly they identified each

15   other.  LaShaundra Childs ain't never even bring up

16   Rafferty Fuqua at all and -- at all.  She does not

17   even put Rafferty Fuqua there.

18         Q.    I want to refer you to Plaintiff's Bates

19   stamp number 00054 which is the taser report.  It

20   indicates that Mr. Fuqua's taser was the one that was

21   discharged eight times.  So you are saying paperwork is

22   not putting him there but your own discovery puts him

23   there.

24         A.    That's --

25         Q.    So are you still saying -- okay.  Don't

```
 1    interrupt me.  Now come on now.  We're not going to do
 2    this.
 3         A.      Okay.
 4         Q.      So are you still sticking by the point
 5    that he was not there despite the OPS records show his
 6    taser is the one that was discharged against you?
 7         A.      Okay.  Once again --
 8         Q.      Are you aware of that?  Were you aware of
 9    that?
10         A.      Once again, that was Frank Jones
11    holding that taser.  Frank Jones was tasering me.
12    That was not Fuqua at all.  That was not Fuqua.  That
13    was Frank Jones with that taser.  And Frank Jones had
14    on that name tag, Fuqua.  That was Frank Jones with
15    that taser.
16              The reason why -- the reason why he
17    failed the lie detector test about did you use the
18    taser, because he had no knowledge of that taser being
19    used.  That was Frank Jones using that taser.  That
20    was not Fuqua.  Fuqua --
21         Q.      Who failed -- who failed the lie detector
22    test?
23         A.      Fuqua, Frank Jones and --
24         Q.      And --
25         A.      -- Markennis Jackson.  I passed it.
```

```
 1           Q.       Right.  So when he was asked about the
 2    taser, Mr. Fuqua, and he lied --
 3           A.       Uh-huh.
 4           Q.       -- which is why he got fired --
 5           A.       Yes.
 6           Q.       -- you're saying that the lie was based
 7    on the fact that he had no knowledge that his taser was
 8    used?
 9           A.       He lied -- he lied in -- he lied in --
10    when they ask you in the lie detector test, they ask
11    you a series of questions.  They don't ask you one
12    question.  I'm saying he --
13           Q.       We're not going into that.
14           A.       He told the trooper --
15           Q.       Stop, stop.  I need you to answer my
16    question.  Are you saying -- because this is what you
17    just testified to -- that Fuqua, the reason why he
18    failed is because he lied about the fact that he was --
19    the lie was based on the fact that he was unaware that
20    somebody had used his taser?  Is that what your
21    testimony is?
22           A.       My testimony is he failed the lie
23    detector test because he was untruthful about the
24    ordeal.
25           Q.       Right.  Untruthful about the fact that he
```

```
1    had not used a taser when the records clearly show that
2    he had?
3         A.        That was -- and once again, yes, ma'am,
4    that was Jones using that taser.  That was not Fuqua.
5         Q.        Are you aware that the sheriff's office
6    when they assign tasers to their deputies that there are
7    records that show the taser number you have been
8    assigned to?
9         A.        Yes, ma'am.
10        Q.        Okay.  So now you think that the
11   sheriff's office is in cahoots and they lied about the
12   fact that Fuqua had a taser because that's essentially
13   what you're saying?  The OPS report clearly says that
14   it's Fuqua's taser.  So is it your testimony that the
15   sheriff's office is now -- everybody is in cahoots and
16   trying to say it was --
17             MR. FILIPOVITS:  Object to the form.
18   It's argumentative.
19        Q.        Okay.  You can still answer.
20        A.        Is it my opinion?  Well, it's not my
21   opinion.  It's fact.  It's fact that they were
22   misrepresenting themselves.  Those were -- he was not
23   even qualified, Jones, to even use a taser.  Those
24   were sheriff's correction officers.  That was not
25   Rafferty Fuqua at all.  I passed the lie detector
```

test.  I have no reason to lie.  None at all.  It does
not benefit me to lie on anyone.  At the end of the
day, they did it.

Q.    So why do you think Mr. Fuqua would have
put himself there as he clearly said at the January 2017
hearing that he was there?  So why do you think he would
put himself there?

A.    Because if he does not stick to his
lie, it would kind of, like, get everybody in trouble.
It's a conspiracy is what I'm saying because you don't
let nobody use your name tag, and if it wasn't a
conspiracy, why everybody failing a lie detector test?

Q.    So going back to the incident, you said
that somebody put shackles around you.  Who was the one
that put the shackles around you?

A.    That was Jones --

Q.    Okay.

A.    -- wearing Fuqua's name tag, the fake
Jones.  We just called him by Jones a/k/a Fuqua.  That
was Jones.  And LaShaundra Childs's statement, she
says, oh, now I recall after seeing this one.  Jones.
She didn't say Fuqua.  Jones is the one that's
dragging me.  Jones is the only one that drug me.

Markennis Jackson did not touch me.
The comedian, he did not touch me.  Saunders did not

1  touch me.  Jones is the only one that touched me.

2  Jones is the only one -- well, LaShaundra Childs says

3  shackled me.  Saunders also said Jones drug him into

4  the shower.  That is Jones, not Fuqua.

5       Q.       Okay.  So if Saunders didn't touch you,

6  why are you suing him?

7       A.       Because he acted as an overseer.  If,

8  if I would have, he would have beaten me.  Secondly,

9  his oath of office is to protect me.  If he's seeing

10  that someone is abusing me especially while in

11  handcuffed and shackled, it is your duty to say, hey,

12  stop that, you can't beat him.  He is -- he is

13  subdued.  He can't protect himself in handcuffs and

14  shackles.

15       Q.       So you acknowledge that you were cussing

16  at the officers?

17       A.       Ma'am, what else could I do if you're

18  slapping me in my face?  After you slap me in my

19  face --

20       Q.       I mean before that.  Before that, didn't

21  you say you made some reference about somebody's mama

22  and called them a bitch?

23       A.       No, I didn't call nobody mama a bitch.

24  I never called nobody --

25       Q.       I didn't say their mama.  I said you used

```
 1   the word bitch.  Didn't you testify earlier that you
 2   made some kind of comment --
 3          A.      When --
 4          Q.      -- and that's what got them all upset?
 5          A.      Okay.  When I'm being drug into the
 6   shower, I didn't recall being knocked out.  I woke up
 7   to being drug by my feet, by the shackles towards the
 8   showers.  When I woke up in pain, the first thing I
 9   started doing was, oh, you a bitch.
10                  That's -- what else -- what else would
11   you say when someone's dragging you by your feet with
12   iron?  You're not going to wake up and say, oh, please
13   stop.  You're going to wake up in the worst mood that
14   you ever woke up in your life.  You been -- you coming
15   back to consciousness.  I don't think anybody is going
16   to say anything nice being drug by your feet in
17   shackles like a slave.
18          Q.      So why did they initially put the
19   shackles on you and drag you?
20          A.      I have --
21          Q.      Do you know?
22          A.      I have no idea.  None.
23          Q.      So you are just sitting down and suddenly
24   three people -- not four -- three came and threw some
25   shackles on you?
```

1          A.        It wasn't -- it wasn't like that.

2    After the guy -- the guy touched me and I pulled away,

3    I don't remember anything but waking up in handcuffs

4    and shackles.  I don't -- I didn't -- I didn't hit the

5    guy.  I didn't throw a punch.  I got knocked out on

6    the floor, put in handcuffs and shackles and drug by

7    my feet.

8                    Maybe they were dragging me by my feet

9    because they realized that they knocked me out and it

10   had to be some type of story where, oh, he was doing

11   something.  When that guy puts those shackles on me, I

12   don't remember those shackles.  I don't remember my

13   hands going behind my back.  I remember being I wake

14   up and I'm being drug face down to a room.

15                   I did not fight that guy.  I did not

16   throw a punch.  I did not say anything to the three

17   guys that were unnamed, the one with the fake name.

18   He's unnamed, too.  The three, Rafferty Fuqua, the

19   fake Rafferty Fuqua, which is Frank Jones, Markennis

20   Jackson and Saunders, I don't even remember them

21   putting knee in handcuffs and shackles is what I'm

22   telling you.

23                   There was not no walking up to me, oh,

24   you a bitch.  No, it wasn't none of that.  It wasn't

25   no, oh -- it wasn't none of that.  All that came from

1   behind me because the guy was on the side of me.  It

2   wasn't in front of me.  It came from behind me.  And

3   when I woke up, hands were behind my back.  My feet

4   were shackled and I was being drug.  I don't -- look

5   at the videotape, this one.  It should be on this one.

6          Q.     How did you get knocked out?

7          A.     When you get knocked out, it ain't like

8   somebody punches you in your face and you're like, oh,

9   I'm knocked out.  No, it don't work like that.  When

10  you get knocked out, you just remember you be standing

11  up and then you wake up, you're on the ground.  You

12  don't --

13         Q.     You don't remember being hit?  I mean I

14  understand what you're saying but you usually remember

15  something right before someone knocks you out.  Was

16  there a pipe in their hand --

17         A.     I --

18         Q.     Okay.  Don't interrupt me.  I'm still

19  talking.  Nobody had, like, a pipe in their hand.  They

20  didn't punch you up side your head.  You just all of a

21  sudden you feel some little twinge in your shoulder, and

22  when you wake up, you're being drug and you don't

23  remember anything about how that happened?

24         A.     I was face forward as I am now.  The

25  guy that pulled my shirt, he was to the right of me.

1    When he pulled me to the right, pulled against my

2    shoulder, I pulled away.  As soon as I pulled away,

3    I'm being drug.

4              I don't remember contact with any of

5    those officers at all.  I don't remember even -- I

6    don't even see them until stand up.  Like one, two,

7    black shirt, black shirt, name tag.  I can't even

8    remember even coming into contact with those guys at

9    all.  I just -- I remember when I was being drug by

10   the shackles though.  They hit me from behind.

11        Q.        Sorry.  I didn't mean to interrupt you.

12   I thought you were done.  Okay.  I'm sorry.

13        A.        I had to be hit from behind or slammed

14   from behind or slammed on my head from behind but it

15   happened, something from behind.  It had to be.  Trust

16   me, if they were in front of me, I would have saw

17   them.  They were not in front of me.  I don't remember

18   them at all.

19              And I pulled away from that guy.  Drug.

20   That's the next thing I remember, being drug past

21   those halls down to the entrance of that doorway where

22   they stopped and I stood up and I said, hey, man,

23   these things are too tight.  You've been dragging me.

24   Loosen them.  And then they dragged me into the

25   shower.

1    Q.      So the one who pulled on your arm before

2  you got knocked out, that's the one who you don't know,

3  correct?

4    A.      That guy where I was walking like right

5  before they drug me to the shower, that was -- that

6  was a sergeant.  I believe that was a sergeant.  I

7  don't remember his name at all.  When you ask them for

8  a pen to write stuff down, they don't give it to you.

9  You can't have it because it's a hazard.  You can't

10  have pens so you have to go strictly by memory.

11    Q.      And is he the same one that threw you to

12  the ground and broke your arm?

13    A.      No, no.  That guy -- that was an older

14  guy that -- that guy was maybe ten years older than

15  me, the sergeant that I pulled away from.  That was an

16  old guy.  He wasn't -- he was not slamming anything

17  but I do remember him saying see what you get.  He did

18  say see what you get.

19             No, the guy that separated my shoulder

20  that slammed me to the ground, he was a young guy.  My

21  color.  Almost my, my height but he had low hair.  Two

22  different individuals.

23    Q.      So as far as what you recall when you

24  awoke, you were being drug, you had shackles on you, you

25  don't know who put the shackles on but you know that

 1   Mr. Jones was the one that was dragging you.  Is that

 2   correct?

 3        A.        That's what -- yes, ma'am.  Jones was

 4   dragging me and LaShaundra Childs verifies it in her

 5   statement.

 6        Q.        Okay.  I'm not asking about what

 7   LaShaundra Childs verifies.  I'm asking do you remember.

 8        A.        Yes, ma'am.

 9        Q.        Who was dragging you by the shackles?

10        A.        I remember Jones -- let me tell you how

11   I remember Jones's facial structure.  Because he's

12   lock jaw.  His face sits sideways.  When he was

13   arguing and hollering and running to the back of the

14   room trying to agitate me or to get me to fight, I

15   remember his jaw structure.  Saunders had the big lip.

16   He had the awkward jaw structure and Markennis Jackson

17   was a light skinned Al B. Sure (sic) type guy.  I

18   locked in their faces.  I know exactly what they look

19   like.

20             The only reason why there's an issue is

21   because they were wearing fake name tags or not tagged

22   at all.  If they were tagged, we wouldn't even be here

23   right now discussing who was what and who is who.  At

24   the end of the day, it was someone involved in that

25   department, either -- look at the evidence.

1      Q.      So in looking at the OPS report, you
2  indicated that you've seen it before.  Is that true?
3      A.      Seen what before?
4      Q.      The OPS report?
5      A.      Oh, yeah, yeah.  I have it in my phone.
6  I've seen it.  I thoroughly read it eighty times,
7  ninety times.
8      Q.      Okay.  And you're aware that OPS
9  exonerated the gentlemen for excessive force.  Are you
10 aware of that?
11     A.      Which one?
12     Q.      All of them for excessive force.  They
13 may have gotten them for other things, violation of
14 policies but you're aware that they exonerated them
15 for --
16     A.      What the OPS report said was they could
17 not --
18     Q.      Are you aware of that?
19     A.      Yeah, they cannot -- they cannot
20 confirm.  It doesn't mean they exonerated.  It just
21 meant they can't prove it.  They didn't exonerate
22 anything.  They just said they couldn't prove it
23 because it was not on tape.
24          We caught them lying.  Yes, they are
25 lying and blase blah but we don't have the physical

```
 1  evidence but if I'm missing teeth and my shoulder is
 2  broken and my toes are broken and my knees ache every
 3  time I bend over, I can't get sleep or the doctors
 4  keep putting me on Percocet, I don't see how.
 5          Q.      Well, let's talk about those injuries.
 6  So you were seen by licensed practical nurse Ronald
 7  Sanders, I presume no relation, immediately after this
 8  incident took place.  Do you recall that?
 9          A.      Which -- I've seen a lot of providers.
10  Which one are you speaking of?
11          Q.      Licensed practical nurse Ronald Sanders.
12          A.      I mean was it from --
13          Q.      He saw you immediately after this
14  incident.
15          A.      At the jailhouse.
16          Q.      Correct.
17          A.      Okay.  Yes.
18          Q.      And he said you had a loose tooth,
19  abrasions on your lip and multiple cuts on your arms but
20  your general appearance was of no apparent distress.  So
21  are you saying Ronald Sanders misdiagnosed your broken
22  arm and your broken toe?
23          A.      Well, the bone is sticking out.  Yes,
24  he did.  Even a layman can see that the bone is
25  sticking out.  If a layperson can identify it, then a
```

```
 1   trained professional should be able to also.
 2        Q.      But he makes no mention of your arm other
 3   than cuts he said he saw and your toe.  So you're saying
 4   that Ronald Sanders misdiagnosed you and you never
 5   brought to his attention about the broken arm and broken
 6   toe?
 7        A.      Ma'am, after that fight, they was
 8   trying to lock us down.  He was not trying to give
 9   adequate medical, medical attention.  When I went to
10   Grady, Grady diagnosed it.
11        Q.      When did you go to Grady?
12        A.      As soon --
13        Q.      I don't have those records.
14        A.      As soon as I got out of the jailhouse.
15   I went from the jailhouse to Grady and Grady had put
16   me on the Percocets and started scheduling stuff to
17   get it taken care of but insurance stopped everything
18   from happening because I no longer had a job, was
19   unemployable.
20              MR. FILIPOVITS:  Can we pause for a
21   second?  Ashley, I thought I gave those to you.  Can I
22   pull that up real quick?
23              MS. PALMER:  Yeah, you can look at them
24   but the ones I have are from two years later.  They all
25   deal with mental health issues.  They don't --
```

```
 1                    THE DEPONENT:  They most --

 2                    MR. FILIPOVITS:  Hold on one second.

 3                    THE DEPONENT:  Can I --

 4                    MS. PALMER:  Listen to your lawyer.

 5                    THE DEPONENT:  Jeff, can I take a break

 6   right quick --

 7                    MS. PALMER:  Sure.  You can take a break.

 8                    THE DEPONENT:  -- to use the bathroom?

 9   I'll be right back.

10                    MR. FILIPOVITS:  Let me see what's going

11   on, okay, because you should have those.

12                    MS. PALMER:  Okay.  That's fine.

13                    (Brief recess.)

14        Q.        (BY MS. PALMER:)  While we were on a

15   break, Mr. Robinson's counsel advised there are some

16   additional medical records he is going to send over and

17   we will take a look at those shortly, my colleague will.

18   And you say those relate to when you went to the

19   hospital after were released from the jail back in 2016.

20   Is that correct --

21        A.        Yes, ma'am.

22        Q.        -- Mr. Robinson?

23        A.        Yes, ma'am.

24        Q.        All right.  And do you remember when were

25   released from the jail in May 2016?
```

```
 1        A.        I was, I believe, the 15th or the 16th,

 2   the 15th or the 16th when I was released.  It was

 3   fourteen -- no, it was fifteen days in jail.  15th or

 4   the 16th.  Around that time, 15th or the 16th.

 5        Q.        Okay.  All right.  So we were discussing

 6   the incident that took place on May the 3rd.  Is there

 7   anything else beyond what you've already testified to

 8   which is that Jones was the one who tased you and he was

 9   the one that drug you in relation to Saunders or --

10   well, Sanders, Saunders specifically which is the other

11   individual I represent.  You say he was standing there

12   present and did not stop the man.  Is that what you're

13   saying?

14        A.        Yes, ma'am.  He did not -- he failed to

15   protect me.

16        Q.        Is that correct?

17        A.        Yes, ma'am.  He failed to protect me.

18        Q.        And what precipitated the tasing if you

19   recall?

20        A.        Nothing.  He did it because he wanted

21   to.  There was -- there was no -- I did not hit him.

22   Nothing.  I never showed any aggression to him.  The

23   first time I came in contact with those guys was when

24   I was being drug.  He never gave a command to stop,

25   sit, don't -- he never gave -- it was just a beating,
```

1  a drag and a beating.

2      Q.    So when the OPS report says that you were

3  combative and they were trying to subdue you, that's not

4  correct?

5      A.    No, ma'am.  When I went to Judge

6  Schwall, Judge Schwall couldn't find where I was

7  combative either.  He asked, well, where is he

8  combative.  No one can point out that at all.  You

9  can't -- you can't even go to the videotape and find

10  where I was combative.

11      Q.    Well, let's move to an incident that took

12  place later that day between you and an inmate named

13  Enzell Woods.  Do you recall Enzell Woods?

14      A.    Yes, ma'am.

15      Q.    That incident?

16      A.    Yes, ma'am, I sure do.

17      Q.    It occurred at -- okay.  It occurred at

18  approximately 450 military time which would have been

19  2:50 p.m. Eastern Standard Time?

20      A.    Yes, ma'am.

21      Q.    Can you tell me about that altercation?

22      A.    Okay.  Before they arrived, there were

23  maybe four white guys and five black guys in the cell.

24  A couple of guys in the cell.  It was like half and

25  half.  I was speaking to an older guy -- he was about

1    maybe sixty-five years old -- about the incident that

2    happened downstairs and he was telling me, yeah, they

3    did a number on you.  He was, like, boy, usually in

4    those situations, they put an inmate on you.  I was,

5    like, yeah, I know.  I heard about it.  Like, yeah,

6    like, be careful.

7              So a guy comes in from prison and the

8    prison uniforms are different from jail uniforms.  The

9    jail uniforms, they'll give you, you know, the cloth.

10   The prison uniforms are the see-through paper type of

11   uniform.  So what I did was I put -- because he's

12   taking his prison thing off so I put it on because I

13   was cold on top of my jailhouse uniform.

14             So they come in, Enzell Jones and

15   another guy, and I'm sitting there talking to the old

16   guy about what happened.  In the middle of me and the

17   old cat's conversation, Enzell Jones said you ain't

18   going to do nothing to him.  The old guy was, like,

19   yeah, he already know.  I said, yeah, we just spoke

20   about it.

21             So what I did was I walked up to Enzell

22   Jones and I sat down right in front of him and he's

23   steadily popping off at the mouth, blase blah.  I

24   didn't say anything to him.  I looked at the ground,

25   and when I looked up he was, like, what the fuck you

1    looking at and he swung and hit me.

2              When he hit me, I immobilized him.

3    Knocked him out, broke his nose.  They come in and

4    they try to shoot with the taser gun.  That's not

5    effective.  We go to the ground, separated.  When they

6    separate us, Enzell Jones looks at Saunders and tells

7    Saunders I didn't get a chance.  That, that, that,

8    that pushed my temper.

9              So I go to cussing and I'm telling him,

10   hell, no, you don't get a chance.  I grew up boxing

11   and fighting.  You picked the wrong guy, right.  And

12   Saunders is shaking his head and I'm talking mad junk

13   and there's a different set of officers that came in

14   this time.  They don't have on black.  They have on

15   green.

16             And he says, Mr. Robinson, shut up

17   before we beat you and you out of line.  You can't --

18   I said, yes, sir, and I shut my mouth, but the whole

19   time where they were putting the chopsticks up his

20   nose, he's looking at Saunders and Saunders is shaking

21   his head.

22             And the other guy who he came in with,

23   you know, talking gang slang, on blood, you know, all

24   this craziness.  That was crazy.  You know, it was

25   crazy.  I have never --

1        Q.      You're talking about the same -- I'm

2   sorry.  Are you referring to the same Saunders that --

3        A.      Yes.

4        Q.      -- I represent?  My client, Mr. Saunders?

5        A.      Yes, ma'am.

6        Q.      All right.  So you had testified earlier

7   that in the previous altercation with the three officers

8   that they knocked your teeth out.  Is that correct?

9        A.      Yes, ma'am.

10        Q.      So isn't it correct that later when you

11   went to the doctor, which was at 5:44 p.m. that day and

12   you saw physician's assistant David Gettier (sic),

13   that's when your teeth were knocked out was by

14   Mr. Enzell Woods?

15        A.      No, ma'am.  When I got to --

16        Q.      Okay.  Let me stop you for a second.  So

17   if the physician's assistant put that in their notes,

18   they're also lying about your teeth being knocked out

19   when they saw you at 5:54 p.m.?

20        A.      Ma'am, okay.  I had --

21        Q.      That's a yes or no and then you can

22   explain.  Are you saying that the physician's assistant

23   David Gettier who examined you at 5:54 p.m. after your

24   incident at 2:50 with Enzell Woods and specifically

25   noted you had a swollen lip, an upper tooth evulsion and

1    an abrasion on your left small toe, injuries that you

2    attributed to the earlier incident, you're saying that

3    that physician's assistant is lying?

4            A.      Yes.   What I'm saying is --

5            Q.      Okay.

6            A.      What I'm saying is the teeth, the

7    teeth, with the gold teeth, they file the gold teeth

8    down and they put the glue on it and they put the gold

9    teeth on top of the glue.   When the incident happened

10   after being hit in the face or whatever, the enamel

11   around the teeth, right, that -- the white part was

12   all off.   It was crushed down and there were jacked

13   pieces like meaning they were not straight.   They were

14   tilted because it had been crushed down.

15                   So when I got to the dentist, the

16   dentist was not putting teeth in.   She was putting the

17   little pieces of the root back in.   There were never

18   teeth at all put back into my mouth.   Those were --

19           Q.      I didn't say teeth were put back in your

20   mouth.   I said teeth were knocked out of your mouth.

21   And you testified that the officers knocked your teeth

22   out of your mouth.

23           A.      The officers.

24           Q.      The physician's assistant has said that

25   the teeth were missing from your mouth when he saw you

```
 1  at 5:54 after the incident with Enzell Woods.

 2          A.      Yes, ma'am.  That's --

 3          Q.      And in fact, the records also reflect

 4  that Enzell Woods picked up two of your teeth off the

 5  floor and gave them to the officer?

 6          A.      That's not true.  The teeth were in my

 7  mouth.  Enzell, Enzell Woods did not pick up any teeth

 8  off the floor.  How can I explain it?  When they

 9  knocked the gold out, the gold, the gold is supported

10  by the enamel, the white enamel around your teeth.

11                  Every time where I was hit or whether I

12  was punched or kicked, it broke the enamel off, all

13  the enamel.  So it was not -- it was a shard of a

14  tooth and they were crooked and jagged.  That was the

15  whole reason why I was going to medical in the first

16  place was to get the attention for my mouth and my

17  shoulder.  That's the reason why I was in medical.  I

18  was not in medical just for my shoulder.  I was in

19  medical for all of the damages.

20          Q.      But are you talking about you were in

21  medical after the incident with the three officers?  Is

22  that what you say that's why you were in medical?

23          A.      Yes, that's why I was in medical in the

24  beginning.

25          Q.      Right.  When you were seen in medical
```

 1    that initial time because you were seen twice that

 2    day -- are we in agreement with that?  You were seen

 3    twice that day in medical, once after the incident with

 4    the officers and once after the incident with Enzell

 5    Woods?

 6          A.      No, no.  The medical, the medical

 7    department upstairs, I was seen one time in the

 8    medical department upstairs.  There's a medical

 9    screening downstairs.

10          Q.      No.  Two different individuals, one named

11    Ronald Sanders, saw you earlier in the day around nine

12    a.m. after the incident with the officers which occurred

13    around 7:45 a.m. on May 3rd and then a second person saw

14    you after the incident with Enzell Woods and his name is

15    David Gettier.  So you don't recall either of those

16    people looking at you?

17          A.      I don't -- I don't -- I don't recall

18    going up there two times.  I only went to the medical

19    floor one time.  I don't -- I don't recall two times

20    at all.  I'm not aware of being there two times.  I'm

21    only aware of being there one time where I got into

22    the fight with the guy.  That was the only time where

23    I was in medical was when I got in a fight with that

24    guy.  There was never two times.

25          Q.      We had just talked about earlier -- but

we just talked about earlier Ronald Sanders seeing you.
You said you had a loose tooth, abrasion on your lip,
and cuts on your arm.  That was after the incident with
the officers.  You and I talked about that.  Okay.  So
you're saying that didn't happen?

      A.      Hold on.  You're confusing me now.
You're confusing me.  There's a medical screening
downstairs.

      Q.      I'm not talking about the medical
screening.  I know exactly what that is.  People come in
intake.  I know what that is.  I'm not talking about
that.  I'm talking about after incidents happen in the
jail the policy is, as you're aware and I'm aware, you
get taken to medical.

      A.      Unh-unh.

      Q.      And pursuant to the records, you were
taken twice.

      A.      I was not taken --

      Q.      What happened after -- okay.  Don't
interrupt me again.  Once after the incident with the
officers and the other time after the incident with
Enzell Woods.  Two different physicians have records of
seeing you on that day.

      A.      Ma'am, I only went to medical one time.
After the shower, I went to medical.  When I went to

1  medical, that's when the fight with Enzell Woods

2  happened, and from there, we went to the 7th floor.

3  I've never -- I've never gone to medical two times

4  during that incident.  I only went to medical one time

5  because after the shower was medical.  After medical

6  was solitary confinement.

7       Q.      So if there are records reflecting that

8  you saw a licensed practical nurse named Ronald

9  Sanders --

10      A.      What are the times on it?

11      Q.      -- are you saying those aren't true?

12      A.      What are the times on it?  Are they

13 around the same time?

14      Q.      They are.  You saw Ronald Sanders around

15 9:45 a.m. and I can get the exact time for you.

16      A.      Well, the time between the dentist

17 and -- what are the times because if they are in the

18 same time period and you're saying that's two

19 different times but it was only -- I only went up

20 there one time.  I never came down a floor.  I never

21 went anywhere other than medical, from that shower to

22 medical and from medical to isolation.  So I don't

23 know about two times.

24      Q.      Hold on a second.  Pulling up the records

25 so I can give you exact time.  So the incident in the

1    intake area occurred at approximately 0734 hours, which

2    is military time, 7:34 a.m. on May the 3rd.  Subsequent

3    to that incident, Robinson was escorted to the medical

4    clinic by DO Frank Jones at approximately 9:27 hours

5    military time, 9:27 a.m. and placed into a cell for

6    further screening.

7                 That screening was done by Ronald

8    Sanders.  He said actually he did the screening at

9    approximately nine a.m. so the time is off but it was

10   subsequent to the incident and that's when he said he

11   noted your scratches to your arms, your loose tooth and

12   abrasions on your lip but that your general appearance

13   was of no apparent distress.

14       A.      The loose, the loose tooth, ma'am, as I

15   have --

16       Q.      No, let's not -- let's not get

17   sidetracked on the tooth for a second.  We'll talk about

18   that in a second.  Do you recall seeing somebody at

19   approximately between nine and 9:30 a.m. -- it looks

20   like it was at nine a.m. --

21       A.      Nine a.m. --

22       Q.      -- the jail clinic.  But nine a.m.

23       A.      If, if Saunders brought me up there and

24   it was around that time because you're not privileged

25   to time in there when you ask people.

1          Q.      I understand that.  I'm not trying to
2     hold you to time.  You're the one that asked me about
3     time.  I'm asking you did you see somebody twice.  I
4     don't care what time it is.  You asked about that.
5          A.      Well, if it's in the same period of
6     time, it had to be if it's on record if it's in the
7     same period of time.  If they brought me up there at
8     eight o'clock and I checked in at eight o'clock and I
9     didn't get seen until nine o'clock or ten o'clock,
10    okay.  If you call that two times, call it two times
11    but I only visited that jailhouse facility medical one
12    time.
13              Now how many times where they took me
14    to this person or that person, I don't -- I went from
15    the shower to medical to solitary confinement.  I
16    don't know -- they didn't bring me from solitary
17    confinement back to medical.  I know because when I
18    got up there I stayed up there locked in that room.  I
19    don't, I don't, I don't recall two times.
20         Q.      Okay.  Well, let's go to the time you do
21    recall after the incident with Enzell Woods.  At that
22    point, they said they observed a swollen lip, an upper
23    tooth evulsion, and abrasion on your left small toe.
24    Nothing about a broken arm and nothing about a broken
25    toe.

1       A.      Well, when I got to Grady, Grady said

2   that I should have been taken in sooner because

3   everything started to heal up.  Grady didn't say a

4   scratch on my toe.  Grady said that it had been broken

5   because it had turned purple.

6               And with my shoulder, Grady said that,

7   yes -- Grady said that it's obvious that there's a

8   separation there, but since I was not immediately

9   taken within I think it was like, what, forty-eight

10  hours, that everything had started to heal up

11  incorrectly and they suggested that I wait to see how

12  it heals up.  If it didn't heal up right to come back

13  and get it corrected but they don't just prescribe you

14  Percocet with scratches or what you think hurts.

15  There has to be some type of medical evidence behind

16  it.  I can't pick up anything with my left shoulder.

17              MR. FILIPOVITS:  Just to jump in here, I

18  did email you guys the medical records.

19              MS. PALMER:  Yeah, we got them.  Thank

20  you.  There's no password right, Jeff?

21              MR. FILIPOVITS:  It's the same as last

22  time.

23              MS. PALMER:  Okay.  There's no password.

24  Jonathan asked if there was a password.

25              MR. FILIPOVITS:  It's Robinson.

```
 1                    MS. PALMER:  It's Robinson, Jonathan.
 2         A.        So during the medical --
 3                    MR. FILIPOVITS:  Thank you.
 4         A.        During medical, Saunders says that he's
 5    seen loose teeth, and then after the fight, you say
 6    that the teeth are gone.  Well, loose and jagged
 7    teeth, we're not talking about enamel teeth.  We're
 8    talking about the root, the little black thing that's
 9    inside of your teeth.  That's what I had in my mouth.
10    It looked like Pumpkin Head.  I looked like -- it was
11    like a horror movie tooth.  It was not a tooth.
12         Q.        And so you deny that Enzell Woods knocked
13    your teeth out?
14         A.        Enzell Woods didn't really even get a
15    lick in that fight if you look at the videotape.
16         Q.        Well, your lip was swollen, you had two
17    missing teeth, and your toe was messed up.
18         A.        That --
19         Q.        So if he didn't get a lick, how did all
20    that happen?
21         A.        That happened downstairs.  When I say
22    the teeth were jagged, they were pushed in, not --
23    your teeth are straight.  When your teeth are jagged,
24    they are pushed in.  Just like a baby tooth.  Like
25    when you have a baby tooth, it's the same --
```

```
 1          Q.      I understand.  I'm not -- I'm not really
 2   understanding the teeth thing and I don't need you to
 3   try to explain it to me.  I'm trying to get you to help
 4   me understand how between somebody seeing you that
 5   morning at nine o'clock, whether that was in medical
 6   intake or not, somebody saw you and they didn't know any
 7   of this and it wasn't until after the incident with
 8   Enzell Woods that something is wrong with your toe, two
 9   of your teeth are knocked out and you've got a swollen
10   lip.
11          A.      Ma'am.
12          Q.      That was not your appearance at nine
13   o'clock that morning when somebody saw you in intake.
14          A.      Okay.  Let me explain.  When you go to
15   the Enzell Woods paper, document that he wrote, Enzell
16   Woods also stated that I had injuries to my mouth,
17   right, where my teeth and all that -- it's in Enzell
18   Woods, right.  He says that the damage came before and
19   this is his statement and the OPS --
20          Q.      I read his statement.  That's not what he
21   said.  He said here's two teeth got knocked out of his
22   mouth and he picked them off the ground and put them in
23   a napkin and gave them to the deputy.
24          A.      No.  I had -- my teeth were inside my
25   mouth.
```

```
 1        Q.       Well, if your teeth are inside your
 2   mouth, you testified that the three deputies knocked
 3   your teeth out.  So were your teeth in your mouth or
 4   were they out of your mouth?
 5        A.       When your teeth are jagged --
 6        Q.       Because your complaint says -- your
 7   complaint says they knocked your teeth out.  So were
 8   your teeth in your mouth or out of your mouth?
 9        A.       The teeth were jagged in my mouth.
10        Q.       I don't know what that means.  I don't
11   know what jagged in your mouth means.
12        A.       Straight -- your teeth right now are
13   straight.  When somebody hits them or kicks them, they
14   push in.  They push in at an angle, like maybe a
15   forty-five degree angle.  Right now they would
16   be considered --
17        Q.       So your tooth was loose -- so your tooth
18   was loose as the nurse indicated at nine a.m. that
19   morning.  Is that what you're saying?
20        A.       Yes --
21        Q.       When I think jagged, I think part of your
22   tooth is missing --
23        A.       No, that was --
24        Q.       -- like it's been crushed and missing.
25        A.       No, no.
```

1      Q.      That's not what you mean by jagged.  You
2  mean your tooth was moving?
3      A.      Yeah, moving inside like I could use my
4  tongue and move them.
5      Q.      Right.
6      A.      Like I could move them with my tongue.
7  Going to medical, I could literally put my tongue on
8  my tooth and move them when I went to medical.  That's
9  what I meant by jagged because they're damn near
10  coming out of my mouth at that point.  A baby could
11  have came by and pulled it out.  It was just like baby
12  teeth coming out.
13      Q.      So did your teeth subsequently get
14  knocked out?  Did they get knocked out?
15      A.      They were already out when we went to
16  medical.  They were jagged.
17      Q.      Where is the records that show that your
18  teeth were already out when you saw -- before Enzell
19  Woods?
20      A.      You said that his teeth were loose.
21  That's what loose -- that's, that's what loose teeth
22  are.  Loose teeth are not the kind that sit in your
23  mouth.  When the teeth are loose, they're falling out.
24      Q.      Mr. Robinson, I have three children.  I
25  know what a loose tooth is and you know that is not

1    true.  The nurse said you had one loose tooth.  Your

2    tooth was loose.  When you saw a doctor later, you were

3    missing two teeth.  So are you telling me that you were

4    not missing two teeth after the incident with Enzell

5    Woods?

6        A.    What I'm telling you is the teeth that

7    were there were crushed down to the root and were

8    loose.  Do you understand?  Like, there is no --

9        Q.    Nobody ever knocked two teeth out of your

10   mouth?  Because two were picked up off the ground that

11   were attributed to you.  So are you saying those were

12   not your two teeth?

13       A.    Ma'am --

14       Q.    That's a yes or no question.

15       A.    Those --

16       Q.    Just yes or no.  Were two teeth knocked

17   out of your mouth?

18       A.    What I'm saying, that is a lie.  My

19   teeth were in my mouth.  When the dentist put them in,

20   I took the teeth out of my mouth.  I kept them in my

21   mouth because if they would have hit the ground they,

22   they get bacteria on them.  You have to keep them in

23   your mouth.  The teeth were in my mouth.

24       Q.    When did the dentist put teeth in your

25   mouth?  When did the dentist put teeth in your mouth?

1        A.        Yeah, in Rice Street.  They stitched it
2  all back together.  They tried to stitch it back
3  together.
4        Q.        When did that occur?
5        A.        That was in medical.  That was in
6  medical.
7        Q.        Was that after the Enzell Woods incident?
8        A.        Yes, ma'am.
9        Q.        So that was not after the incident where
10  in your complaint you allege that my clients knocked
11  your teeth out?
12        A.        Yes, ma'am.
13        Q.        Now you're saying the teeth were not out
14  of your mouth?
15        A.        What I'm saying is when I went to
16  medical, I was going to medical for my shoulder and
17  for my teeth.  My teeth were loose and jagged.  When
18  me and Enzell Woods got into the fight, Enzell Woods
19  got one lick and then I knocked him out.  They came
20  in.  I'm already busted up.
21              Read Enzell Woods because I've got it
22  right here on the phone.  Enzell Woods said that I had
23  a busted lip and all that before him.  He said he
24  didn't do anything.  I will pull that up for you right
25  now if you want me to.

1    Q.    Please do and refer me to the page number
2  so we can all read together.
3    A.    Okay.  Enzell Woods, case number
4  16034B.  I was in there for medical depression on
5  5/3/16.  A group of males came in.  They were trying
6  to get the officer's attention.  The same time
7  Mr. Robinson took a swing at me.  Before I knew it, we
8  was fighting.  Mr. Robinson already had a busted lip
9  and paper in his mouth.  He was telling the officers
10 that he got jumped by some inmates in booking.
11    Q.    You got jumped by some inmates in
12 booking?
13    A.    That's what -- that's what Enzell Woods
14 is writing.  He said --
15    Q.    So is that what happened?  You told him
16 you got jumped by inmates --
17    A.    I don't know Enzell Woods.
18    Q.    So how am I supposed to believe Enzell
19 Woods if your lip is busted if he's saying inmates
20 jumped you and you're saying that's not what happened?
21    A.    I never -- I never came into contact
22 with inmates until medical.
23    Q.    Right.  Do you understand my point,
24 Mr. Robinson?
25    A.    All right.  Now --

```
 1          Q.        You're trying to use Enzell Woods as a
 2    credible source which first of all is not even here for
 3    me to question -- don't interrupt me because you're
 4    about to.  And second of all, he's saying inmates jumped
 5    you.  Is that your testimony that inmates jumped you?
 6          A.        No.
 7          Q.        So how credible is he?
 8          A.        Exactly.
 9          Q.        (Inaudible).
10          A.        Exactly.  So that's why I'm wondering
11    why are you trying to use the statement of he picked
12    up two teeth off the floor.
13          Q.        No.  You're trying to use the statement.
14          A.        Two teeth off the floor.  You said you
15    used Enzell Woods two teeth off the floor and I
16    just --
17          Q.        I don't have to use -- Mr. Robinson, I
18    don't have to use his statement that teeth were picked
19    up off the floor.  There's other corroborating evidence
20    that two teeth were picked up and taken to the dentist.
21    You just said they tried to stitch teeth back in your
22    mouth.  Did you not testify to that?
23          A.        My teeth were in my mouth --
24          Q.        Okay.
25          A.        -- when I went to the dentist.
```

1    Q.      Did you not testify that they attempted

2  to stitch some teeth back in your mouth?  Those were

3  your exact words.

4    A.      Yes, because they were loose.  They

5  were loose.  It wasn't -- it wasn't, oh, my teeth were

6  over there.  No, it wasn't like that.

7    Q.      So let me ask you this, Mr. Robinson.

8  Your complaint alleges my clients knocked your teeth

9  out.

10    A.      Uh --

11    Q.      Your testimony here -- don't interrupt

12  me.  Your testimony here is emphatically your tooth --

13  your teeth were loose.  There's a big difference in that

14  and you have tried to argue me down about the fact that

15  none of your teeth ever landed on the ground.  So is it

16  your statement that you filed a complaint saying that my

17  client knocked your teeth out and that is not what any

18  of the evidence shows?

19    A.      Yes, ma'am.  Yes, ma'am.  When your

20  client beat me in the shower, I lost my teeth.  There

21  were -- when I looked in the mirror, they were crooked

22  and out of place loose, chipped, however you want to

23  say it, all the way down to the root.

24    Q.      No.  What I'm saying, were teeth knocked

25  out of your mouth?  Yes or no.

1        A.        Yes, ma'am, the teeth -- the teeth were

2    out of my mouth before I got --

3        Q.        Where were they?

4        A.        Huh?

5        Q.        Where were they?  They were knocked out

6    to where?

7        A.        They were in my mouth.  The teeth were

8    inside of my mouth.  I'm running my teeth -- my

9    tooth -- I mean my tongue over my tooth and they're

10   hanging on by pieces of meat.  It's not like, oh, pop.

11   They -- like meat, man.

12       Q.        Are you talking about your real tooth or

13   the gold teeth?

14       A.        The gold teeth were gone.  I'm talking

15   about the real teeth under the gold teeth.

16       Q.        And what did the real teeth look like

17   under the gold teeth before the incident?  Do you have

18   pictures of that?

19       A.        You see my real teeth here?  They look

20   like this.  Teeth --

21       Q.        Which ones of your teeth got knocked out?

22   Please show me.

23       A.        Here.  All that's gone.

24       Q.        So your two front teeth got knocked out?

25       A.        That's four teeth.  Three teeth, three

1   teeth were gone and one was -- it wasn't as bad as the

2   rest but one I got taken out in prison.  They had

3   to -- they removed that one in prison so --

4        Q.      So four teeth in the top of your mouth

5   got knocked out?

6        A.      Four teeth at the top of my mouth.

7        Q.      When the nurse indicated there was only

8   one loose tooth when you saw the nurse at nine a.m.?

9        A.      One loose tooth?

10       Q.      One loose tooth.

11       A.      I don't know -- then where were the

12  other ones?

13       Q.      That's a good question.

14       A.      At nine a.m. --

15       Q.      That's a good question.

16       A.      If you got one loose tooth, where are

17  the other ones?  When -- it's not like he just hit

18  that one tooth.  There are teeth surrounding them

19  teeth.  All that -- when I made it up to the medical

20  department, the teeth were gone.  The white -- no

21  white, no white.  Sitting straight?  Oh, no, unh-unh.

22  It was like somebody -- when you kick them in, they

23  kicked in.  There is no I can straighten it back out.

24  No.

25              When a tooth is broken, the bone goes

```
 1   all the way up to your skull.  That tooth is gone.
 2   You can't just put it back in and expect support.
 3   It's gone.  If your tooth is to move out of place, it
 4   has broken from the bone inside of your skull.  That's
 5   gone.
 6         Q.      So your testimony is that Enzell Woods is
 7   not the one that knocked your teeth out?  Is that your
 8   testimony?
 9         A.      My testimony is Enzell Woods didn't do
10   anything.  All that Enzell Woods tried to cover up the
11   beating by punching me but I stopped him immediately.
12   Check out the video.  They tried to submit it.  The
13   same video you're speaking of, they tried to submit
14   that to Judge Schwall.  Judge Schwall saw through that
15   also.  He said it didn't come from medical, not all of
16   that.
17         Q.      First of all, I'm not even sure what
18   you're talking about.  I don't recall seeing that, but
19   be that as it may, my question was is it your testimony
20   that Enzell Woods is not the one that knocked your teeth
21   out?  That's your testimony?
22         A.      My testimony is Enzell Woods was not
23   the one that harmed me at all.  Enzell Woods did not
24   harm me.  Those were the deputies downstairs.  I
25   passed a lie detector.
```

1        Q.        I didn't ask you anything about a lie

2   detector, okay.  Just answer my questions.  So which

3   deputy is the one that hit you and loosened your teeth?

4        A.        That would be Jones a/k/a Fuqua, fake

5   name tag Fuqua Jones who was the only --

6        Q.        How many times did he strike you?

7        A.        That's hard to say.  It's been some

8   time.  I was in -- when he was beating me, I wasn't he

9   hit me one time, that's two times.  I was not

10  counting.  I was trying to shield myself and get out

11  of harm's way.  I can't say that he hit me ten times.

12  I can't say that.

13       Q.        And he struck you with a closed fist or

14  an open hand?

15       A.        Both.  And feet.

16       Q.        So he stomped you, too?

17       A.        I believe it was once or twice where I

18  was kicked.

19       Q.        In your face?

20       A.        Yes.

21       Q.        So he slapped you with the open hand,

22  punched you and kicked you in your face yet there's no

23  medical records to substantiate that?

24       A.        No.

25       Q.        How is that?

1      A.      You tell me.  I don't have control over
2  the jailhouse.  All I can do is do what they tell me.
3  I don't have control.  When I opted to go -- I said,
4  hey, man, I need to go to medical.  When I pushed the
5  issue, that's when all this began for me asking for
6  medical attention.  Nobody should be deprived of
7  medical attention.
8      Q.      I don't think the records indicate that
9  you were deprived.  You saw the nurse at nine a.m. and
10  at 5:54 p.m.  So at what point was there deprivation of
11  medical attention?
12      A.      Well, when my hands were on the wall
13  and that guy separated my shoulder, from that point of
14  me being intaked all the way up until -- that's
15  unnecessary.  Seven, eight hours.  Nine, ten hours
16  sitting there in that pain.  Medical ain't nothing but
17  a floor up.  Ain't no reason why I had to sit ten,
18  twelve hours without medical attention.  None.
19      Q.      Where is the medical records in the jail
20  about your arm?  You saw two separate individuals and
21  there's no indications that there was ever anything said
22  about your arms other than there were cuts on your arms.
23      A.      Okay.  Here's --
24      Q.      Did you make a verbal complaint about
25  your arm allegedly being broken?

1        A.        Yes, ma'am.  I complained to the staff

2   sergeant on the floors, especially in the 7th floor on

3   that lockdown, solitary confinement.  I told that guy

4   every time when he came around.  I told the nurse

5   every time they came around.  I said hey, man, my

6   shoulder.  When they said you fight downstairs, ain't

7   nobody trying to listen to you.  They're just going to

8   lock you down.  As soon as you get out of here, you go

9   to the doctor.  And that's what I did.

10                As soon as -- as soon as that fight is

11   initiated, they don't care how bad you're hurt.

12   You're going in the hole.  We'll deal with that after

13   you get out of the hole.  And I've never seen Enzell

14   Woods before.  I don't even know that guy.  Never seen

15   him one day in my life.

16        Q.        So when you went to Grady on 5/18/2016

17   for complaints of shoulder pain and a toe during an

18   altercation in the jail, there's no indication -- and I

19   haven't seen the records.  There's no indication they

20   said your arm was broken or your toe?

21        A.        It's not -- what they told me was --

22        Q.        I'm not asking what they told you.  I

23   need you to point me where in your records -- because

24   that's significant -- you had a broken arm and a broken

25   toe.  That would be in your medical records May 18th of

1   2016.  So where is that reflected in the records.  Can

2   you point that out to Mr. Loegel so he can pull that up

3   for me, please?

4           MR. FILIPOVITS:  He does not -- Ashley,

5   he does not have the medical records in front of him.

6           MS. PALMER:  Okay.  Mr. Filipovits, can

7   you point in the records where his arm was broken and

8   his toe.

9       A.      It does not say arm.  It's shoulder

10  separation is what it was.  It's not a broken arm.

11  It's a separation of the shoulder.  It's never a

12  broken arm at all.  They didn't break my arm.  It's a

13  separation of the shoulder.

14      Q.      Well, you testified throughout this that

15  your arm was broken.  You used the word fractured,

16  broken.

17      A.      Fractured, separated.  You can -- when

18  we get to court, you'll see it because it's never

19  been --

20      Q.      On what page does it say the shoulder was

21  separated?

22      A.      It's never --

23      Q.      Can you refer me to that?

24      A.      It's never been --

25      Q.      Stop talking for a second, Mr. Robinson.

1        MS. PALMER:  Can you refer me to that,

2    Mr. Filipovits, where his arm was separated?

3        MR. FILIPOVITS:  Give me a moment here.

4    I mean the records are going to speak for themselves.

5    If I say --

6        MS. PALMER:  Okay.  I didn't have the

7    records beforehand, Jeff, and I have a right to question

8    him about this.  If it says separated, I want to see

9    that.

10        MR. FILIPOVITS:  You're asking me

11    specifically whether these medical records indicate that

12    his shoulder was separated?

13        MS. PALMER:  That's correct.

14        MR. FILIPOVITS:  And you're asking about

15    the date of which visit?  I may need to take a break so

16    that you have a chance to review that.

17        MS. PALMER:  Let's do that.  Let's do

18    that.  Let's take a ten minute break and I'm going to go

19    through the records.

20        MR. FILIPOVITS:  I don't want you to rely

21    on me.

22        MS. PALMER:  I agree.  That's probably

23    true.  No offense against you but -- all right.

24        (Brief recess.)

25        Q.    (BY MS. PALMER:)  So Mr. Robinson, just

```
 1   to go circle back around to a couple of things, I'm
 2   going to have Mr. Loegel read what we found on the Grady
 3   report in just a second because he had it in front of
 4   me.  Trying to switch between different devices and it's
 5   difficult.  So you stated after the incident with the
 6   deputies that your concern was your shoulder and your
 7   teeth.  Is that correct?
 8        A.        Yes, ma'am.
 9        Q.        Okay.  So at no point did you express at
10   that point anything about a toe.  Is that correct?
11        A.        Ma'am, I was -- I was pointing out the
12   most painful things.  I did -- I did point out my toe.
13   I did show him my toe.  I remember sitting on the desk
14   and pointing down at my toe and telling him it didn't
15   look right because it was purple.
16        Q.        Who did you point your toe out to?
17        A.        It was -- it was a lady in medical.  It
18   was a lady in medical.  Then when I went to the
19   lockdown floor, I also showed it to the lady that was
20   coming by giving me my medicine, and then every time
21   at dinner, I would point it out.  I would point out
22   all of my injuries.
23        Q.        So the toe you pointed out to a lady in
24   medical after the Enzell Woods incident or after the
25   deputy incident?
```

1    A.       I didn't -- I didn't get seen -- I

2    didn't get seen --

3    Q.       So you pointed out the toe after the

4    deputy incident or the Enzell Woods incident?

5    A.       I believe it was -- I believe it was

6    the deputy, the deputy.  It had to be.  Sat me on the

7    desk.

8    Q.       When you were seen by Ronald Sanders?

9    A.       I'm not aware of whoever I was seen by.

10   I don't recall his name but --

11   Q.       So when you were seen at nine a.m.,

12   that's when you pointed out the toe?

13   A.       Yeah, I pointed out the toe.  I made

14   sure --

15   Q.       You were seen at nine a.m.  Is that when

16   you pointed out the toe?

17   A.       I pointed out the toe in medical.  I

18   don't know what time -- I don't know what time it was.

19   We're not privileged to time.

20   Q.       Had the Enzell Woods incident happened?

21   A.       Possibly.  I don't -- I don't know what

22   time that you're talking about.  All I can tell you --

23   Q.       I'm not talking about time now.  I'm

24   talking about had Enzell Woods happened?  Time is

25   irrelevant at this point because you acknowledge you

```
 1    don't know what time it was.  So had the Enzell Woods
 2    incident happened when you pointed out the toe?
 3           A.      It could have been -- it could have
 4    been with the deputy.  I don't -- I don't know because
 5    they're both the same time period.
 6           Q.      They were not the same time period, sir.
 7    One happened at seven o'clock in the morning and one
 8    happened at 2:50, almost three o'clock in the afternoon.
 9    So no, they were not the same time period.  (Technical
10    difficulty).
11           A.      That was -- it was after the sheriff's
12    deputy -- after the sheriff's deputy when I was going
13    up to medical, I showed everybody my injuries and I'm
14    pointing to my injuries.  I pointed out all my
15    injuries to everyone and I said, hey, that don't look
16    right.  This ain't right.  It hurts every time I lift
17    it.  My teeth.  I pointed everything out to everybody.
18    Everybody who I could speak to about it, I spoke to
19    them about it.
20           Q.      So you spoke about the toe incident right
21    after the deputy incident?
22           A.      I do believe so.
23           Q.      Okay.  And that should be reflected in
24    your medical records that you mentioned something about
25    a toe?
```

```
1        A.       I don't -- I don't -- I didn't -- I
2   didn't -- I wasn't -- I don't have the medical
3   records.
4        Q.       I'm not asking if you have them.  I'm
5   saying you mention --
6        A.       It should be in the medical records
7   where I pointed out about my toe.  It should be.
8        Q.       Okay.
9        A.       Because it was purple.  I couldn't move
10  it so it should be somewhere in there.
11       Q.       Okay.  All right.  I'm going to have
12  somebody check to see when that was.
13               MS. PALMER:  Going back to the Grady
14  records, Mr. Loegel, could do you unmute yourself and
15  read what was found in the Grady records?  And then we
16  will have a discussion about it on the other side,
17  Mr. Robinson.
18               MR. LOEGEL:  This is Jonathan Loegel.  It
19  is on page 88 -- the documents as defined on page 24 of
20  84.  Page 80.  The material provided to us today.  It is
21  the medical record.  It is dated at the top 5/18/16,
22  0733 which appears to indicate time.
23               Middle of the page, it indicates bones
24  and joints, colon, no acute fracture.  Well-defined
25  lucency in the left scapula is concerning for possible
```

1 metastatic lesion versus multiple myeloma.  Good

2 alignment of the glenohumeral and acro clavicular

3 joints.  Soft tissues.  No focal abnormality.  That's

4 the end of the part I'm quoting.

5 　　　　　　MS. PALMER:  Thank you, Mr. Loegel.

6 　　Q.　　Do you recall any of that being stated

7 out loud to you?

8 　　A.　　I don't -- I don't know the

9 terminologies of what they're saying so I can't -- I

10 can't really recall that.  I don't --

11 　　Q.　　Do you know what myeloma is?

12 　　A.　　Yeah.  My mother died of multiple

13 myeloma.  That's -- that's bone.

14 　　Q.　　Right.  So it sounds as if they had some

15 concern about possible tumor in your bone?

16 　　A.　　No, that's, that's, that's the actual

17 bone that's sticking up.  That's the injury.  It

18 should have been level there.  That's the bone that

19 they speak of.

20 　　Q.　　Okay.

21 　　　　　　MR. FILIPOVITS:  I'd like to state an

22 objection to, you know, witness's qualifications to talk

23 about his medical diagnosis, but with that objection

24 obviously --

25 　　　　　　MS. PALMER:  Understood.  Understood.

1      Q.      So the bone was sticking up from --

2      A.      That's what they're talking about in

3  that report.  The bone was sticking up.

4      Q.      Okay.  Did you hear anything about a

5  separation or a fracture?

6      A.      Separation or a fracture?

7      Q.      In fact, I think the exact terminology

8  was not acute fracture.

9      A.      Not acute fracture?  I know but the

10  bone is sticking up.  It's --

11      Q.      I hear -- I hear what you're saying.

12      A.      Okay.

13      Q.      My question to you is did anyone either

14  in these medical records once you received them or

15  verbally say to you that there was a separation in your

16  bone?

17      A.      At the hospital, I heard it, but in

18  those papers, I've never seen the papers so I can't

19  say yes or no because I haven't seen what you're --

20      Q.      What individual at the hospital used the

21  word separation?

22      A.      When I went to the hospital, like a

23  couple of times after that incident.  I think I went a

24  few days after that also.  It was one of the ladies.

25      Q.      Correct.  You did.  You went on May 19th,

1     and in those records, you indicated you had slipped and

2     fell --

3          A.       No, no, I didn't.

4          Q.       -- and that's why your toe was injured?

5          A.       No, nobody said that.

6          Q.       So if that's in the medical records,

7     you're saying they're lying?

8          A.       That's a lie.

9          Q.       That's in the medical records.

10         A.       That's a lie.  I don't know where you

11    got that from.  No slip and falls or nothing.

12               MS. PALMER:  Mr. Loegel, can you pull

13    up May 19th date where it talks about the slip and

14    fall and read that to Mr. Robinson?

15               THE DEPONENT:  Slip and --

16               MR. LOEGEL:  Certainly.  You mind

17    holding on for one moment?

18               THE DEPONENT:  Slip and fall.  Man,

19    come on.  No.  Where did that happen?

20               MR. LOEGEL:  It may be best to take

21    another quick break while I find this reference.

22               MS. JOINER:  This is Amelia Joiner.

23    It's on page 30.

24               MR. LOEGEL:  Can we go off the record

25    for a second?

```
1                    MS. PALMER:  Yes.

2                    (Off-the-record discussion.)

3         Q.        So when we were off the record, there was

4    some information that was read to Mr. Robinson and

5    everyone on the video deposition from some records

6    concerning Mr. Robinson.  Previously he stated he didn't

7    say anything about a slip and fall but I think he wants

8    to correct that now?

9         A.        Yeah.  What she's talking about is same

10   thing that's going on right now.  I fall down when I

11   walk.  Sometimes the hip pops out of place and it

12   makes me fall.  I can't -- I can't do what I used to

13   do like walk down the street and things like that.

14                    When I went to that hospital, I was

15   falling down and I was dizzy.  I kept getting dizzy

16   and I was falling down.  I never said that the

17   shoulder came from falling down.  I was going to the

18   hospital because I was dizzy and I couldn't walk.

19                    I mean I was scared.  I remember that

20   day.  I had to -- I had an ambulance up there because

21   I couldn't walk up there.  That's what they're talking

22   about on the slip and fall.  I was falling down after

23   the incident.  I couldn't -- I couldn't walk.

24                    They gave me the MRI's and they said,

25   hey, whatever it is that's going on should have been
```

```
 1   taken care of at that time.  Everything is healing up.
 2   You need to take care of yourself.  Bedrest.  More
 3   Percocet, more Percocet.  I remember she gave me
 4   another prescription of Percocet on that 19th because
 5   I couldn't -- I couldn't do anything for myself.
 6              I couldn't even -- it was worse than
 7   fall.  Like if I crawled, if I was trying to crawl, I
 8   would fall down.  That's what that is.  That is -- no,
 9   unh-unh, unh-unh.  No.
10        Q.     You indicated when you had the incident
11   with Enzell Woods that you all were tased but you said
12   it was ineffective.  What did you mean by that?
13        A.     Well, it didn't -- the handheld taser
14   that I was getting shocked with downstairs was
15   skin-to-skin contact where they contact with you.
16   With that gun, when they shot it, it didn't pierce my
17   skin or anything like that.  It didn't -- it didn't
18   lodge at all.  Neither one of us.  It didn't lodge in
19   neither one of us because I was in front of him and
20   they shot me and it didn't lodge in my skin.
21        Q.     You also indicated earlier during the
22   incident with the deputies that you were naked.  Why
23   were you naked?
24        A.     Talking about when clothes -- because
25   my hands were shackled and my feet were shackled and
```

```
 1   it was a zip up type of thing where you button it up
 2   and I couldn't -- I couldn't button it up because my
 3   hands were behind my back.  So it was basically open
 4   from here all the way down and hanging.  Like, you
 5   know, like you're supposed to button it up.  Well, I
 6   couldn't button it up and, you know, you're nude --
 7   you're nude at the waist down because it's a button up
 8   so I couldn't --
 9        Q.     Are you talking about the jail
10   jumpsuit --
11        A.     Yeah.
12        Q.     -- when you say "it"?
13        A.     Yeah.
14        Q.     Okay.  Why was it unbuttoned in the first
15   place?
16        A.     I never buttoned it up.  That was
17   coming from the shower.  It wasn't buttoned.  I never
18   buttoned it.  I remember going out and then I wake up
19   in there and it's half on, like half on.  I couldn't
20   button it up.  I didn't -- I was nude.
21        Q.     How long had you been in possession of
22   this jail jumpsuit before the incident?  Who gave you
23   the jail jumpsuit?
24        A.     The three deputies that -- in the
25   shower.  So from the shower --
```

1     Q.      So they dressed you.  The three that beat
2  you up, they dressed you?
3     A.      When I was getting dressed, he would
4  take the handcuffs off but leave the feet shackled.
5  So I put my arms in and then he handcuffed me.  That
6  way, I'm handcuffed and shackles again and then he
7  took over the legs and I got my legs in.
8     Q.      I'm just trying to get a clear
9  understanding of when did you initially get this
10 jumpsuit, why was it unbuttoned, and why were you naked
11 from the -- nude from the waist down.
12    A.      I didn't --
13    Q.      That's what I'm trying to understand.  At
14 what point -- let's start with this question.  At what
15 point were you assigned the jumpsuit?
16    A.      After they drug me into the shower.
17    Q.      So what were you wearing before that?
18    A.      Regular clothes.  The shirt -- you see
19 me when I don't have a shirt on.  That was ripped off
20 of me.  That was ripped off of me and I just had on a
21 regular pair of pants.  I didn't have on a shirt when
22 we went into the shower.  I was getting dressed out in
23 the shower.
24    Q.      So the three men who beat you up then put
25 clothes on you?

1      A.      While he was beating me and he was

2  tasing me, he threw the uniform.  Put it on.  I'm

3  putting it on.  As soon as I put on the top, he had

4  cuffed the top still slapping and punching and then

5  take off the bottom.  So once I got my bottom in,

6  that's when I was out.  I'm out after that point.

7           And when I wake up, I'm back in the

8  intake area face down, hands behind my back and

9  shackled and that's when Frank Jones comes in and

10 tases me in my back when I'm face down, face down, out

11 of it.  He comes in and he brings me back to life with

12 that taser.

13     Q.      So when -- before you got drug, you were

14 in plain clothes?

15     A.      Yes.

16     Q.      Because you were in the clothes you were

17 in when you got brought over from court?

18     A.      Yes.

19     Q.      And was there ever any issue with you

20 being asked to put your jumpsuit on and you refusing to

21 do it?

22     A.      Never.  Never.  I've been to that

23 facility more than one time, and in order for you to

24 even go to medical, you have to be dressed out.  So,

25 you know, I was like let's go to medical.  Got to get

1    dressed out.  They're not going to let nobody up to

2    medical with plain clothes on so there was never an

3    issue about dressing out at all.  That helped me get

4    to medical.  I was looking forward to getting dressed

5    out and going to medical.

6            Q.       So when they first encountered you, that

7    had nothing to do with dressed out with three deputies?

8            A.       Nothing at all.  When that person

9    counted me, I pulled away from the sergeant and then I

10   wake up being drug.  As soon as I pulled away from the

11   sergeant in pain, I wake up being drug back to that

12   shower.

13           Q.       And what was the sergeant trying to force

14   you to do, if anything?

15           A.       I don't know.  He just -- he just

16   grabbed me.  I didn't hear anything.  I just know he

17   grabbed me and it was like, awe, like wow, like no.

18           Q.       So the sergeant just grabbed you and

19   didn't explain why he was grabbing you?

20           A.       As soon as he grabbed me, I pulled

21   away, and when I pulled away, it was the incident.

22           Q.       So he just walked up on you and grabbed

23   you, the sergeant?

24           A.       He probably -- look, it was shift

25   change.  It was shift change.  He probably --

```
 1          Q.       Okay.
 2          A.       -- was telling me do something or
 3   something or go sit back down but I was under the
 4   impression that the guy that was at that desk I showed
 5   the bulge in the shoulder, I'm like, hey, man, this is
 6   the bone sticking out.  I thought he was taking me to
 7   medical.  I thought he was taking me to medical so --
 8          Q.       So the sergeant had given you the
 9   instruction, you believe, and you were defying it
10   because you said you were going to medical?
11          A.       No.  There was no instruction ever
12   given to me.  I thought I was going to medical.
13          Q.       So what did the sergeant do?  You said he
14   didn't just walk up and --
15          A.       He walked up on me --
16          Q.       Don't interrupt.  Mr. Robinson, let me
17   finish my question.  So he walked up on you and you just
18   said he probably was telling you to say something or to
19   do something?
20          A.       He was probably telling me --
21          Q.       Was he telling to you do something or
22   not?
23          A.       No, I didn't hear anything come out of
24   his mouth.  All I know is he grabbed me and I was in
25   pain and I pulled back.  Whatever he was saying, I did
```

```
 1   not hear anything that he was saying.  The only thing
 2   I remember is pulling away, like, oh, like pulling
 3   away.
 4        Q.     How do you know he was saying something?
 5   If you didn't hear anything, how do you know --
 6        A.     He was -- he was close in personal
 7   space.  He was like close, like close.  He had to be
 8   trying to say something.
 9        Q.     Well, was his mouth moving?
10        A.     I don't know.  I was looking straight
11   ahead.  I was looking straight ahead and I felt an arm
12   touch me and I pulled away, and when I pulled away,
13   the ordeal began.  The ordeal began.  I don't -- I
14   didn't see the guys touch me.  I didn't -- I didn't --
15   I didn't feel going into handcuffs.  I did not feel
16   going in shackles.
17             What I remember is waking up being drug
18   by my feet by the shackles to that area.  It wasn't no
19   cuss, cuss, argue, argue.  It wasn't no run away, run
20   away.  It wasn't none of that.  It was just woke up,
21   you drug.  And I woke up, like, in a fit of rage
22   because the shackles were cutting into my ankles.
23   That's a slave drag.  Ain't no slaves around here and
24   he did me like a slave.
25        Q.     When you testified earlier that you
```

1    thought you had seen Fuqua at your probation

2    officer's -- with your probation office, when would that

3    have been?

4            A.      That was in the hallway getting on the

5    elevator after I asked for the revocation.  That was

6    the last time when I went to the probation office.  I

7    came out of the office and there's the hallway where

8    the elevators sit.  I walked past Fuqua.  Fuqua was on

9    the left-hand side.  I looked at him.  I'm not in

10   violation of no law.  He can't tell me anything and I

11   jumped on the elevator.  I didn't tell him that.  When

12   I see him, I'm like I'm not in violation of no law.  I

13   have nothing to be afraid of asking for a revocation.

14           Q.      Why did you assume that?  Did he say

15   something to you?

16           A.      Unh-unh.  He just gave me that look

17   but --

18           Q.      What kind of look?

19           A.      Just a look.  Just a look.  He gave me

20   that -- just a look.  He looked at me.

21           Q.      Like a look like he didn't like you?

22           A.      Yeah, like a menacing like type of a

23   look.  He just gave a look.

24           Q.      So why would he do that?  Had y'all had

25   some prior issues or something?

1     A.     No, no.  There was -- there was -- all

2  the times when I went down to that probation office,

3  never was there an officer present at all.  I have

4  never seen him there before.  I have never come in

5  contact with that man.  Nothing at all.  Then when I

6  got down to the jailhouse, it was something waiting.

7     Q.     He was what?

8     A.     I guess they were waiting because in

9  order for you to swap name tags --

10     Q.     Let me understand.  The last time you

11  went to your probation officer before you got locked up

12  in May 2016, you made a request for a revocation because

13  it was interfering with your life, all the reporting.

14  Is that correct?

15     A.     Yes.  And the fact that when -- when I

16  asked my probation officer certain things, she was not

17  for me.  She seemed like she was more against me.

18     Q.     Okay.  I understand.

19     A.     So I asked -- I went to her supervisor.

20  I was like I need another probation officer because

21  this one, me and her, we're not seeing eye to eye, all

22  right.

23     Q.     And so when you were in her building at

24  the probation office, that's when you walked out of her

25  office or wherever she sits, a cube or whatever, and you

1    walk out and you saw Fuqua there?

2        A.       Fuqua was not in the probation office.

3    He was outside of the probation office in the hallway.

4    He never -- I never seen him inside.

5        Q.       Did he have his uniform on?

6        A.       Yeah, he had on the sheriff's -- the

7    whole sheriff's uniform, the uniform.  It wasn't -- it

8    wasn't no name tag.  He had on the uniform.

9        Q.       And is the probation office located in

10   the courthouse?

11       A.       That's on -- no, it's not the

12   courthouse.  That's on -- it's on Peachtree next to

13   the park, across the street from the park by the

14   Coca-Cola building.  Right down there by that

15   Coca-Cola building down there.

16       Q.       Okay.  And what date would this have been

17   on?

18       A.       When I asked for the revocation, they

19   set it I think it was a week after.  So it was

20   sometime in April because it happened in May.  So it

21   was sometime in April, late April where I asked for

22   the revocation and just go do the jail time and that

23   was --

24       Q.       So your testimony is you saw this Fulton

25   County sheriff's deputy just randomly in the probation

```
 1   office?
 2         A.      Yep, and had never been there before at
 3   all.
 4         Q.      And what was he doing?
 5         A.      Just standing by that door.
 6         Q.      Was he working like an off-duty job?
 7         A.      Unh-unh, unh-unh, no.
 8         Q.      How do you know that?  I mean was he
 9   reporting to probation?  What was he doing?
10         A.      He was just standing at the entrance
11   door of the probation office just standing there.
12         Q.      Would they typically have officers
13   standing at the entrance --
14         A.      No.
15         Q.      -- of the probation office?
16         A.      Never.  Never ever, ever.
17         Q.      So when you walked out, what did he do?
18         A.      He just looked, just gave me the look.
19   I gave him the look and I just kept on going.  We
20   didn't say a word to each other.  None of that.  He
21   just gave me the look and I gave him a look.
22         Q.      Did he continue to stand -- did he
23   continue to stand at the probation office?  Did he
24   continue to stand at the door after you left?
25         A.      Yes.  When I got on the elevator, he
```

1    was still at that door.

2         Q.      Is the probation office in Park Place?

3    Is that where it is?

4         A.      Yes, ma'am.

5         Q.      Okay.  So is that why you believe he then

6    gave his taser and his name tag to somebody, because he

7    saw you on a random April --

8         A.      Yes, ma'am.

9         Q.      -- at the probation office?

10        A.      Yes, ma'am.

11        Q.      And y'all had no words?

12        A.      Never.  We -- never had no words with

13   this man in my life.  Never seen him.  I couldn't even

14   pronounce his name when Markennis Jackson was making

15   the jokes because I asked Markennis Jackson how do you

16   pronounce that.  He's like, oh, you too ignorant.  You

17   can't pronounce nothing.  Should have went to school.

18   I was like, oh, I got school for you, uh-huh.

19        Q.      Well, how did he know that you had

20   happened to be booked in the jail that day?

21        A.      I mean because the revocation, when you

22   revocate, they know, they know -- your probation

23   officer know what time you're going to jail.

24   Everybody know what time you're going down there.

25        Q.      No, I'm not asking about your probation

```
 1   officer.  I'm asking how did Fuqua who is not your
 2   probation officer --
 3           A.      How did Fuqua know?  I have no idea.
 4   He works at the jailhouse.  I have no idea.  I have
 5   no --
 6           Q.      So you're telling me from a month before
 7   Fuqua was checking records to see when you got booked in
 8   so he could give somebody his name tag and taser?
 9           A.      It wasn't -- it wasn't a month before.
10   The revocation --
11           Q.      You said it was April.
12           A.      It was April but it happened in May,
13   May 1st -- excuse me -- May 2nd, May 3rd.
14           Q.      Okay.
15           A.      Seven days before May 3rd would be
16   April 23rd or 24th.  So at the end of April, that's
17   when -- that's when I catch him in the hallway.  I go
18   for my revocation.  And in the court, I was going to
19   address the probation officer and the judge at the
20   same time but the probation officer was not there at
21   all because I wanted to really talk to the judge about
22   her attitude and her demeanor.  She was not there.
23   Then I went to the jailhouse.  When I went to the
24   jailhouse, they were waiting.
25           Q.      Right.  But my question is this.  So
```

1   Fuqua from seven days before, you believe he had been
2   waiting to see when you would get booked into the jail
3   so he could switch name tags and taser to get you?
4          A.      That's -- that's what I believe.
5          Q.      Why?  Why would he do that?  Just because
6   you gave each other a look at probation?
7          A.      Maybe, maybe because he may know the
8   probation --
9          Q.      I'm not asking maybe.  What happened
10  between y'all other than you looking at him and him
11  looking at you?
12         A.      The only person I had words with is
13  Valerie Sims.  Maybe he knows Valerie Mims.  That's
14  all -- that's the only thing I could think of.  Like,
15  he has to know Valerie Mims.  He was at the office.
16  Name tags got swapped.  It had to be me arguing with
17  this probation lady.  That's the only thing that I --
18  that's the only person what I had an altercation with
19  before this to happen.
20                 I've been to that facility before and
21  I've never gotten into any fights with the inmates.
22  I've never gotten into any altercations with staff.  I
23  just do my little days and go home.  I have never been
24  combative inside any institution.
25         Q.      How do you spell -- how do you spell

1   miss -- your probation officer's last name?

2           A.      M-i-m-s.  Her first name is not the one

3   that's listed on the court proceedings because I

4   think it had --

5           Q.      I want the Valerie lady that you think

6   you had --

7           A.      Valerie Mims.  I have her name as

8   Valerie but it starts with a V.  It's V. Mims.  If

9   it's not Valerie, it's someone else but --

10          Q.      Spell her last name.

11          A.      Veronica Mims or Valerie Mims.

12  M-i-m-s.

13          Q.      Spell her last name.

14          A.      M-i-m-s.

15          Q.      So you believe that because you and Ms.

16  Mims had words, she and Fuqua had a relationship.  He

17  then a week later switched his name tag and taser to get

18  you back for the words you had with Ms. Mims?

19          A.      That's what I believe to be the story.

20          Q.      And you don't have any evidence to prove

21  these two even know each other other than the fact that

22  you believe he was present there at the probation

23  office?

24          A.      I can't speak on anybody's relationship

25  but they had some type of connection.  That's the only

1    way --

2         Q.      How do you -- how do you -- that is you

3    speaking on somebody's relationship then.  What kind of

4    connection?

5         A.      Probably professional.  Probation

6    officers and -- probation officers and sheriff's

7    deputies, they all work in the same network.  I'm

8    pretty sure they know each other.  More than positive

9    they know each other.

10        Q.      And so describe what Fuqua was wearing

11   again on this date and what time it was.

12        A.      He was dressed in the sheriff's

13   deputy's uniform, you know, with the tie and all that.

14   You know, he had his uniform on.

15        Q.      What do you mean the tie?

16        A.      Huh?

17        Q.      What do you mean the tie?

18        A.      You know, the brown -- the brown

19   uniform, the sheriff's deputy uniform that they wear.

20   The brown uniform.  That's the uniform.

21        Q.      And it had his name on it, emblazoned on

22   it?

23        A.      Yes.

24        Q.      And you saw it and it said Fuqua?

25        A.      Yes.  It -- he had on -- I mean he had

1    on the whole uniform, the light brown with the black

2    brown.

3         Q.     Okay.  And what did Fuqua look like?  Can

4    you describe him for me?

5         A.     Brown skin, short haircut, clean

6    shaven.

7         Q.     How tall?

8         A.     Maybe five -- five nine.  Maybe five --

9         Q.     What weight?

10        A.     180.  Between 170 and 180.

11        Q.     And what time would this have been?

12        A.     Like I say, they don't really keep the

13   time frames in that probation office and it wasn't on

14   time.  I tell you that.

15        Q.     What time were you supposed to report

16   that day?

17        A.     I think it was maybe ten or eleven.  So

18   it had to be between one and -- well, 12:30 and three.

19   Between 12:30 and three.  Somewhere between that time

20   frame.

21        Q.     Do you recall going in front of Judge

22   Schwall prior to January 2017 date when we were reading

23   through the transcript?

24        A.     Yeah, I remember Judge Schwall.

25        Q.     And do you recall that previous time you

1    all were in court that Jones was there as well?

2         A.      Yes.

3         Q.      And what is it that you said to the judge

4    then in reference to Jones?

5         A.      That --

6         Q.      Because it doesn't appear that you

7    accused Jones that prior time.

8         A.      Well, what I asked for was -- how it

9    played out, Fuqua was here.  Jones walked in.  And I

10   said, Your Honor, we have two Fuquas in the house now

11   because I know I got him in the court.  I said we've

12   got two Fuquas in the house.  I said and this Fuqua

13   says that he was not there but I know this Fuqua here

14   and this is also Fuqua.  I didn't know -- I didn't

15   know his name was Jones or Saunders or Jackson.  I

16   wasn't aware of anyone's names.

17              I asked the judge, I said, Your Honor,

18   now here's the dilemma.  There's -- on that video, you

19   see three people on that video but they're saying that

20   it's four.  Technically there's three people on that

21   video but the reason why Fuqua is here is because they

22   swapped name tags.  They're lying.

23              I need one, two, three.  I need his

24   name, birth, address.  I need all of them because they

25   are part of this investigation.  Give me their names

1    and their date of births so I can put a civil warrant

2    on them.  And the judge, give him what he need and --

3           Q.      No.  That happened in January.  The only

4    people who were present in January were you and Fuqua.

5    There was a prior --

6           A.      Yeah.

7           Q.      -- court hearing where Jones was actually

8    present?

9           A.      Yeah, yeah, the judge -- that's the --

10          Q.      (Unintelligible).

11          A.      That's the day the judge -- that's the

12   day the judge slammed the gavel when they all three

13   was present because -- I need all their names and I

14   thought they was going to be coming to the next trial

15   but I didn't -- I didn't subpoena them.  So they

16   didn't pop up at the last trial.  Just Fuqua came.

17          The judge -- the judge slammed the

18   gavel down when they all three are there and said give

19   me their names, date of births.  Nobody gave me no

20   names or date of birth, nothing, nothing but the judge

21   ordered them to.

22          And that's when I found out after I got

23   in there -- I was like, oh, that's the guy right

24   there.  I googled him.  That's the guy.  That's when I

25   figured it out.  I'm like, oh, there he is.  Fuqua.

```
 1   Jones.  Fuqua.
 2        Q.      What do you mean you googled him?
 3        A.      I googled -- I googled Frank Jones on
 4   Facebook.  I googled Rafferty Fuqua, Facebook.  I
 5   googled Saunders, Facebook, and Markennis Jackson,
 6   Facebook.  Pictures popped up and I saw that jaw.
 7   Once I saw that jaw formation, I was like there's my
 8   guy right there.
 9        Q.      Are you referring to Jones?
10        A.      Yes.
11        Q.      But you had seen Jones in court
12   previously.  So why were you not -- why did you have to
13   go to Facebook to figure out if that was the right guy?
14        A.      No.  I went to -- I was on Facebook to
15   get their date of births because y'all did not turn
16   them over to me as the judge ordered.  So I had to go
17   on Facebook and try to figure out when the date of
18   births was and get the personal information off of
19   Facebook.
20        Q.      And their dates of birth were all on
21   Facebook?
22        A.      Everything is on the internet.
23   Everybody's information is on the internet.  You know,
24   people celebrate their birthday and like to post on
25   Facebook what they got on their birthday.  So I used
```

1    that, figure out Rafferty Fuqua's date of birth and

2    where he reside and all that stuff.  I was using the

3    Facebook as an investigative tool.

4         Q.    Mr. Robinson, have you ever been

5    diagnosed with a mental health illness?

6         A.    Yes.

7         Q.    What mental health illness and when?

8         A.    After my mother died, a depression.

9         Q.    What year did your mother die?

10        A.    Two thousand -- well, after my mother

11   and my father died because they died months apart.

12   That was 2014, 2014.  Boy, that was the worst time in

13   my life.  Extreme depression.  You know how it is when

14   mama die -- when your mama die or your daddy die.  Put

15   them both together.  Extreme depression.

16        Q.    In 2014, I have records that reflect you

17   were diagnosed with bipolar disorder.  Is that

18   incorrect?

19        A.    Yeah, yeah, because I snapped.  I had

20   snapped.  I had snapped.  Yes, I would snap.  If I got

21   angry at that time, I was feeling so many different

22   emotions like -- yeah, yeah.  You'd be bipolar, too,

23   if your mother died.  One day you'll feel happy.  One

24   day you feel sad but they said that's a part of the

25   healing process is to be happy and then you be sad.

```
 1    You think about one emotion and think about emotion.
 2    That's natural.
 3              So I was like, well, if it's mental --
 4    it definitely because I lost my mother.  Everybody
 5    would be sad -- and happy and sad.  And my father.
 6    You would feel the same way, too.
 7         Q.      Did they give you any kind of medication
 8    for the bipolar?
 9         A.      Yeah, but -- yeah, but it wasn't the
10    bipolar.  I just needed to come to grips with what God
11    had put in front of me.  No medicine can cure that.
12    You have to trust God and go on the path.
13         Q.      So they did -- they did prescribe you
14    some medication and you just declined to take it?
15         A.      No.  I took it -- I took it until it
16    ran out, and after it ran out, they was like that's
17    not bipolar.  That's depression, the up and down
18    because look what you're going through.  That's
19    normal.
20         Q.      (Inaudible).  Mr. Robinson, did you hear
21    my question?
22         A.      No, ma'am.
23         Q.      How long did you take the medication?
24         A.      Oh, about six, six months.  About six
25    months.  I took it for about six months.  But even
```

1    after the six months, you know, you never get over the

2    loss of your parents.  That's something you've just

3    got to deal with.  No medicine can take that wound

4    out.  You have to deal with it so I dealt with it.

5         Q.     Mr. Robinson, I'm going to refer you to

6    the records that your attorney sent me and I'm sorry I

7    can't share them with you but I'm going to start with

8    plaintiff's Bates stamp number 00862.  It's from the

9    transcript of the initial hearing that you had before

10   Judge Schwall.  If you give me a second, I'll find that

11   date for you.  The date on that is August the 5th of

12   2016.

13             I'm going to read to you what you

14   testified to during that hearing.  "They dragged me from

15   intake by my feet in shackles to a back room.  In the

16   back room, Mr. Fuqua punched me in my face, kicked me in

17   my face and tased me so many times I can't remember.

18   Tased me in my testicles, and the whole time, the other

19   guys are holding me down laughing like it's a joke."

20   Who was holding you down?

21        A.     There was -- there was no holding me

22   down.  It was --

23        Q.     Then why did you say that to the judge?

24        A.     That's their interpretation.  When I

25   was in the shower --

1    Q.      Wait a minute.  Stop for a second.  Stop.

2  So you're saying that the court reporter transcribed her

3  interpretation and not the exact words that you had said

4  in court?

5    A.      Exactly.  There was nobody -- there was

6  nobody in that shower --

7    Q.      You never said -- you never said the

8  words they -- the whole time, the other guys are holding

9  me down laughing like it's a joke?  So the court

10  reporter took that down incorrectly?

11    A.      That's -- that's inaccurate.  When --

12  when I was in the shower being assaulted by Jones

13  a/k/a Fuqua, Saunders and Jackson were in the other

14  part.  They were not in the shower area.  They were in

15  the other part laughing and joking.  Nobody needed to

16  hold me down because I was handcuffed and shackled so

17  there was no need for anybody to hold me at all.

18    Q.      How about the other (technical

19  difficulty).

20            (Court reporter interruption.)

21    Q.      So from the shower area where the other

22  two gentlemen were standing, they could see what was

23  going on?

24            (Court reporter interruption.)

25    A.      They were not present.  No, they were

```
 1    not present.  It was just --
 2         Q.      They were not present?
 3         A.      No.
 4         Q.      Could they see what was going on?
 5         A.      No, ma'am.  No, ma'am.  It's separated
 6    by a partition and there's a doorway.  There's just
 7    one single doorway.  And I know for certain Saunders,
 8    Saunders was out -- and Jackson both, they both were
 9    out there.  They were not in the same doorway corridor
10    as we was.  They were in the adjoining room next to
11    it.
12         Q.      Understood.  The whole time Jones is
13    hitting and punching and kicking, they're in the
14    adjoining room unable to see what's going on?
15         A.      They are in the adjoining room
16    laughing.
17         Q.      And unable to see what's going on,
18    correct?
19         A.      You can hear -- you can hear the
20    punches and the kicks.  You can hear them.  I mean
21    he's not -- he's not --
22         Q.      How do you know what they could hear?
23         A.      Before, before I got drug into the
24    shower, I was in the corridor between the shower and
25    the room where they're standing.  That's when the
```

1    beating started.  Half of my body was inside the

2    shower.  My legs were in the shower.  I'm face down

3    and I'm looking up.  I see Saunders on the right

4    hand -- the left-hand side and Jackson on the

5    right-hand side.

6                And that's when Jones a/k/a Fuqua

7    started hitting and he started off with a slap first.

8    Then I commented he hits like a girl.  And it turned

9    into a punch and that was in front of Saunders and

10   Jackson.  That's when he gets behind me to my legs and

11   drags me completely into the shower where --

12        Q.       I see.

13        A.       So they saw.  They saw him hit me in

14   the beginning, but after getting drug into the shower,

15   it was more of a joke.  They was laughing and joking

16   when I was in the shower.

17        Q.       So the court reporter incorrectly

18   transcribed that they were holding you down?

19        A.       Yeah.  No, I --

20        Q.       Have you read this before?  Did you go to

21   the court reporter and tell her she had messed up?

22        A.       No, no.  From the beginning, I

23   maintained Saunders never put his hand on me.  He

24   never held me down.  He never touched me.  He never

25   did any of that.  That man did not -- but he just --

```
 1    he sat there as the bodyguard and he was laughing.  If
 2    I would have did something, Saunders would have beat
 3    me if I had acted inappropriately.
 4        Q.    So let me continue.  "So he takes the
 5    handcuffs off of me and I'm like, oh, you are blase
 6    blah.  And I'm cussing at him.  No lie.  I'm like, oh,
 7    you scared to fight and I'm like, man, you got two
 8    deputies holding me down and then you running on here
 9    talking about fighting me."  So again she took that down
10    incorrectly?
11        A.    When I said holding me down, that
12    was -- that was while I was handcuffed and shackled.
13    When you see me spin past that wall, all of them have
14    hands on me but they're -- it's not -- they're not
15    holding me down while he's on top of me hitting me,
16    no.  No.  They may have been holding me or keeping me
17    in place, but as far as holding me down and punching
18    me, no, they didn't do that.
19        Q.    Okay.
20        A.    They didn't -- they didn't -- no, no,
21    unh-unh.  I wouldn't put that on them.  Saunders and
22    Jackson did not hold me down while that guy sat on me
23    and beat me.  No, not that type of hold.  No indeed.
24        Q.    And then you say, "anyway they dragged me
25    to the back talking about undress.  Mr. Fuqua was
```

1    tasering me with a taser so many times I'm trying to
2    jump on it.  He's tasing me in my testicles.  Anyway
3    from there, he disappears and hits the punches.  I see
4    my teeth fall out.  I also see his foot retracting from
5    my face.  I see his hand retracting from my face.
6              When my teeth falls out, I said, hey,
7    man, my teeth fell out.  One of his buddies says, hey,
8    you need to get Fixodent and then drags me.  From there,
9    I blacked out.  They dragged me back.  I'm pissing on
10   myself.  While I'm handcuffed and shackled face down,
11   Mr. Fuqua says, oh, you're pretending and runs up behind
12   me while I'm handcuffed and shackled face down and tases
13   me again in my back to wake me up.
14             When I wake up, I'm pissing on myself.
15   I'm bleeding out the mouth.  One of my teeth was gone.
16   Two of my teeth was loose.  I'm spitting blood on the
17   window.  I can't stand so I'm hitting the wall.  I'm
18   like, oh, this is not Rice Street.  I'm butt ass naked.
19   The suit is hanging off.  It's not even zipped up."  So
20   you did have teeth fall out of your mouth?
21        A.      Like I said, a loose tooth or
22   whatever --
23        Q.      No, no, no.  I will read it to you again
24   but you said in here you had two teeth loose and one
25   tooth had fallen out.  That's what this transcript says.

```
1        A.        Yeah, yeah, one tooth had fallen out,

2   however you want to look at it.  Yeah, the teeth were

3   gone.  It was gone after that point.  However you want

4   to word it, the teeth were --

5        Q.        No, no, no.  I'm not trying to word it

6   any way.  Let's define what teeth fall out means.  No

7   longer in your mouth, not attached in any way in your

8   mouth.  So is that your testimony that teeth were no

9   longer in your mouth?

10       A.        My testimony --

11       Q.        (Unintelligible).

12       A.        My testimony is the teeth were hanging

13  by the meat in my mouth.  The meat was around the

14  teeth.  It wasn't, like, pulled out.  The meat was

15  around the tooth like it had been ripped out.  That's

16  what I'm trying to explain to you.  It's not like pop

17  out.  The meat and the teeth.  To get them out, I had

18  to pull the meat from my gums.

19       Q.        So when you testified to the judge I see

20  my teeth fall out, you meant you saw your teeth hanging

21  by meat?

22       A.        The gold teeth had fallen out.  Bling,

23  bling, bling.  Markennis Jackson, we got trophies.

24  That's what -- when my teeth fell out, bling, bling,

25  talking about the gold falling on the ground.
```

```
 1   That's -- my gold teeth fell off.
 2        Q.      Was your gold tooth on top of a real
 3   tooth?
 4        A.      Yeah.  Yeah, they shave the teeth down
 5   and they put glue around the teeth to keep it in place
 6   and that's how they keep it in place.  And, you know,
 7   to make it look normal, they shave the teeth down.  So
 8   the teeth are shaved down and glue, gold.
 9        Q.      And how many of these golds did you have
10   in your mouth?
11        A.      Four.
12        Q.      All up in that area at the top --
13        A.      Yes.
14        Q.      -- where your teeth are missing?  Those
15   were all gold teeth?
16        A.      Yeah, they were all gold teeth.
17        Q.      So when they put gold teeth in your
18   mouth -- and pardon my ignorance.  I've never had gold
19   teeth.  I don't know anybody that's had gold teeth.
20   Well, I do but I don't know the process.  They shave
21   your real teeth down to put gold and glue them --
22        A.      They did --
23        Q.      Don't interrupt me.
24        A.      All right.
25        Q.      Let me finish.  They shave your real
```

1  teeth down that you were born with to put gold teeth in

2  your mouth with glue.  Is that what you're telling me?

3        A.        Yes, ma'am.  They file them down.

4        Q.        How far down do they get filed?

5        A.        Not that far.  Maybe like a few

6  centimeters.  Not filed down to little bitty posts.

7  Just a few centimeters.  You couldn't even tell if you

8  take off the teeth.  It's just so they fit, align with

9  the rest of your teeth so the gold don't bulge down

10  but it's not like a super file down.  It's just a

11  minor file.  Maybe a centimeter, two centimeters.  Not

12  that much.

13        Q.        So when your gold teeth came out, your

14  real teeth also came out?

15        A.        Yeah.  When the -- they hit the gold

16  teeth, they move.  There was movement inside my mouth.

17  So every time the metal pushed against it or was

18  thrust against the teeth, it broke everything down

19  that was around.  The file was gone.  The gold was

20  gone.  Everything was gone up until the root.  Just

21  like roots.

22        Q.        In 2018, do you recall visiting Grady and

23  being diagnosed with PTSD and depression?

24        A.        Yes, ma'am.  Yes, ma'am.  I can talk

25  about the PTSD.  When I went to the psychiatrist's

1  office about the issue, I had a lot of fears.  I still

2  have a lot of it now where I don't really deal with a

3  lot of people but I was diagnosed with the PTSD from

4  the beating and she put me on some type of pill.  I

5  forget what it was called.  It's right on the tip of

6  my tongue but they medicated me to calm me down so I

7  can be in groups of people and not be fearful of this

8  or that and not be hypervigilant, just to sort of

9  relax.  I forget the name of this pill that they put

10 me on.  I have it -- I have it at home.

11       Q.     This diagnosis was after you had been to

12 prison, right?

13       A.     No.  Yeah.  Well, I got diagnosed in

14 prison.  I went to the psychiatrist in prison and that

15 prompted me to go to seek mental health after prison.

16 So I went and sought the mental health after prison.

17 So yeah, yeah.

18       Q.     What was your experience like in prison?

19 What prison were you in --

20       A.     Well, I was in Coffee County.  I spoke

21 to the warden about my issue and I wrote a statement

22 out to the warden to let the warden know exactly what

23 I went through, my experience, and the warden, black

24 guy, best warden in the whole world.  I thank God for

25 that guy.  He kept me sane.  He let me clean the

1    bathrooms and all that stuff.  He gave away gift

2    packs.  He made -- he made prison -- I hate to say it

3    but he made it pleasurable to get away from all the

4    stuff that had happened.

5                He went -- he bent over backwards.  He

6    even created a bingo day for me when I was there and

7    he started letting all the other prisoners come to

8    bingo.  Coffee County correctional did a good job.

9    Nothing bad to say about them.

10        Q.      Are you still on that medication?

11        A.      No, ma'am.  I don't take any

12   medications.  I'm off of all that.  I don't take any

13   Percocet.  I don't take anything.  The only way I'm

14   going to deal with it is to put it in God's hands.

15   Percocet don't work.  None of that stuff don't work.

16   That pain is always going to be there.  I have to pray

17   on it and I do that religiously.

18        Q.      Let's talk about you going to the

19   district attorney's office to make a criminal report.

20   So we talked about the hearing before Judge Schwall.  Do

21   you recall speaking with Deputy District Attorney Adam

22   Abbate?

23        A.      That was a long time ago.  Yes.

24        Q.      Are you aware that Mr. Abbate has been

25   unable to move forward with your investigation in your

1  case because of your refusal to speak with him or other

2  members of his office?

3       A.      Yes, ma'am.  I, I, I declined on

4  speaking with them guys is because there's nothing

5  more that I can say.  I've said this story a thousand

6  times the same way.  They have all the information and

7  honestly I was -- I was afraid of retaliation from the

8  Fulton County sheriff's deputies because I initiated

9  the lawsuit.

10         So I wanted to stay away from all of

11  that negativity up until I got a chance to speak to

12  someone who I could trust about it and I just didn't

13  feel comfortable with speaking about none of them.

14  And it wasn't that what he said -- the exact words was

15  we're two separate departments, but I'm saying if it's

16  a conspiracy thing, who can I trust.  If I tell you a

17  piece of information and the information gets back to

18  me, then I have an issue.

19         I had told -- I had told that district

20  attorney some information and it got back to me as a

21  threat from the streets.  So I was like, oh, well, if

22  I can't tell the district attorney anything in

23  confidence, I can't trust him.

24         If I tell you something about a certain

25  person to investigate, you can't tell that to them and

1    then they tell that to the thugs and the thugs come

2    ask me about what I'm talking to y'all about.  So

3    that's why I stopped messing with the district

4    attorney.

5          Q.       Who threatened you in the street?

6          A.       I have it on my phone.  It's a guy.

7    It's a guy.  He said something about, yeah, I heard

8    what you said, blase blah blah.  Grand --

9          Q.       Can you pull it up and read it to us?

10                  THE DEPONENT:  Miss Court Reporter, do

11   y'all have WiFi here?

12                  THE COURT REPORTER:  Yes.  Pull that sign

13   around to you.  There's a password.  Do you see it?

14         A.       Okay.  All right.  There we go.  Come

15   on now.  Go on to the next question while I pull it up

16   because my screen is cracked and it takes a minute for

17   me to type everything in here.

18         Q.       Okay.  So let's discuss your prior

19   incarcerations in the Fulton County Jail.  During the

20   prior times that you were in the Fulton County Jail,

21   were you ever given an inmate handbook?

22         A.       No.

23         Q.       How many times have you been incarcerated

24   in Fulton County Jail?

25         A.       Several.

```
 1        Q.       What is several?  Can you give me an
 2   estimate?
 3        A.       More than five.
 4        Q.       Okay.  And in those five times or more,
 5   you've never received an inmate handbook?
 6        A.       No, ma'am.  Everything is automated.
 7   It's on the wall.  There's the kiosk on the wall.
 8        Q.       That's now.  That's now but that wasn't
 9   then.  So you're saying --
10        A.       You're saying --
11        Q.       It is automated now.
12        A.       You're talking about a printed copy of
13   it?  No, we never -- they stopped -- they stopped
14   doing that.  I asked them why we couldn't get one.
15   It's because they said it came with staples in them
16   and they made tattoos with the staples so they don't
17   give out inmate handbooks.
18        Q.       When were you told that?
19        A.       I remember asking about it one time.  I
20   don't recall what year.
21        Q.       But you were -- so you were aware an
22   inmate handbook existed?
23        A.       Yes.
24        Q.       According to you, you refused to -- they
25   refused to give you one because of the staples?
```

1          A.        Yeah.   They don't give out staples at

2     all inside those facilities because they make tattoo

3     guns with them.   So there are no paperback -- there

4     haven't been paperbacks back there -- I've never seen

5     one at all but I heard of one but I never seen it.

6          Q.        Okay.   Are you familiar with the

7     grievance process at the jail?

8          A.        Yes, ma'am.   Now I am.

9          Q.        What do you mean now you are?

10         A.        That the last -- I put in a grievance.

11    I put in a grievance before about --

12         Q.        When was that?

13         A.        When I went to jail for the violation

14    for the -- the last one I went to prison for for the

15    nolo contendere.   All right.

16                   During that nolo contendere, I wrote a

17    grievance against Rafferty Fuqua in the sheriff's

18    department and my grievance was during this

19    investigation Rafferty Fuqua's wife, pink motor bike,

20    was following me around Atlanta, followed me to a gas

21    station.   When I went to another spot, she was there.

22    She was asking me to buy the motor bike.   My girl is

23    like, no, he's not buying the motor bike.   He has to

24    get himself together.   He can't get on a motor bike.

25                   But I wrote a grievance about it

1    because I didn't know that that was Rafferty Fuqua's

2    wife at that time up until I Facebooked him and then I

3    see him hugged up with a girl on a pink motor bike.  I

4    wrote a grievance about that.

5         Q.     Okay.  So what year was that?

6         A.     That was in two thousand -- right when

7    I went to prison.  The judge gave me county time but

8    they sent me to prison.

9         Q.     I don't know when you went to prison.  We

10   don't know each other.

11        A.     2018.

12        Q.     What year was that?

13        A.     2018.

14        Q.     Okay.  And how did you become aware of

15   the grievance process in 2018?

16        A.     I was told about it.

17        Q.     By whom?

18        A.     An inmate.

19        Q.     So prior to 2018, in the five other times

20   you had been to the jail, you had no idea there was a

21   way that you could file a grievance?

22        A.     No, I wasn't -- I wasn't aware that you

23   could file a grievance like -- no, no, not that I'm

24   aware of.

25        Q.     So how do you think you made complaints

```
1    in the jail?
2         A.      I thought you just write a complaint.
3    You write the complaint and put it in the box.  I
4    didn't know you could address --
5         Q.      That's what -- that's what a grievance
6    is.
7         A.      But here's the thing.
8         Q.      Uh-huh.
9         A.      When I was on --
10        Q.      Okay.  So let me stop you.  You're aware
11   there's a box and you can write it and put it in the
12   box.  You were aware of that.  How soon were you aware
13   that the box existed and you could write stuff and put
14   it in the box?  When did you first become aware of that?
15        A.      Well, when I wrote the grievance
16   against Fuqua, they wouldn't even let us put it in the
17   box.  We slid it under the door and --
18        Q.      That's the first time in all the times
19   you had been in the Fulton County Jail that you ever
20   became aware of a box?
21        A.      That I can remember.  Now the
22   difference between those times and that time is the
23   7th floor, that's the murder floor.  There is no
24   grievance on that floor.  You don't get no grievance
25   paper.  I asked for it.
```

```
1              You don't get any documents.  A
2    document pen, I asked for that.  I asked for all this
3    to write this information down.  I was refused a pen.
4    I was refused any form to write anything down.  To
5    people that I spoke to, I need to write the names down
6    but they would not give me anything to write it down
7    with, no pen, no paper.
8         Q.      Who are they?  Who are they?
9         A.      The commanding officer of the floor.
10        Q.      What's the name?
11        A.      No pen, no paper.  I don't remember.  I
12   don't remember but he came around to do the showers.
13   When they came around to do the showers, I need to
14   write blase blah.  We don't allow pens in here.
15              I said, well, how are you supposed to
16   get a pen?  Blase blah, blah, blah.  Oh, you've got to
17   fill out an indigent.  Well, I'm not there long enough
18   to be indigent and I doubt the killer next door is
19   going to give me his pen.  They don't share pens in
20   that jailhouse.  You have to have a super or something
21   to give to them to get an inmate from their pen and
22   then --
23        Q.      So you were advised to request an
24   indigent kit which you didn't do and you were aware --
25        A.      Fifteen days.
```

```
 1        Q.        Okay.  Don't interrupt me.  I'm still
 2   asking my question.  You were advised to request an
 3   indigent kit to get a pen and you were aware that if you
 4   had gotten to a pen you could have filled out the form
 5   and put it in the box.  Is that what you're saying?
 6        A.        No, ma'am.  On that day, I was not
 7   advised to get an indigent kit.
 8        Q.        Well, that's what you just said.
 9        A.        I said when I went to prison on that
10   last time --
11        Q.        I'm not --
12        A.        Hold up.  When I went -- listen.
13   Listen.
14        Q.        I just want you to tell me about the
15   Fulton County Jail.  Prison is irrelevant to me.  When
16   you -- all the times you were in the Fulton County Jail,
17   your testimony is you were unaware that there was a box
18   that you put the forms in for the grievance.  Is that
19   what your testimony is?
20        A.        My testimony is on that day in
21   question --
22        Q.        I'm not asking about --
23        A.        -- there was no -- there was no --
24   there was no box on the 17th -- on the 7th floor.
25   There is no box where you can do an indigent --
```

1      Q.      I'm not asking about that in the
2  question.  I'm asking about your knowledge of the
3  grievance process at the Fulton County Jail.  So please
4  explain to me your knowledge of the grievance process
5  which as you have already articulated involved writing
6  on a piece of paper and putting it in a box.  Explain to
7  me how you came about to that knowledge and when you
8  did.
9      A.      I came to that knowledge after the fact
10 when I got arrested and I went to prison and I wrote
11 the grievance paper.  That's when I wrote a grievance.
12 At that point, I became aware of the grievance system
13 to write it down.  That's after the effect.  That's
14 after the point.
15            When I got beat up in Rice Street,
16 there was the 7th floor and there was the door.  They
17 slid the door thing open, looked in there, put the
18 food in and slid it back.  There is no here's a pen.
19 Here's a grievance.  No, no.  There is no commissary
20 because you don't get commissary up there, especially
21 on the fight charge.  All that is revoked.  You don't
22 get --
23     Q.      Okay.  You're not understanding my
24 question, Mr. Robinson.  I understand that you're saying
25 you had inability.  I'm asking about the grievance

1    process.

2         A.       That's in 2018.

3         Q.       Okay.  You were in prison -- I mean you

4    were in Fulton County Jail in 2011.  You were in the

5    Fulton County Jail on 2014.  According to you, at least

6    five times, maybe more.  And in all of those times,

7    you're telling me that you never knew there was a

8    grievance process?

9         A.       No, ma'am, not that I'm aware of.

10        Q.       I don't know what that means, not that

11   I'm aware of.

12        A.       I was not aware of a grievance system.

13   I was not aware of any kind of way where I could

14   reciprocate an action.  I was not aware of that.  I

15   was not aware.  I've never been through a situation

16   where I've been jumped on by an officer before.

17        Q.       I said nothing about being jumped on.

18   You keep trying to myopically focus on that.  I'm

19   talking about globally.  You're saying all the times you

20   have been in the Fulton County Jail -- you're familiar

21   with shift change.  You're familiar with people's

22   titles, stuff that people typically aren't familiar with

23   unless they've been to jail a lot of times.  And I'm not

24   trying to disparage you.  I'm just saying that's the

25   case.  And you're telling me that in all those times you

```
1  had no knowledge that there was a grievance process by
2  which you could avail yourself of?
3       A.      No, ma'am.  I was not -- I was not
4  aware that I could put a grievance against anybody
5  and --
6       Q.      (Unintelligible)
7       A.      Hold up.  Hold up.  And to make matters
8  worse, they were not giving the grievances out when I
9  was on the 7th floor.  It was impossible --
10      Q.      How do you know that?
11      A.      I asked for a pen.  I asked for a pen.
12 I asked for a piece of paper.  I asked for something
13 to document and I was refused.
14      Q.      Okay.  I'm not asking about refusal for
15 paper and pen.  I'm asking how do you know they weren't
16 giving out grievances?  Did you --
17      A.      I asked.  They didn't give anything.
18 They didn't -- I said, man, how do I put this in black
19 and white.  They didn't give me anything.  They didn't
20 give me anything.  Nothing.  Nothing at all.
21      Q.      So before 2016 if you had a complaint at
22 the jail, how did you make your complaints?
23      A.      I never had any complaints.  I was
24 never -- I was never combative.  I never got into
25 anything at that jailhouse.  I never got in no
```

1  trouble.  Nothing, nothing.  I've never had a use for
2  the system at all.
3       Q.       So who told you about the box and that's
4  where you put the form in because you say it happened
5  when you went to prison.  I don't understand how it's
6  helping us when you were in prison.  I'm talking about
7  the jail.  How did you find out about the box in the
8  jail?
9       A.       When I was in jail, that's when I wrote
10 the grievance.  I didn't write the grievance in
11 prison.  The prison was -- they did right by me in
12 prison.  Inside that --
13      Q.       Where did you get the grievance form from
14 in 2018?
15      A.       I believe my roommate had one under his
16 bed.  The roommate -- the guards never walked around
17 with them at all.  You had to get them from another
18 inmate and I got it from an inmate.
19      Q.       How did that inmate get it if the guard
20 never gave anybody one?
21      A.       I don't know.  I don't know how he -- I
22 don't know.  Why don't you ask --
23      Q.       How did the inmate get it?
24      A.       Grievances don't come on a copy
25 machine.  The grievances, they come in like a three

1    pack and you'll write on them and it has a copy of a
2    copy of a copy.
3          Q.      Okay.
4          A.      That -- my roommate gave that to me.
5          Q.      And how did your roommate get it if the
6    guards weren't giving them away?
7          A.      I don't know.  He had been there for
8    two or three years.  I'm pretty sure that, you know --
9    he was in there for a minute.  He had been in there.
10         Q.      So he had to get it from the jail
11   personnel?
12         A.      He got it from somewhere.
13         Q.      It didn't just fall out -- okay.
14         A.      He got it from somewhere.
15         Q.      So there's this triplicate and you've
16   never seen a form like that ever before?
17         A.      Unh-unh, not that I'm aware of.  I'm
18   not aware of any form.
19         Q.      Have you found the text message?
20         A.      Say again.
21         Q.      Have you found the text message?
22         A.      No.  I'm going through it right now.  I
23   will find it.  Hold up.  All right.  There we go.
24   Video, screenshots.  Screenshot.  It's coming up.  One
25   second.  There we go.  All right.  I think it came in.

1   Screenshot, baby.  Where we going?  Oh, there it is.
2   Okay.  All right.  Here it go.
3              Well, I never thought your bitch ass
4   nigga boy would sing that fucking song.  Remember what
5   comes around goes around.  Grand memo.  Ain't no love
6   I have to change about you.
7              And this was -- this was the guy --
8   this was the guy where I had spoken to -- I think his
9   name was Ray, ADA Ray.  I got his number at the house.
10  I forwarded him the information about Jones, Fuqua,
11  blase blah and them using the street guys to bring
12  harm.  So I put it all in an email, blase blah.  I
13  sent it to him.
14             And the next day -- it wasn't the next
15  day.  Let me correct that.  That's a lie because I
16  don't really check the emails.  I checked it about
17  maybe three weeks later and I saw this.  And I said,
18  damn, that's the guy that I was speaking to the DA
19  about, Rafferty Fuqua, blase blah and now you send
20  back this text message.
21       Q.     That text message is from ADA Ray?
22       A.     No.  It's from the text message that I
23  sent ADA.  This guy and Rafferty Fuqua, Frank Jones or
24  whoever, they were conspiring together and I sent --
25       Q.     How do you know that?

```
 1                  THE DEPONENT:  Jeff?
 2        Q.      What?  I'm sorry.
 3        A.      Hold on.  I'm speaking to my attorney.
 4   Jeff?
 5                  MR. FILIPOVITS:  I'm sorry.  I can't help
 6   you.
 7        A.      Okay.  Well, okay.  How they conspired
 8   together?  When --
 9        Q.      Who -- first of all, stop.  Who is this
10   person.  What is this person's name?
11        A.      He goes by the name of Monster.
12        Q.      Well, what's his real name?
13        A.      Darryl.
14        Q.      Darryl what?
15        A.      I don't know his last name.
16        Q.      And how does he have your cell phone
17   number?
18        A.      I had known him from in the past from
19   New Orleans.
20        Q.      You know this person from the past.  What
21   date is on the message you just read to us?
22        A.      Let me see.  August 18th.
23        Q.      Of what?
24        A.      2019.  2019.
25        Q.      Okay.  So you're telling me August 18th
```

```
 1   of 2019 somebody sent you a text that doesn't say
 2   anything in any way connected to this case and you're
 3   about to show us how this is connected to this case that
 4   happened in 2016?
 5        A.      Okay.  When I spoke with --
 6        Q.      That's what I would like you to do.
 7        A.      When I spoke with the DA about the case
 8   and about, about what was going on in my personal life
 9   from how I was being --
10        Q.      What year was that when you spoke with
11   the DA?
12        A.      This is 2019.  This is the reason why
13   because Ray, DA Ray told me to come down and I was
14   like no, no, no.  And I sent DA Ray an email.  I said,
15   man, I'm not coming in because blase, blah, blah,
16   blah.  They're using the streets to get -- to re-enact
17   revenge on me.  It happened on my job.  It happened at
18   5191 Jonesboro Road where shots were fired at my
19   house.
20              How do I know?  My neighbor came and
21   told me.  I was at the movies.  They all outside
22   scared for their life.  I said what the hell?  How
23   somebody shooting up my house now?  I don't get into
24   anybody.  Roadside.  I towed cars.  I like cars.  I
25   don't have street problems.
```

1        Q.        What job?  I thought you hadn't worked

2   since 2017?

3        A.        This is -- this is -- this is 2017 that

4   I'm speaking about.  This is all in that time frame or

5   period where I stopped working.  This is what I'm

6   speaking about.  This is why I stopped working.

7        Q.        From 2019.  So when did you speak to the

8   ADA?

9        A.        I spoke to them from 2017 all the way

10  up to 2019.  I stopped speaking to them in 2019 when I

11  got this text back from the guy who I spoke to the DA

12  about.  That's when I stopped speaking to the DA and I

13  was like, no, y'all got something going on.  The text

14  messages are coming back to me about I'm speaking to

15  you about.  Something is going on.  So that's why I

16  refused to come in to the DA's office because of

17  the -- what reciprocated after I spoke to them.  I had

18  no problem --

19        Q.        Perhaps you can translate -- (technical

20  difficulties).

21               (Court reporter interruption.)

22        Q.        Perhaps you can translate that text

23  because what you read, first of all, I didn't even

24  understand half of it.  How do we know that that's

25  connected to this case?

```
 1        A.      This guy right here, I don't talk to
 2   this guy.  It's just someone I know.  He's an
 3   associate.  And he said, well, never thought your old
 4   bitch ass nigga boy would sing a fucking song like
 5   that.  Talking about when I spoke to y'all because I
 6   don't speak to anybody during this period of time.  I
 7   only speak to you and my lawyer, right.  Remember --
 8        Q.      Mr. Robinson, you've given countless
 9   interviews.
10        A.      No.
11        Q.      Countless.  At least three.
12        A.      To the news?
13        Q.      Yes, sir.
14        A.      To the news?
15        Q.      Yes, sir.
16        A.      But the information that I sent to DA
17   Ray had nothing to do with the news.  It had nothing
18   to do with anything -- it had nothing do with that.
19        Q.      So I don't understand.  The text doesn't
20   tell me what song he alleges you're singing.
21        A.      The song that I'm singing?  Oh.
22        Q.      It could be about anything.
23        A.      The song that I sung was -- when they
24   say you singing songs, that means you ratting.  That's
25   what singing a song means.
```

```
 1        Q.      I get it.

 2        A.      All right.

 3        Q.      I'm not that dense.  I get that but how

 4   do I know that he's talking about this?  Where in that

 5   text message does it tell you or anybody that this

 6   situation is what he's talking about?

 7        A.      It doesn't but he knows -- he knows

 8   Frank Jones personally.  He knows --

 9        Q.      How do you know that?

10        A.      He called him on the phone.  Because I

11   was talking to him about it like, man, these boys beat

12   me to death, blase blah, blah, blah.  Had on fake name

13   tags.  He called Frank Jones on his phone and Frank

14   Jones said -- because I'm listening in the background.

15   It's on speaker.  Frank Jones says, oh, he acted up in

16   intake.  That's what he told this guy right here that.

17   Oh, he was acting up at intake.

18                And I looked at him and I was like, oh,

19   okay, okay.  So you know Frank Jones and you keep

20   asking me these questions.  And every time you ask

21   this question, either my house gets shot up, somebody

22   following me.  Every time I tell you where I'm at --

23   let me just cut you out.

24                So I cut him off, too, and I cut off

25   the district attorney's office because I didn't tell
```

```
 1   him none of my business.  None.  I just told him I got
 2   beat up.  That's it.  Nothing more than that.  He
 3   don't know that -- he don't know that I been to
 4   umpteen courts about -- he don't know none of that at
 5   all and he don't know how to read.  He is illiterate.
 6   I have to read stuff for him.
 7              So the only way where he could get it
 8   is from word of mouth from somebody else because he
 9   can't read.  Can't read a sheet of paper that you put
10   in front of him.  I know -- so I know he ain't read it
11   and I don't talk to nobody at all.  When I go home, I
12   lock myself in the house and I don't come outside.  I
13   do not contact the woman that I spoke with in the
14   past.  I have not spoken with anyone from Atlanta in a
15   very long time.
16              I stay away from anybody who has
17   Atlanta on their name tag because I don't know who
18   they know and who knows who and who knows what so I
19   stay away from everybody.  It's impossible for him to
20   send me stuff because I don't talk to nobody from
21   Atlanta.  None.  Zero.
22        Q.     Okay.  So what's Darryl's phone number?
23        A.     Unh-unh, I don't want to get into that.
24        Q.     Well, I'm asking you a question.  You
25   said that he's connected and that he's been talking
```

1   to --

2        A.        If I bring that man in court, man,

3   people are going to kill me in Atlanta.  I'm not

4   involving nobody but the people that's inside this

5   case.  That man got nothing to do with this case.

6        Q.        You just testified he did.  You testified

7   he has been threatening you and I have a right to follow

8   up on that.

9        A.        No, I don't have his number available.

10  That was on Facebook Messenger.  You can get it off

11  Facebook Messenger.

12       Q.        I'm not on Facebook and you sued my

13  clients and so I'm making a request of you and I will

14  put it orally in writing and I expect to get his number.

15       A.        I didn't get his number.  It's Facebook

16  Messenger.  That's what I keep telling you.  It came

17  from Facebook Messenger.  He messaged it on Facebook.

18  He didn't dial me.  That came on my Facebook

19  Messenger.  I just so happened to go through my

20  Facebook Messenger because I don't check it every

21  month or -- I check it every so often and I go through

22  it and I say, damn, this is message me and it's on

23  Facebook Messenger.  This is not a telephone number.

24  You can get it from Facebook Messenger.  I'm pretty

25  sure Facebook, they got details.  They got all their

```
 1   accounts.
 2         Q.      So you don't have Darryl's phone number?
 3         A.      No.  It came from Facebook Messenger.
 4         Q.      So what information did you give ADA Ray
 5   about Darryl?
 6         A.      I didn't give -- I gave it about Frank
 7   Jones and them using the streets to -- the gist of the
 8   message was that they were using people in the
 9   streets, offering people in the streets money to have
10   harm done to me.
11              One guy I heard -- his name is Steven,
12   Steven Perkins.  I went to the rooming -- it wasn't a
13   room.  It was -- where you have to go after prison,
14   that halfway house type thing.  So I hear the
15   conversation in the halfway house room type thing and
16   Steven is like, yeah, we're going to get that
17   twenty-five thousand dollars and he going to give us
18   some weed.
19              But I didn't realize that, you know,
20   they talking about me up until someone tried to pry
21   open the door and I called the police.  And I'm like,
22   hey, man, somebody is prying open this door, blase
23   blah, blah.  Something ain't right about here.  Nobody
24   just keep popping up on me everywhere I go.
25   Somebody's got to be targeting me.
```

1          And once I started saying something

2    like, oh, they're targeting me, then everybody wants

3    to make me seem like I'm crazy but my house ain't

4    never been shot up.  I ain't never been followed at

5    work.  I ain't never had dummy calls at work.

6          I've been doing towing and recovery so

7    long where I know it's a dummy call before I even go

8    to it by how the person reacts to me over the phone,

9    whether they answer the phone, whether they're with

10   the call, whether they ain't with the call, where the

11   call was.  No.  I've been doing this for a very long

12   time as far as driving.

13          So to call my phone and to get me to

14   come to the bluff at three o'clock in the morning --

15   you know what the bluff is.  Three o'clock in the

16   morning to a church in the bluff at three o'clock in

17   the morning to do a winch out and how you going to

18   winch out a car that's front wheel drive -- rear wheel

19   drive and front wheels stuck in -- the front wheels

20   don't get boggled down.  Only the spinning wheels get

21   boggled down.

22          So when I go out there to the one in

23   the bluff, the one I'm speaking of, the front wheels

24   are boggled down and at church at three o'clock in the

25   morning.  The driver is not present but there's a

 1   bunch of other people that are saying, hey, wait for
 2   the driver.  I declined the call and told the
 3   dispatcher about sending through bogus calls.
 4            I mean when somebody is following you,
 5   you would know.  You know when something ain't right
 6   when you're being followed.  That happened numerous
 7   times in Atlanta.  Numerous.  Not one time.  Enough to
 8   make me fear to be around my children, to fear to be
 9   around anyone.
10        Q.    Mr. Robinson, I'm going to refer you to
11   Plaintiff's Exhibit Bates number 00092 which was
12   provided to me by your counsel.  They are the medical
13   records that were produced by the then medical provider
14   at the jail.  I'm going to read to you from two
15   different portions again starting with that Bates number
16   that I just read into the record.  The time that you
17   were seen at intake and receiving screening was done at
18   9:18 a.m.
19            MR. FILIPOVITS:  I'm sorry, Ashley.  Can
20   you give that Bates number once more?
21            MS. PALMER:  Sure can.  00092.
22            MR. FILIPOVITS:  Got it.  Thanks.
23            MS. PALMER:  You're welcome.  And I'm
24   scrolling through that, Jeff, and going past 00093 to
25   00094.

1    Q.    So I'm going to read to you what it says.
2  Mr. Robinson, can you hear me?
3    A.    Yes.
4    Q.    It says examination, general appearance,
5  no apparent distress.  Oral screening findings, cuts on
6  lip, low, teeth from altercation.  Visible skin exam
7  findings, tattoos, multiple cuts and abrasions.  Health
8  education, oral hygiene education provided to patient.
9  Disposition placement.
10    And it goes down and it says referral --
11  referral, excuse me, urgent care clinic order initiated.
12  Behavioral health expedited.  Dental referral routine.
13  Then it says consent for treatment signed, yes, and care
14  reviewed, yes.  Grievance explained, yes.  The
15  information provided is correct on the intake date
16  listed and I accept the provision of mental, dental and
17  mental health care that's electronically approved by
18  Ronald Sanders as of 9:28 and 42 seconds a.m. on May 3,
19  2016.  In anything I read there, did you tell me where
20  you pointed out the toe incident, the toe?
21    A.    I didn't hear anything where you just
22  said anything but I pointed it out.  I pointed it out
23  a thousand times and multiple people a thousand times.
24    Q.    Pardon?
25    A.    I didn't hear it in what you read but I

```
 1   pointed it out not just to one person but to every

 2   person that I came into contact with.  I showed them

 3   that toe because I'm dark-skinned and it kind of

 4   looked crazy when a dark-skinned person turns purple

 5   so I kept pointing it out.  Man, something ain't

 6   right.  I can't move it.  I kept pointing it out.

 7        Q.      So also anything about your shoulder at

 8   that time?

 9        A.      Uh-huh, I kept showing it to him.  Hey,

10   man, look at my shoulder.  My toe, my shoulder.  My

11   shoulder and toe.

12        Q.      Now I'm going down to 00095 which is the

13   urgent care encounter records from 5:41 p.m. on May 3rd

14   of 2016 and here it says -- again these are your

15   records.  History, complaints.  Patient was in a fight.

16   Resulted in upper tooth evulsion and one pinky toe

17   laceration.  Admits pain.  Patient was seen by the

18   dentist for the current tooth injury.  He is prescribed

19   Motrin and something I cannot pronounce.

20        A.      That was for the swelling to make the

21   swelling go down.

22        Q.      And it says denies LOC, headache,

23   dizziness, SOB, chest pain.  So it does there indicate

24   that you mentioned the toe but that was after the

25   altercation with the inmate but you say that you had
```

 1    been mentioning it before then?

 2         A.      Yes, ma'am.

 3         Q.      So they document it in this record but

 4    you acknowledge there was no documentation in the other

 5    one, correct?

 6         A.      Not that I'm aware of.

 7         Q.      Also under general appearance, it says

 8    alert, no acute distress, no obvious deformity.  Upper

 9    front tooth evulsion, edema to your upper lip.  I know

10    that enough to know that's swelling.  They talk about

11    your eyes, your lungs being clear, your heart regular

12    rate and rhythm, abdominal soft and nontender, positive

13    bowel sounds.

14              Musculoskeletal.  They see one to two

15    centimeter superficial abrasion laceration.  One foot

16    fifth dorsal digit, which is the toe that you mentioned.

17    Mild bleeding.  (Unintelligible) is well.  They said you

18    were moving your extremities well but are you still

19    saying your arm was broke?

20         A.      Ma'am, the injury -- the nature of my

21    injury prevents me from doing certain things.  I can

22    push off, but as far as pull up on something, it makes

23    it gap worse.  It falls down.  It's fallen.  See, I

24    can push, but as far as lifting stuff up or pulling

25    something, anything that pulls down on it, when it

1    pulls down on it, it put me back in tears.  Don't
2    touch me.
3              I have to go back to the hospital.
4    When I get to the hospital, all they do is write an
5    opiate prescription.  That don't help because after I
6    do the opiate prescription I'm still hurt.  And when
7    the opiate wear off, it's one hundred times worse
8    because I thought that, you know, the opiates make you
9    think that you're, you're healthy and you're fine.
10   You don't feel the pain but in all actuality all you
11   do is tear it up more.  So opiates is -- unh-unh.
12   That's more pain.  Unh-unh.
13        Q.     Your charge from 2011, the aggravated
14   assault, what was that in reference to?
15        A.     Well, my mother was dying of cancer.
16   My mother and father were fighting.  I got into the
17   middle of it, which I shouldn't have, and I wound up
18   with an aggravated assault.  I'm defending my mama.
19              When it came down to court, I had the
20   option to testify against my father and we both go to
21   jail.  I was already in jail and leave my mother who
22   was terminal with cancer with no one to take care of,
23   alone or take the charge and leave her with her
24   husband.  I took the charge and left her with her
25   husband.  I would do it again just to see my mother

```
 1   live a little bit longer.
 2        Q.      So the charge for aggravated assault
 3   meant that you allegedly used some kind of object to
 4   assault someone.
 5        A.      Yeah.
 6        Q.      So what was the object?
 7        A.      The object?  It was a broomstick and
 8   they said it was assault because it had blood on it.
 9   My blood was on it.  They thought it was his blood but
10   it was my blood.  I didn't want to put my parents
11   through that because my mother was dying at that point
12   and then my father -- I know the captain go down with
13   the ship.  He was a naval captain.  I knew what he was
14   going to do so I took the charge.  I'd take it again,
15   too.  I didn't hit anybody but I would take that
16   charge just to have my mama live a little bit longer.
17        Q.      When you were in jail on May 3rd, they
18   did a mental health evaluation 2016 and one of the lines
19   in here says patient stated that he used to take
20   anti-psychotics but it has been many years since he last
21   had meds.  What anti-psychotics did you used to take?
22        A.      I didn't know -- I should have said
23   antidepressants but I don't know the name of it.  It
24   was the antidepressants.  When my mother first had
25   came down with the multiple myeloma, my world came to
```

```
 1   an end.  I was severely depressed because multiple
 2   myeloma, it ain't like regular cancer.  It has a --
 3   ten years.  It's like, oh, she's got ten years to
 4   live.
 5              So when I figured out my mother only
 6   had so long, I was depressed.  Super depressed.
 7   Nothing, nothing can compare (sic) you for it.  No
 8   medicine they give can medicate you.  That's something
 9   that you have to live through.  There's no cure for
10   that at all.
11        Q.      Also in your Grady records, it indicates
12   you had a diagnosis of schizophrenia at some point.  Is
13   that correct or incorrect?
14        A.      Schizophrenia?
15        Q.      Correct.
16        A.      In that jailhouse, everybody --
17        Q.      In the Grady records.
18        A.      The Grady records?  The schizophrenia?
19   They said that all came from the depression on my
20   mother and father.  They said that was a misdiagnose.
21   You're not schizophrenic.
22        Q.      Who said you were misdiagnosed?
23        A.      The people at Mercy, Mercy Care.  Mercy
24   Care.  You're not schizophrenic or none of that.
25   That's the life.  Get used to.  That's life.  People
```

```
 1  die.  God's plan.  So all that bipolar -- I was -- my
 2  parents and all that stuff was dying.
 3        Q.      So Mr. Robinson, in Plaintiff's Bates
 4  number 00105, you referenced earlier you were
 5  polygraphed and it actually says an inconclusive opinion
 6  was rendered.  Are you aware that it says it was
 7  inconclusive rather than your testimony that you passed?
 8        A.      No.  My paperwork says that I passed.
 9  They never gave me an inconclusive.  I never --
10        Q.      This is what your lawyer sent to me.
11        A.      No, no.  The one that was
12  inconclusive -- the one that was inconclusive was
13  Frank Jones.  Frank Jones was inconclusive.  You must
14  have misheard what he said.  I passed mine.  Flying
15  colors.
16        Q.      I'm looking at Plaintiff's Bates number
17  00105 and I'm sorry that I can't show it to you on
18  screen.
19        A.      You have to send that to the lawyer
20  because the judge --
21        Q.      The lawyer sent it to me, sir.  This is
22  what I got from your lawyer.  That's why I'm reading the
23  Bates number to you.  It's your document.
24        A.      No.
25        Q.      Your document.  It says subject, William
```

```
 1    Robinson.  Also lists you as being the alleged victim
 2    and it says it's the polygrapher's opinion that your
 3    (technical difficulty) an opinion, therefore an
 4    inclusive opinion is rendered.
 5         A.      No.
 6         Q.      That's what it says from your Bates --
 7         A.      When I left the GBI, the GBI, the
 8    GBI --
 9         Q.      GBI document.  This is a GBI document.
10         A.      GBI didn't say inconclusive.  They
11    didn't say -- they didn't say anything.  Everybody
12    said that I passed that.  This is the first time I'm
13    hearing inconclusive.
14         Q.      You need to ask your lawyer to send you
15    Bates number 00105.
16         A.      I passed my lie detector.  Judge
17    Schwall even looked at the paper and Judge Schwall
18    said I passed the lie detector so I don't know -- I
19    don't know where you're getting this from.
20               MR. FILIPOVITS:  On 00105?
21               MS. PALMER:  Yes, 00105.  What's your
22    question, Jeff?
23               MR. FILIPOVITS:  I thought you said that
24    it stated it was inconclusive but --
25               MS. PALMER:  It does say that.
```

```
 1                    THE DEPONENT:  It doesn't.  I passed.
 2                    MR. FILIPOVITS:  Can you just read that
 3   portion?  I'm just not --
 4                    MS. PALMER:  Based up on the polygraph
 5   chart recordings of subject (technical difficult)
 6   opinion that chart records were not adequate to form a
 7   definite opinion.  Therefore an inconclusive opinion is
 8   rendered.  Polygraph Reynolds.  Subject was Robinson.
 9                    THE DEPONENT:  No, I never --
10                    MR. FILIPOVITS:  Read two paragraphs
11   above it.
12                    MS. PALMER:  It says deception was not
13   noted but it also says it was inconclusive.
14                    THE DEPONENT:  I think you might be
15   reading Frank Jones.
16                    MR. FILIPOVITS:  Read the options though.
17   It says deceptions were not noted.
18                    MS. PALMER:  Were not noted.
19                    MR. FILIPOVITS:  And the next one says
20   were noted.
21                    MS. PALMER:  It does say that.  That's
22   why -- because one says were not noted and one says were
23   noted.
24                    THE DEPONENT:  No.  This is the first
25   time I've ever heard that and OPS --
```

```
 1              MR. FILIPOVITS:  We're not the ones to --
 2   this witness is not going to figure out what that means.
 3              MS. PALMER:  Well, this witness testified
 4   he passed so I have a right to ask him about that.
 5              THE DEPONENT:  I did pass.  You're the
 6   first person that said it was inconclusive.  OPS said
 7   that I passed.  Judge Schwall said that I passed.  The
 8   GBI said that I passed.  You're the very first person on
 9   planet Earth that said I failed.
10              MR. FILIPOVITS:  You can look at 00103.
11   It's Fuqua's polygraph.
12              MS. PALMER:  I looked at --
13              MR. FILIPOVITS:  His name is -- the name
14   is listed on one of those three options.  I mean I don't
15   want to get into it anymore but I'm not sure that's the
16   proper interpretation of that document.
17              THE DEPONENT:  Yeah, I think you're
18   misreading that.
19              MS. PALMER:  It may not be.  It's your
20   document.
21              THE DEPONENT:  May I use the restroom
22   just for two seconds?
23              MS. PALMER:  We can take a ten minute
24   break.
25              (Brief recess.)
```

1    Q.      (BY MS. PALMER:)  So earlier when we

2  first started, Mr. Robinson, you had testified -- I

3  think you used the words that your body was broken down

4  from doing the towing.  What exactly was going on with

5  your body?

6    A.      Well, you have to secure the cars with

7  J hooks and the J hook maybe weighs like twenty,

8  twenty something pounds.  When I extend my arm to go

9  under the car between the bed and the car, I could no

10  longer lift up the J hooks because it pushes down on

11  my injury and in my elbows, too, but it -- I can't

12  lift it up with one hand, two hands.  It's hard

13  because of my shoulder injury.  Then when I get --

14    Q.      I'm not referring to your shoulder

15  injury.  Before 2016, you indicated that your body had

16  been broken down.

17    A.      Oh, no, no.  Oh, no, no, no.  That's --

18  you're mistaken.  Before 2015, I had -- '16, I had no

19  medical issues.  I had never had a medical issue in my

20  life.  I never had no broken bones, no nothing ever

21  before twenty -- before this incident.  I was in good

22  health.  Good shape.  Unh-unh, no.  No injuries at all

23  before 2016.

24    Q.      So when you indicated earlier about the

25  towing and your body breaking down, you weren't talking

1    about --

2         A.      2016.  No.  I was talking about that's

3    after, after the incident.  That was not before.

4         Q.      When was the last time you worked in the

5    towing industry?

6         A.      Twenty -- 2014 is when I started the

7    roadside, 285 Roadside.  So I did that 2014, 2015,

8    2016.  Before, before the roadside was towing.  I was

9    good with all my employers.  I was the hardest working

10   tow truck driver they had.  No injuries, no nothing.

11        Q.      So what treatment were you given for your

12   shoulder and your toe when you went to Grady?

13        A.      Well, the lady said that in order for

14   them to do surgery on it I had to get insurance.  I

15   couldn't get insurance because I couldn't stay long

16   enough at a job without hurting myself.

17        Q.      Wait a minute.  Who mentioned that you

18   needed surgery?

19        A.      The people at Grady and they said they

20   wouldn't perform it unless I had insurance.

21        Q.      And what exactly did you need surgery

22   for?

23        A.      The shoulder.  The shoulder needs

24   surgery.

25        Q.      So those medical records that your

```
 1    counsel provided me recommended you have surgery?
 2         A.      Uh-huh.  They had me scheduled but I
 3    didn't get the insurance that they required.  I didn't
 4    have insurance.
 5         Q.      You were scheduled for a surgery?
 6         A.      No.  Hold on.  Hold on.  I was not
 7    scheduled for the surgery.  I was scheduled -- they
 8    were scheduling the surgery, but in order to get it
 9    scheduled, I must have insurance or they would not
10    operate on me and I didn't have any insurance.
11         Q.      And what was the surgery supposed to be
12    for?
13         A.      My shoulder.
14         Q.      I understand that.  What was the surgery
15    supposed to be for?
16         A.      I guess to fix it.  To fix it because I
17    can't lift anything with it.  They was going to fix it
18    because the bones that you see are supposed to be even
19    with my shoulder.  So my shoulder is down about maybe
20    that much.
21         Q.      So the records that Mr. Filipovits sent
22    over to me when we started the deposition will reflect
23    somewhere in there a conversation with you about
24    surgery?
25         A.      It should because that's what they
```

1    said.  It should.  That it needed to be corrected.

2         Q.      What was the treatment for your toe?

3         A.      They said there is no treatment.  They

4    gave me a foot cast and they said there's nothing that

5    they can do.  It's past the time.  It's already

6    started healing.

7         Q.      You were in a cast?

8         A.      Yeah.  When you break your toe, they

9    give you a foot cast.  Not the cast that goes all the

10   way around but it's a cast that you can take on and

11   you can take off to prevent you from damaging your toe

12   anymore.  They gave me a foot cast.

13        Q.      And how long did you wear that?

14        A.      A couple of months.

15        Q.      Okay.  Do you have pictures of yourself

16   in this foot cast?

17        A.      No, I don't.  No.

18        Q.      Do you still have the foot cast?

19        A.      No, I don't.

20        Q.      So the records will reflect you were

21   given a foot cast?

22        A.      Yeah, uh-huh.  Yeah, I remember

23   catching the bus home with one shoe and that foot cast

24   on.

25        Q.      So your counsel sent over some medical

1    records to me and numerous pages were missing.  I would

2    like all of those pages.  Is that going to be an issue?

3                    THE DEPONENT:  Is that going to be an

4    issue, Jeff?

5                    MR. FILIPOVITS:  Well, I -- hold on one

6    second.  There were a lot of medical records that I did

7    not know were responsive to your request.  Let me look

8    for what you asked for.

9                    So you sought all records that you

10   contend support damages sought or to be sought in this

11   action and all treatment that was sought or received as

12   a result of the injuries alleged in the complaint.

13                   There were other medical visits but they

14   were not related to injuries nor are they -- nor does

15   the plaintiff intend to rely on them in support of their

16   claim for damages.  So if you're telling me that you

17   want to broaden that request, that's fine.

18                   MS. PALMER:  No, but -- so you're telling

19   me that pages 32, 33, 34, 35 -- sorry.  I'll give you

20   the labels in a second.  There are a bunch of records

21   that were taken out from the Mercy and it starts with

22   page 32 which is Bates stamp number as Plaintiff's

23   00888.  You're saying all the records before that had to

24   do with something else?

25                   MR. FILIPOVITS:  Hold on one second.  I

1  will give you an example.  We've got November 2018 visit

2  complaining of ringworm.

3                MS. PALMER:  Got it.

4                MR. FILIPOVITS:  I didn't think that was

5  relevant.  I can do a more thorough -- I mean I will be

6  happy to review these again obviously because I made a

7  mistake before.  I will go through it again.

8                MS. PALMER:  Yeah, if you could just

9  review it again, I found it curious I got pages that

10  start at page 32.  That's all.  If it's ringworms,

11  clearly I don't want to know about that.

12                MR. FILIPOVITS:  Right.  And there are a

13  number of visits that have nothing to with anything.

14                MS. PALMER:  I presume the records they

15  printed were from any time they have seen him.  Is that

16  right?

17                MR. FILIPOVITS:  Right.  So I did not

18  produce a complete set.  I think a complete set would be

19  outside the scope of what's relevant.  You know, I was

20  careful to be responsive to your request as we always

21  are.  I will do another review and make sure.  If you

22  have any doubts, we can talk about that more but there

23  were visits that had nothing to do with that.

24                MS. PALMER:  Okay.  Thank you.  I

25  appreciate that.  Give me one more second, Mr. Robinson.

1  I'm going to review your complaint one more time to make
2  sure.
3        Q.       So Mr. Robinson what are the damages that
4  you are seeking as a result of the injuries that you
5  allegedly sustained?
6        A.       Teeth, shoulder.
7        Q.       Okay.  Let's stop for a second.  What
8  about your teeth?
9        A.       They're gone.
10       Q.       I'm aware of that.  What precisely would
11  you like to be paid for because your teeth are gone?
12       A.       I'd like my teeth back and the pain
13  associated with it.
14       Q.       What kind of pain have you been
15  experiencing as a result of having no teeth?
16       A.       You can't get a job with no teeth.
17  When you go up to someone and you ask them about a
18  job, you have no teeth, they say you scare the
19  customers.  I've heard that before.
20       Q.       I thought you said you had made a
21  decision not to work since 2017 because your body was --
22       A.       I'm telling you the reasons, the
23  reasons people give when you have no teeth because --
24       Q.       I understand that.  I understand that.
25  Let me stop you for a second.  You testified way earlier

```
 1   that the reason why you weren't currently employed is
 2   because your body had broken down.  Is it now that you
 3   are saying you were missing teeth and you couldn't get a
 4   job?
 5          A.      No, ma'am.  The teeth is just one part
 6   of it.  It's just --
 7          Q.      What jobs have you attempted to apply for
 8   and were denied because of your teeth?
 9          A.      Towing jobs.  When I tried to get back
10   to it, towing.  They didn't just deny for my teeth.
11   They denied me for the overall health because I
12   couldn't lift the chains or when I couldn't properly
13   secure the vehicle with getting on my knees.
14          Q.      So in your complaint on page three of
15   your complaint, I'm going to see if I can share this
16   with you.  Can you see what's on my screen?
17          A.      Uh-huh.
18          Q.      Page three, number 14 -- excuse me.
19   Let's start number 13.  After dragging plaintiff to a
20   separate area of the jail, each of the three officers
21   participated in assaulting plaintiff.  You're now saying
22   that's not correct?
23          A.      Well, they all participated in it
24   because they were all actively there.  No one stopped
25   it so they're participating silently.  They're -- they
```

1    didn't stop it.  They didn't say, hey, you're

2    violating the law.  So they are active participants.

3    If I would have thrown a punch, they would have

4    actively participated then.

5         Q.      Okay.  We're not talking about

6    hypotheticals.  I'm asking you when you state in your

7    complaint after dragging plaintiff to a separate area of

8    the jail, each of the three officers participated in

9    assaulting him -- and we're all grown.  We know what

10   assaulting means.  That means laying hands on someone.

11   I mean you know the legal definition of assault.  You

12   had an aggravated assault charge.  So it's not thinking

13   in your mind you're going to hit somebody.

14              So is that -- are you saying now that

15   that is not what took place and somebody actively

16   assaulted you?  Not passively, not somebody in their

17   mind.  Actively assaulted you.

18        A.      The question is did three people

19   actively assault me?

20        Q.      Correct.  Correct.

21        A.      One person assaulted me.  Two stood by

22   and watched.

23        Q.      Watched from another room, correct, where

24   they couldn't see?

25        A.      No.  The incident began in front of

1   them and I was dragged to another room.  The punches

2   and the slapping started in a different room and that

3   was in front of them.

4           Q.      In paragraph 15 which I've now gone to,

5   during the attack, two of plaintiff's teeth were knocked

6   out.  Are you still sticking by that two were knocked

7   out?

8           A.      Uh-huh.  Yes.

9           Q.      Well, when you testified before Judge

10  Schwall, you said it was three.  So was it two or three?

11          A.      It could be four because the last one

12  was messed up, too, but it didn't come out.  The last

13  one was not jagged but the other ones, gone.  So yeah,

14  they did it.

15          Q.      So you're missing four teeth.  Your

16  complaint alleges two but now --

17          A.      No, no.  My complaint should allege --

18          Q.      Okay.  Let me get my sentence out.  So

19  you have testified that they knocked four of your teeth

20  out.  Your complaint says two.  Before Judge Schwall,

21  you testified that one was knocked out and two were

22  loosened.  So which one is it?

23          A.      When the incident was over, three teeth

24  were missing and the fourth tooth which I had removed

25  in prison, that was -- it was badly chipped up.  It

```
 1    was chipped up real bad but it was still a tooth but
 2    the prison removed it so it had to be bad, too.  All
 3    four of the teeth -- all the damage from my mouth came
 4    from them.
 5         Q.       You testified about being in solitary
 6    confinement.  Do you mean being placed on the 7th floor?
 7    Is that what you mean by solitary confinement?
 8         A.       Solitary confinement.  No roommate at
 9    all.  I didn't have a roommate at all.  Solitary
10    confinement.
11         Q.       I'm not asking about a roommate.  Just
12    because you don't have a roommate doesn't mean you're in
13    solitary confinement.  Does that mean they had you
14    locked down for a certain period of time without
15    interaction with other people?
16         A.       Exactly.
17         Q.       Is that what you're saying?  Where was
18    that?
19         A.       The 7th floor.
20         Q.       So the 7th floor is not a solitary
21    confinement floor.  Did they have you in a solitary
22    confinement room?
23         A.       Yeah, they had me in a room by myself.
24         Q.       Okay.  So you were by yourself.
25         A.       Uh-huh.
```

1      Q.      Does that mean that you were never
2  allowed out to have interaction with other people?
3      A.      Got out to take a shower and that's it.
4  One by one.  There was no group getting out.  They let
5  each person out of a cell one at a time.  I had enough
6  time to talk to the guy and point out my injuries,
7  take a shower, go back in the room.
8      Q.      So that's because you were housed on
9  seven which is the maximum security floor, not because
10 you were in solitary confinement?
11     A.      Well, when -- I was under the
12 impression when you get into a fight inside of the
13 facility --
14     Q.      Uh-huh.
15     A.      -- you go to solitary confinement and
16 that's where I --
17     Q.      What is your definition of solitary
18 confinement?
19     A.      In a room by yourself.  No contact with
20 anyone.  That's solitary confinement.
21     Q.      And never allowed out?
22     A.      Well, they got to give you time to take
23 a shower.  The only time I was allowed out was to take
24 a shower.
25     Q.      That was true for everybody on the floor.

```
 1  Isn't that correct?
 2          A.      Yes.
 3          Q.      Okay.  So everybody was in solitary
 4  confinement on the 7th floor?
 5          A.      Yeah.  Nobody had a roommate.
 6          Q.      Okay.  That's not my question about
 7  having a roommate, sir.  My question is are you saying
 8  that everybody on the 7th floor is in solitary
 9  confinement?
10          A.      Yes.
11          Q.      Simply because they had no roommate and
12  that's what you define as being solitary confinement?
13          A.      The 7th floor is the worst floor you
14  can go to.
15          Q.      I understand that.
16          A.      They don't -- they don't -- they don't
17  have roommates on the 7th floor.
18          Q.      Okay.
19          A.      At all.  It's solitary confinement.
20  You're by yourself.  There is no one else.  Solitary
21  means you're by yourself.  Solitaire.  There was no
22  one.  They come around and they feed you through a
23  slot.  They give you 30, 45 minutes to take a shower.
24  Then you go back in the room.
25          Q.      And that wasn't just you, correct?  That
```

1  was everybody on the 7th floor?

2      A.      As far as I know.  When I got back in

3  the room, there was only like a little bitty hole that

4  you can see through so --

5      Q.      Did you ever see anybody through that

6  little bitty hole congregating in groups --

7      A.      No.

8      Q.      -- that you weren't allowed to congregate

9  in?

10     A.      No.

11     Q.      Okay.  So on paragraph 43 which I'm

12 showing you now, it says in addition to the internal

13 investigation which was opened by the sheriff's office,

14 the circumstances surrounding the use of force against

15 by plaintiff are also subject to an ongoing

16 investigation by the Fulton County District Attorney's

17 Office.  You testified that you no longer intend to --

18 you haven't been cooperating with the DA's office?

19     A.      Oh, yes, I've been cooperating with the

20 DA's office.  We have a good rapport.

21     Q.      I thought you said you aren't talking to

22 them anymore because they --

23     A.      I wasn't talking to those guys.  They

24 put another attorney on it and --

25     Q.      Who is that person?

1    A.      Let me see.

2    Q.      Because I will represent to you that I

3    personally spoke to Deputy District Attorney Adam Abbate

4    and he told me that you haven't been cooperating.

5              THE DEPONENT:  Jeff, what's the name of

6    that attorney?

7              MR. FILIPOVITS:  Robert, hold on a

8    second.  Let me think about this for a moment.  Okay.

9    All right.  So his name Robert Schollmeyer,

10   S-c-h-o-l-l-m-e-y-e-r.

11   Q.      And when is the last time you spoke with

12   him, Mr. Robinson?

13   A.      I don't recall the date.  It's been a

14   few weeks.  Maybe about -- say maybe three weeks.

15   Maybe about three weeks, maybe four.  It's been a

16   month.

17   Q.      And when you spoke to him last, what was

18   the update that was provided concerning your criminal

19   case?

20   A.      He said that he was impressed with what

21   was going on.

22   Q.      What does that mean, he was impressed by

23   what was going on?

24   A.      I don't know.  You have to ask him what

25   that means.  And that the case is on his desk and that

```
 1   they're going forward.  I haven't spoke with him

 2   since.  He just left it open and said they're moving

 3   forward.

 4          Q.      Were you confused when he used the word

 5   impressed?

 6          A.      No.  Impressed could mean a lot of

 7   things.

 8          Q.      What do you take that to mean?

 9          A.      It could mean a lot.

10          Q.      I'm asking you what did you take the word

11   impressed to mean?

12          A.      That it was impressionable.

13          Q.      All right.  Go back to your injuries.  So

14   you are wanting damages for all four teeth even though

15   one was pulled by the DOC.  Is that correct?

16          A.      Had he had not put his hands on me I

17   wouldn't need no teeth from nobody.  Had not they

18   touched me, I would be happy in life.  Had not they

19   did what they did to me, I would be able to live a

20   normal life.  I can't run with the kids.  I can't work

21   too long.  I can't do the things that I normally would

22   do.

23          Q.      Because of your teeth?

24          A.      No.  Because of my knees, because of my

25   hip because of my shoulders.
```

1      Q.      Wait a minute.  Let me stop.  What

2  happened with your knees and your hip?  You never said

3  anything about that.

4      A.      When someone drags you by your -- the

5  opposite way, everything hyper-extends, much less pull

6  you around the corner.  There's a lot of tears that

7  happen in between the time.

8      Q.      And what treatment have you received for

9  those?

10     A.      I've gotten shots.  They say it's

11 neuropathy where I can't feel my legs and my arms at

12 certain times.  I was on pills for that, too.  They

13 call it --

14     Q.      Do you have those records that you could

15 provide?

16     A.      Uh-huh, and I went to Grady.  Grady

17 neurologist.  I was having issues with my fingers.

18 Not carpal tunnel syndrome but -- no, excuse me.  Not

19 cubital tunnel syndrome.  No, it's cubital, not carpal

20 tunnel syndrome where my fingers go numb and a few of

21 my toes go numb.  I can feel half and I can't feel the

22 other half.  They were giving me shots.

23     Q.      What are they saying that's a result of?

24     A.      Shock.  Like some type of --

25     Q.      Shock?

1     A.      Some type of reaction from the shock.

2  I told them what happened with the shocks, the tasers

3  and they said this could be possibly from that

4  incident but I've never lost the feeling in none of my

5  body parts ever.  This is like strange.  I wake up out

6  of my sleep with my arms and my legs dead.  It feels

7  like pins are in my arms and my legs.

8            Sex.  Don't have that.  The orgasm

9  hurts.  There is no need for a female.  There's no

10  need for any -- anything like that because the orgasm

11  hurts.  The walking.  When I walk too far, my knees

12  hurt and what's crazy is they hurt until I pop them.

13  And when I pop them, my hip pop back in place, pop,

14  and then it feels a little bit better until it pops

15  back out of place.

16            Being drug in the opposite direction, I

17  would have had better luck being drug by a car than to

18  be jacked and jerked because that pulled everything

19  apart.

20     Q.      And where are records that reflect that

21  dragging caused all of these issues to your body?

22     A.      I don't have any records that say that.

23  That's the only thing that happened to me.

24     Q.      Did you either of your parents have

25  arthritis?

1          A.        No, ma'am.

2          Q.        And prior to these visits to Grady that

3     you made back in 2016, beginning in 2016, do you have

4     any complaints of any other ailments that you presented

5     to Grady with?

6          A.        No, I -- no.  Nothing.

7          Q.        Your attorney is going to take a look,

8     but if there are records that reflect prior ailments

9     that you complained of prior to 2016, I would like those

10    records.

11         A.        No, there are no ailments at all.  I

12    never went to the hospital for anything before this

13    issue.  I've never been --

14         Q.        You never saw a doctor before 2016 in

15    your life?

16         A.        I saw a doctor but not for no pain or

17    breaking anything or anything like that.  I've never

18    had any serious injuries.  Nothing.  None of that.  No

19    serious injuries.

20         Q.        Right.  But the things that you're saying

21    about the pulling, those aren't going to be in any

22    records.  That's just you saying that?

23         A.        I guess, yeah, that's just me saying

24    that because when I addressed it to them what they say

25    is you did not come when you were supposed to be down

1    here.  When it happened, you had a couple of hours to

2    get here.  You didn't come in a couple of hours.  Your

3    body has started healing.  It's in its healing

4    process.

5          Q.      I'm not talking about the shoulder and

6    toe.

7          A.      I'm talking about knees, too.  I went

8    down there with my knees.  I put on some Timberland

9    boots and the boots were too heavy.  It pulled against

10   my knees.  I went down there and they said, oh, we

11   can't find it but I'm like, man, I feel pulling in my

12   knees.  I know it feels like it's being pulled apart.

13   Oh, we can't find it.  They said when did it happen.

14   It happened blase blah.  They didn't take me

15   immediately to the hospital.

16         Q.      What does blase blah mean, sir?  I need

17   you to --

18         A.      Blase blah means it happened when I got

19   assaulted.  It happened when I got assaulted in 2016.

20         Q.      I need you to say that.  The Court can't

21   interpret --

22         A.      You're right.  You're right.  I'm

23   sorry.  It happened in 2016.  I was not taken to the

24   hospital and they pulled me by the shackles and now my

25   hip or my knees, it hurts.  It hurts.

```
1              Q.       Right.

2              A.       The only thing --

3              Q.       You went to the doctor and they can't

4       find any evidence of any injuries but you want damages

5       because you're articulating that?

6              A.       Because I was not taken to the

7       hospital.  If I was taken to the hospital, I'm not

8       saying I would not be in pain.  I'd still probably

9       feel some pain but it wouldn't be as bad as it is.

10      The beating went unchecked with no medical help.  If

11      they would have gave me medical attention, it

12      wouldn't -- it wouldn't -- it wouldn't be this drastic

13      of a life change for me.

14             Q.       You saw someone in the clinic, sir.

15             A.       Excuse me?

16             Q.       You saw someone in the clinic, did you

17      not?

18             A.       In the jailhouse clinic?

19             Q.       Correct.

20             A.       Ma'am, inside the jailhouse clinic,

21      they don't -- they ain't -- they ain't did no x-rays.

22      They didn't do nothing but look at it.  Oh, okay, and

23      that's it.  They didn't -- they was more concerned

24      with having me in the cell than to treat my medical

25      damage.  Black people don't -- black people doesn't
```

1    turn purple.

2         Q.        They didn't give you anything?   Because

3    the records reflect you were given several

4    medications --

5         A.        Tylenol.

6         Q.        -- I can read off.

7         A.        Tylenol, Tylenol.   That Tylenol, they

8    took me off Tylenol as a matter of fact because the

9    pain was so severe where I would over-medicate and

10   they said you can't take it -- take Tylenol like that

11   but Tylenol, that's for topical.   Tylenol is not for

12   pain at all.   That's for a headache.   Tylenol does not

13   help at all.

14              I could take twenty Tylenols, walk

15   outside and still feel the pain.   So I can't take

16   ibuprofen.   They took me off.   They had me on eight

17   hundreds.   They had me on six hundreds.   They had me

18   on the max with Tylenol and none of that works for

19   pain.   If the Percocet -- and I'm telling them no, I

20   don't want any Percocet.   If the Percocet is not

21   working for pain, Tylenol is nothing.

22        Q.        So other than not giving you sufficient

23   pain medication at the jail, what else did Grady do for

24   you that they didn't do for you at the jail?

25        A.        Grady, Grady, Grady -- they didn't do

1    at the jail?  They didn't do any x-rays at all.  They

2    didn't -- they didn't do any of that.  They just

3    shipped me on to the front -- excuse me -- to the

4    upper room.

5           Q.      And what did the x-rays show according to

6    you?

7           A.      It shows the bulge that's in my

8    shoulder.  It shows the bulge that something ain't

9    right in my left shoulder.  It showed that.  Once they

10   saw it on the x-ray, that's how they prescribed the

11   Percocet.  They don't just prescribe the Percocet

12   because I have a topical cut or I've got a swollen

13   finger.  You know, they give you the Percocet --

14          Q.      Back to my question.  Other than giving

15   you narcotics, what did they do at Grady -- and the

16   x-rays which --

17          A.      They x-rayed -- they x-rayed and they

18   were attempting to do the surgery on it, but as I

19   stated, I had no insurance to pay for the -- I had no

20   money to pay for the insurance nor could I last long

21   enough at a job to acquire medical insurance through

22   the job because I would get hurt before then.

23               And the only thing the doctor would do

24   is give me Percocet and then you can't drive and move

25   tons of cars or anything with a car on Percocet at

1    all.  Can't do none of that.  That's DUI.  So all they

2    did was just medicate me and hope that it went away

3    but it hasn't gone away at all.

4              If I should go out here and try to weed

5    eat for two hours.  In two hours, I drop the weed

6    eating machine because I lose control of my hands and

7    the weed eating machine falls, the shoulder falls and

8    I feel the pain in my back and ain't like no back pain

9    you ever felt.  It feels like someone is stabbing me.

10   It's like a stabbing in my back, a sharp pain, the

11   worse pain ever.  You have to lay down.  There is

12   no -- no, unh-unh.

13        Q.     And so you're seeking damages for the

14   teeth, your shoulder, your knees, your back and your

15   leg.  Is that correct?

16        A.     And my genitals.  And my genitals.

17        Q.     Okay.  Have you put a value on those

18   damages?

19        A.     Ma'am, I ask myself that every day when

20   I wake up.  I pray.  I meditate when I wake up and I

21   ask God to take it away and I pose that question.

22   Could you put a dollar amount on it and for my loss.

23   I can't.  I can't put a dollar amount on that.  I

24   can't.  It's impossible.  Can't put a dollar amount on

25   it, on your private area.  You can't put a dollar

```
1    amount on being able to walk down the street.  You
2    just -- you can't put a dollar amount on it when you
3    wake up in pain out of sleep.  It's something that you
4    just --
5         Q.    All right.  I'm going to be -- I think
6    we've already discussed follow-up documents I'm going to
7    be requesting from your -- if there are any relevant
8    ones from your attorney.  I think I also am going to
9    need follow-up documents on your probation, especially
10   since you have the allegation that Fuqua and your
11   probation officer had a relationship.  So I'm going to
12   be reaching out to her and I probably will need to get
13   those records so I can talk with her about that.
14        A.    Yeah.  Now on that, I think that says
15   Valerie, it's either Valerie or Veronica but I know
16   it's V. Mims.
17        Q.    I wrote that.
18        A.    I'm not sure of her first name but I
19   just know it's V. Mims.
20        Q.    Okay.  I wrote that down.  And then --
21             MR. FILIPOVITS:  Ashley --
22             MS. PALMER:  Yes.
23             MR. FILIPOVITS:  I'm sorry.  I didn't
24   mean to cut you off.
25             MS. PALMER:  It's okay.
```

1          MR. FILIPOVITS:  With regard to the

2    medical records, so what I request that you do because

3    it sounds like some of what you're saying you want which

4    I agree would be relevant would fall outside of the

5    scope of what you specifically requested in the request

6    for production, could you just get me a new request for

7    production --

8          MS. PALMER:  Sure.

9          MR. FILIPOVITS:  -- in writing so I

10   can -- I don't want to disclose medical records of my

11   client unless I have a lawful request.

12         MS. PALMER:  I understand that.

13         MR. FILIPOVITS:  Something in writing.

14         MS. PALMER:  Certainly.

15         MR. FILIPOVITS:  We can go outside the

16   scope of what I initially produced even though I don't

17   think there's anything that's relevant but I understand

18   that you -- given on what you touched on and talked

19   about today, I think that it would be proper for you to

20   request that stuff.

21         MS. PALMER:  No, and I appreciate that.

22   I can put that in writing.  I don't have an issue with

23   that at all.

24         MR. FILIPOVITS:  Okay.  And if we need to

25   reconvene at some point, we can talk about how to handle

1   that.

2                   MS. PALMER:  Okay.  Thank you.  I was

3   going to mention that so thank you for bringing it up

4   for me.  All right.  I think that's all I have unless

5   you have anything you need to ask your client.

6                   MR. FILIPOVITS:  No.

7                   MS. PALMER:  All right.  Thank you, Mr.

8   Robinson.

9

10                   FURTHER THE DEPONENT SAITH NOT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T E
2

3

4    STATE OF ALABAMA)
5    MOBILE COUNTY)
6

7              I hereby certify that the above
8    proceedings were taken down by me and transcribed by me
9    and that the above is a true and correct transcript of
10   the said proceedings given by said witness.
11             I further certify that I am neither of
12   counsel nor of kin to the parties nor in anywise
13   financially interested in the outcome of this case.
14

15

16

17

18

19                      JAN A. MANN
20                      COMMISSIONER - NOTARY PUBLIC
21                      ACCR NO. 321
22

23

24

25
```

Case 1:18-cv-02350-MHC   Document 120   Filed 11/23/20   Page 192 of 216
William Robinson vs.
Frank Jones, et al.

William Robinson
May 19, 2020

# A

**a/k/a (5)**
42:14;47:19;
84:4;120:13;122:6
**Abbate (3)**
129:22,24;178:3
**abdominal (1)**
156:12
**ability (2)**
8:14;9:7
**able (5)**
12:8;35:5;57:1;
179:19;188:1
**abnormality (1)**
93:3
**above (2)**
5:8;162:11
**abrasion (4)**
64:1;67:2;70:23;
156:15
**abrasions (3)**
56:19;69:12;
154:7
**absolutely (1)**
30:25
**abuse (1)**
39:12
**abused (1)**
38:8
**abusing (1)**
48:10
**accept (2)**
15:22;154:16
**acceptable (1)**
23:14
**access (1)**
42:3
**accident (1)**
19:12
**accidentally (1)**
36:2
**accompanied (1)**
30:18
**According (3)**
132:24;139:5;
186:5
**accounts (1)**
151:1
**accurately (1)**
7:22
**accused (1)**
114:7
**ache (1)**
56:2
**acknowledge (3)**
48:15;90:25;
156:4
**acquire (1)**
186:21
**acro (1)**
93:2

**across (1)**
106:13
**acted (3)**
48:7;123:3;
148:15
**acting (2)**
5:2;148:17
**action (3)**
5:19;139:14;
168:11
**active (1)**
172:2
**actively (5)**
171:24;172:4,15,
17,19
**actual (1)**
93:16
**actuality (1)**
157:10
**actually (4)**
7:15;69:8;115:7;
160:5
**acute (4)**
92:24;94:8,9;
156:8
**ADA (5)**
143:9,21,23;
146:8;151:4
**Adam (2)**
129:21;178:3
**added (1)**
41:7
**addition (1)**
177:12
**additional (1)**
58:16
**address (5)**
10:2;36:11;
109:19;114:24;
135:4
**addressed (4)**
27:11,12,15;
182:24
**adequate (2)**
57:9;162:6
**adjoining (3)**
121:10,14,15
**adjourned (1)**
39:15
**Admits (1)**
155:17
**admitted (1)**
39:14
**adult (6)**
12:25;13:2,3;
14:6,15;24:4
**adults (3)**
12:16,18,19
**advised (5)**
6:13;58:15;
136:23;137:2,7
**affect (1)**
9:6

**afraid (2)**
104:13;130:7
**afternoon (1)**
91:8
**again (19)**
28:14;32:13;
44:7,10;46:3;
67:20;99:6;112:11;
123:9;124:13,23;
142:20;153:15;
155:14;157:25;
158:14;169:6,7,9
**against (14)**
7:2;32:5;44:6;
52:1;88:23;105:17;
127:17,18;133:17;
135:16;140:4;
157:20;177:14;
183:9
**agg (1)**
22:13
**aggravated (8)**
19:5;20:12;
22:17;29:17;
157:13,18;158:2;
172:12
**aggression (1)**
59:22
**aggressive (1)**
27:3
**agitate (1)**
54:14
**ago (1)**
129:23
**agree (3)**
6:20;88:22;
189:4
**AGREED (5)**
2:3,9,15,21;25:8
**agreement (1)**
66:2
**ahead (3)**
40:17;103:11,11
**ailments (3)**
182:4,8,11
**ain't (22)**
43:15;51:7;
61:17;85:16,17;
86:6;91:16;103:23;
143:5;149:10;
151:23;152:3,4,5,
10;153:5;155:5;
159:2;184:21,21;
186:8;187:8
**AI (1)**
54:17
**Alabama (4)**
2:7;5:2,7;6:7
**alert (1)**
156:8
**Alexis (1)**
15:1
**alias (1)**

**9:21**
**aliases (1)**
9:22
**align (1)**
127:8
**alignment (1)**
93:2
**allegation (1)**
188:10
**allege (2)**
77:10;173:17
**alleged (2)**
161:1;168:12
**allegedly (3)**
85:25;158:3;
170:5
**alleges (3)**
80:8;147:20;
173:16
**allow (1)**
136:14
**allowed (5)**
5:24;175:2,21,
23;177:8
**Allstar (1)**
16:10
**Almost (2)**
53:21;91:8
**alone (1)**
157:23
**along (1)**
19:6
**altercation (6)**
60:21;63:7;
86:18;110:18;
154:6;155:25
**altercations (1)**
110:22
**alternators (1)**
17:1
**always (2)**
129:16;169:20
**ambulance (1)**
96:20
**Amelia (2)**
6:11;95:22
**amount (6)**
25:4;187:22,23,
24;188:1,2
**angle (2)**
74:14,15
**angry (1)**
117:21
**ankles (5)**
28:17,22,23,24;
103:22
**anticipate (2)**
8:6;12:8
**antidepressants (2)**
158:23,24
**anti-psychotics (2)**
158:20,21
**anymore (3)**

**163:15;167:12;**
177:22
**apart (3)**
117:11;181:19;
183:12
**apparent (3)**
56:20;69:13;
154:5
**apparently (1)**
33:12
**appear (1)**
114:6
**appearance (5)**
56:20;69:12;
73:12;154:4;156:7
**appears (1)**
92:22
**apply (1)**
171:7
**appreciate (2)**
169:25;189:21
**approved (1)**
154:17
**approximately (5)**
60:18;69:1,4,9,
19
**April (8)**
106:20,21,21;
108:7;109:11,12,
16,16
**area (11)**
29:3,6;69:1;
100:8;103:18;
120:14,21;126:12;
171:20;172:7;
187:25
**argue (4)**
20:19;80:14;
103:19,19
**arguing (4)**
21:13;22:24;
54:13;110:16
**argumentative (1)**
46:18
**arm (25)**
25:14;26:20,22;
32:23;53:1,12;
56:22;57:2,5;67:3;
70:24;85:20,25;
86:20,24;87:7,9,10,
12,12,15;88:2;
103:11;156:19;
164:8
**arms (12)**
18:1,5,6,6;56:19;
69:11;85:22,22;
99:5;180:11;181:6,
7
**arose (1)**
10:23
**around (32)**
8:7;33:4;47:14,
15;59:4;64:11;

65:10;66:11,13;
68:13,14;69:24;
86:4,5;89:1;
103:23;125:13,15;
126:5;127:19;
131:13;133:20;
136:12,13;141:16;
143:5,5;153:8,9;
167:10;176:22;
180:6
**arrest (1)**
21:24
**arrested (1)**
138:10
**arrived (1)**
60:22
**arthritis (1)**
181:25
**Arthur (2)**
14:9,9
**articulated (1)**
138:5
**articulating (1)**
184:5
**Ashley (7)**
6:14;34:14;
35:13;57:21;87:4;
153:19;188:21
**aside (1)**
43:11
**ass (3)**
124:18;143:3;
147:4
**assault (13)**
19:5;20:12;
22:14,17;30:6;
157:14,18;158:2,4,
8;172:11,12,19
**assaulted (9)**
33:7;38:17;
42:12;120:12;
172:16,17,21;
183:19,19
**assaulting (3)**
171:21;172:9,10
**assign (2)**
2:18;46:6
**assigned (2)**
46:8;99:15
**assistance (1)**
18:14
**assistant (5)**
63:12,17,22;
64:3,24
**associate (1)**
147:3
**associated (1)**
170:13
**Associates (1)**
5:6
**assume (1)**
104:14
**assuming (1)**

38:9
**Atlanta (15)**
6:8;13:4,7,23,24;
16:13,16,19;19:3;
133:20;149:14,17,
21;150:3;153:7
**attached (1)**
125:7
**attack (1)**
173:5
**attempted (2)**
80:1;171:7
**attempting (1)**
186:18
**attended (1)**
15:9
**attention (9)**
57:5,9;65:16;
78:6;85:6,7,11,18;
184:11
**attitude (1)**
109:22
**attorney (12)**
8:14;119:6;
129:21;130:20,22;
131:4;144:3;
177:24;178:3,6;
182:7;188:8
**attorney's (3)**
129:19;148:25;
177:16
**attributed (2)**
64:2;76:11
**audible (1)**
7:13
**August (3)**
119:11;144:22,
25
**automated (2)**
132:6,11
**avail (1)**
140:2
**available (1)**
150:9
**aware (38)**
44:8,8;46:5;55:8,
10,14,18;66:20,21;
67:13,13;90:9;
114:16;129:24;
132:21;134:14,22,
24;135:10,12,12,
14,20;136:24;
137:3;138:12;
139:9,11,12,13,14,
15;140:4;142:17,
18;156:6;160:6;
170:10
**away (27)**
28:14,15,16;
50:2;52:2,2,19;
53:15;101:9,10,21,
21;103:2,3,12,12,
19,20;129:1,3;

130:10;142:6;
149:16,19;187:2,3,
21
**awe (1)**
101:17
**awkward (1)**
54:16
**awoke (1)**
53:24

**B**

**B&L (1)**
16:16
**baby (5)**
72:24,25;75:10,
11;143:1
**back (78)**
11:13,14;12:1,8;
17:12,13;18:20;
21:1;22:8;26:19;
28:17;29:14;31:14,
18,21;32:20;34:3;
35:21;36:21;38:6;
42:17;47:13;49:15;
50:13;51:3;54:13;
58:9,19;64:17,18,
19;70:17;71:12;
77:2,2;79:21;80:2;
82:23;83:2;89:1;
92:13;98:3;100:7,
8,10,11;101:11;
102:3,25;111:18;
119:15,16;123:25;
124:9,13;130:17,
20;133:4;138:18;
143:20;146:11,14;
157:1,3;170:12;
171:9;175:7;
176:24;177:2;
179:13;181:13,15;
182:3;186:14;
187:8,8,10,14
**Background (2)**
38:3;148:14
**backwards (1)**
129:5
**bacteria (1)**
76:22
**bad (7)**
28:8;82:1;86:11;
129:9;174:1,2;
184:9
**badge (1)**
30:3
**badly (1)**
173:25
**Bain (1)**
5:6
**bar (4)**
16:8;17:12;
36:11,11
**bartending (1)**

16:6
**based (3)**
45:6,19;162:4
**basically (3)**
18:21;27:2;98:3
**Bates (16)**
35:19,22;37:15,
16;39:9;43:18;
119:8;153:11,15,
20;160:3,16,23;
161:6,15;168:22
**bathroom (1)**
58:8
**bathrooms (1)**
129:1
**battery (4)**
20:20;21:12,23;
22:13
**beat (10)**
48:12;62:17;
80:20;99:1,24;
123:2,23;138:15;
148:11;149:2
**beaten (1)**
48:8
**beating (9)**
22:24;59:25;
60:1;83:11;84:8;
100:1;122:1;128:4;
184:10
**became (2)**
135:20;138:12
**become (3)**
6:3;134:14;
135:14
**bed (2)**
141:16;164:9
**Bedrest (1)**
97:2
**beforehand (1)**
88:7
**began (5)**
16:9;85:5;
103:13,13;172:25
**beginning (5)**
5:7;65:24;
122:14,22;182:3
**Behavioral (1)**
154:12
**behind (19)**
24:15;25:14;
28:17;29:14;31:21;
50:13;51:1,2,3;
52:10,13,14,14,15;
71:15;98:3;100:8;
122:10;124:11
**bend (1)**
56:3
**benefit (1)**
47:2
**bent (1)**
129:5
**best (3)**

8:14;95:20;
128:24
**better (2)**
181:14,17
**beyond (1)**
59:7
**big (3)**
25:7;54:15;
80:13
**bigger (1)**
35:10
**bike (5)**
133:19,22,23,24;
134:3
**bingo (2)**
129:6,8
**bipolar (6)**
117:17,22;118:8,
10,17;160:1
**birth (4)**
114:24;115:20;
116:20;117:1
**birthday (3)**
9:25;116:24,25
**births (4)**
115:1,19;116:15,
18
**bit (5)**
27:6;30:21;
158:1,16;181:14
**bitch (9)**
29:18,24;48:22,
23;49:1,9;50:24;
143:3;147:4
**bitty (3)**
127:6;177:3,6
**black (12)**
16:18;26:16;
52:7,7;60:23;
62:14;72:8;113:1;
128:23;140:18;
184:25,25
**blacked (1)**
124:9
**blah (26)**
23:3,3;29:13;
55:25;61:23;123:6;
131:8,8;136:14,16,
16,16;143:11,12,
19;145:15,15,16;
148:12,12,12;
151:23,23;183:14,
16,18
**Blank (3)**
28:15,15;34:25
**blase (17)**
23:2;29:13;
55:25;61:23;123:5;
131:8;136:14,16;
143:11,12,19;
145:15;148:12;
151:22;183:14,16,
18

William Robinson vs.
Frank Jones, et al.

William Robinson
May 19, 2020

**bleeding (2)**
124:15;156:17
**Bling (5)**
125:22,23,23,24,
24
**block (1)**
30:14
**blood (6)**
62:23;124:16;
158:8,9,9,10
**bluff (4)**
152:14,15,16,23
**body (11)**
17:4;122:1;
164:3,5,15,25;
170:21;171:2;
181:5,21;183:3
**bodyguard (1)**
123:1
**boggled (3)**
152:20,21,24
**bogus (1)**
153:3
**bone (15)**
26:25;28:5;
56:23,24;82:25;
83:4;93:13,15,17,
18;94:1,3,10,16;
102:6
**bones (4)**
27:10;92:23;
164:20;166:18
**bone's (1)**
28:4
**booked (6)**
9:20,20;25:20;
108:20;109:7;
110:2
**booking (2)**
78:10,12
**boots (2)**
183:9,9
**born (1)**
127:1
**both (11)**
8:1;14:22;15:2;
21:25;30:16;84:15;
91:5;117:15;121:8,
8;157:20
**bottom (2)**
100:5,5
**bowel (1)**
156:13
**box (14)**
135:3,11,12,13,
14,17,20;137:5,17,
24,25;138:6;141:3,
7
**boxing (1)**
62:10
**boy (4)**
61:3;117:12;
143:4;147:4

**boys (1)**
148:11
**break (13)**
8:5,8,10;17:8;
58:5,7,15;87:12;
88:15,18;95:21;
163:24;167:8
**breakage (1)**
26:20
**breaking (2)**
164:25;182:17
**bricks (2)**
22:25;23:2
**brief (4)**
15:24;58:13;
88:24;163:25
**bring (5)**
27:23;43:15;
70:16;143:11;
150:2
**bringing (1)**
190:3
**brings (1)**
100:11
**broaden (1)**
168:17
**broke (7)**
32:23;38:15;
53:12;62:3;65:12;
127:18;156:19
**broken (26)**
26:25;27:10;
56:2,2,21,22;57:5,
5;70:24,24;71:4;
82:25;83:4;85:25;
86:20,24,24;87:7,
10,12,15,16;164:3,
16,20;171:2
**broomstick (1)**
158:7
**brought (4)**
57:5;69:23;70:7;
100:17
**brown (6)**
112:18,18,20;
113:1,2,5
**browser (5)**
35:8,11;36:11,
17,20
**brutality (1)**
39:13
**buddies (1)**
124:7
**building (4)**
41:9;105:23;
106:14,15
**bulge (4)**
102:5;127:9;
186:7,8
**bullying (2)**
27:14,14
**bumped (1)**
21:16

**bunch (4)**
14:4;32:19;
153:1;168:20
**burning (2)**
26:22;27:21
**bus (1)**
167:23
**business (1)**
149:1
**busted (4)**
77:20,23;78:8,19
**butt (1)**
124:18
**button (6)**
98:1,2,5,6,7,20
**buttoned (3)**
98:16,17,18
**buy (1)**
133:22
**buying (1)**
133:23

## C

**cahoots (2)**
46:11,15
**call (10)**
48:23;70:10,10;
152:7,10,10,11,13;
153:2;180:13
**called (8)**
13:13;47:19;
48:22,24;128:5;
148:10,13;151:21
**calls (4)**
23:5;24:25;
152:5;153:3
**calm (3)**
27:17,19;128:6
**came (45)**
5:5;15:15;16:7;
21:1,12;22:23;
26:16;31:11,12;
37:22;49:24;50:25;
51:2;59:23;62:13,
22;68:20;73:18;
75:11;77:19;78:5,
21;86:4,5;96:17;
104:7;115:16;
127:13,14;132:15;
136:12,13;138:7,9;
142:25;145:20;
150:16,18;151:3;
155:2;157:19;
158:25,25;159:19;
174:3
**Can (86)**
7:5,14,22;11:25;
15:23;17:2;34:15,
15,23;35:9;39:9;5;
41:9,12;46:19;
56:24,25;57:20,21,
23;58:3,5,7;60:8,

21;63:21;65:8;
68:15,25;78:2;
82:23;85:2;87:1,2,
6,17,23;88:1;
90:22;95:12,24;
113:3;115:1;
118:11;119:3;
121:19,19,20;
127:24;128:7;
130:5,16;131:9;
132:1;135:11,21;
137:25;146:19,22;
150:10,24;153:19,
21;154:2;156:21,
24;159:7,8;162:2;
163:10,23;167:5,
10,11;169:5,22;
171:15,16;176:14;
177:4;180:21;
185:6;188:13;
189:10,15,22,25
**cancer (6)**
10:9;15:15;
22:21;157:15,22;
159:2
**captain (2)**
158:12,13
**car (10)**
17:22;19:12;
22:24,25;23:2;
152:18;164:9,9;
181:17;186:25
**care (13)**
21:4;57:17;70:4;
86:11;97:1,2;
154:11,13,17;
155:13;157:22;
159:23,24
**careful (2)**
61:6;169:20
**carpal (2)**
180:18,19
**carried (2)**
31:10,11
**cars (12)**
16:17,20,21,21,
24,25;17:13,23;
145:24,24;164:6;
186:25
**case (21)**
13:9;20:9,10,16,
17;21:1;22:13,20;
24:9;36:2;78:3;
130:1;139:25;
145:2,3,7;146:25;
150:5,5;178:19,25
**cast (10)**
167:4,7,9,9,10,
12,16,18,21,23
**cat (1)**
5:20
**catch (1)**
109:17

**catching (1)**
167:23
**cat's (1)**
61:17
**caught (1)**
55:24
**cause (1)**
5:9
**caused (1)**
181:21
**causes (1)**
25:14
**celebrate (1)**
116:24
**cell (8)**
31:11,12;60:23,
24;69:5;144:16;
175:5;184:24
**centimeter (2)**
127:11;156:15
**centimeters (3)**
127:6,7,11
**Central (1)**
6:2
**certain (6)**
105:16;121:7;
130:24;156:21;
174:14;180:12
**Certainly (3)**
34:16;95:16;
189:14
**certify (1)**
5:3
**chains (4)**
17:21,24,25;
171:12
**chair (5)**
26:23;27:4,7,7,
17
**chance (4)**
62:7,10;88:16;
130:11
**change (8)**
23:7;27:25;
28:12;101:25,25;
139:21;143:6;
184:13
**changed (1)**
23:8
**changes (1)**
16:25
**changing (1)**
17:1
**charge (10)**
19:5;24:2;
138:21;157:13,23,
24;158:2,14,16;
172:12
**charges (3)**
19:6,7;20:11
**chart (2)**
162:5,6
**Check (5)**

**checked (2)**
83:12;92:12;
143:16;150:20,21
70:8;143:16
**checking (1)**
109:7
**chemo (1)**
15:16
**chest (1)**
155:23
**child (5)**
13:2,3;14:6;24:4,
5
**children (8)**
12:14,15,25;
13:18;24:3,10;
75:24;153:8
**Childs (3)**
43:15;48:2;54:4,
7
**child's (1)**
14:15
**Childs's (2)**
40:25;47:20
**chipped (3)**
80:22;173:25;
174:1
**chopsticks (1)**
62:19
**church (2)**
152:16,24
**circle (1)**
89:1
**circumstances (2)**
24:15;177:14
**citation (4)**
19:16,18;22:6;7
**City (7)**
10:3,14,15,17;
12:2;14:11;16:17
**Civil (5)**
5:4,19,25;19:10;
115:1
**claim (1)**
168:16
**clavicular (1)**
93:2
**Clayton (9)**
13:15;14:2,13,
13,14,15,19,22,23
**clean (2)**
113:5;128:25
**clear (2)**
99:8;156:11
**clearly (8)**
7:19,21;43:8,14;
46:1,13;47:5;
169:11
**client (5)**
63:4;80:17,20;
189:11;190:5
**clients (4)**
7:3;77:10;80:8;

150:13
**clinic (7)**
69:4,22;154:11;
184:14,16,18,20
**close (3)**
103:6,7,7
**closed (1)**
84:13
**cloth (1)**
61:9
**clothes (9)**
31:12,20,22;
97:24;99:18,25;
100:14,16;101:2
**Cobb (2)**
6:9;13:15
**Coca-Cola (2)**
106:14,15
**Coffee (2)**
128:20;129:8
**cold (1)**
61:13
**colleague (1)**
58:17
**colleagues (1)**
6:10
**collect (2)**
18:11,13
**College (3)**
14:24;15:9;16:6
**colon (1)**
92:24
**color (1)**
53:21
**colors (1)**
160:15
**combative (6)**
60:3,7,8,10;
110:24;140:24
**comedian (1)**
47:25
**comfortable (1)**
130:13
**coming (12)**
31:6,7;49:14;
52:8;75:10,12;
89:20;98:17;
115:14;142:24;
145:15;146:14
**command (1)**
59:24
**commanding (1)**
136:9
**commenced (1)**
26:20
**comment (1)**
49:2
**commented (1)**
122:8
**commissary (2)**
138:19,20
**Commissioner (3)**
2:6,22;5:3

**common (1)**
7:18
**companies (1)**
16:19
**company (4)**
19:21,22,23,24
**compare (1)**
159:7
**compared (1)**
28:6
**complained (2)**
86:1;182:9
**complaining (1)**
169:2
**complaint (17)**
74:6,7;77:10;
80:8,16;85:24;
135:2,3;140:21;
168:12;170:1;
171:14,15;172:7;
173:16,17,20
**complaints (6)**
86:17;134:25;
140:22,23;155:15;
182:4
**complete (2)**
169:18,18
**completely (2)**
8:3;122:11
**compliance (1)**
2:12
**concern (2)**
89:6;93:15
**concerned (1)**
184:23
**concerning (3)**
92:25;96:6;
178:18
**concisely (1)**
7:21
**condone (1)**
39:13
**conference (1)**
6:5
**confidence (1)**
130:23
**confinement (19)**
68:6;70:15,17;
86:3;174:6,7,8,10,
13,21,22;175:10,
15,18,20;176:4,9,
12,19
**confirm (1)**
55:20
**confused (2)**
12:3;179:4
**confusing (2)**
67:6,7
**congregate (1)**
177:8
**congregating (1)**
177:6
**connected (4)**

145:2,3;146:25;
149:25
**connection (2)**
111:25;112:4
**consciousness (1)**
49:15
**consent (1)**
154:13
**considered (1)**
74:16
**conspiracy (3)**
47:10,12;130:16
**conspired (1)**
144:7
**conspiring (1)**
143:24
**contact (10)**
52:4,8;59:23;
78:21;97:15,15;
105:5;149:13;
155:2;175:19
**contend (1)**
168:10
**contendere (6)**
20:24,25;23:10,
11;133:15,16
**contenderes (1)**
23:13
**contents (1)**
34:14
**continue (4)**
107:22,23,24;
123:4
**control (3)**
85:1,3;187:6
**conversation (3)**
61:17;151:15;
166:23
**cooperating (3)**
177:18,19;178:4
**copy (5)**
132:12;141:24;
142:1,2,2
**corner (1)**
180:6
**corrected (2)**
71:13;167:1
**correction (1)**
46:24
**correctional (1)**
129:8
**corrections (1)**
42:6
**corridor (2)**
121:9,24
**corroborating (1)**
79:19
**counsel (11)**
2:4,17;5:5;6:5,8;
15:9;37:13;58:15;
153:12;166:1;
167:25
**counted (1)**

101:9
**counties (1)**
14:5
**counting (1)**
84:10
**countless (2)**
147:8,11
**County (23)**
5:19;6:9;13:15,
16;14:2,13;24:16;
106:25;128:20;
129:8;130:8;
131:19,20,24;
134:7;135:19;
137:15,16;138:3;
139:4,5,20;177:16
**couple (7)**
19:5;60:24;89:1;
94:23;167:14;
183:1,2
**course (5)**
16:19;17:17;
20:24;26:23;30:10
**Court (57)**
2:13;5:1,22;6:7,
16;7:14,22,25;
14:9;20:25;21:6,
10;23:7;25:8,20;
26:5,5;37:17,18,20,
23;38:7,10,14,18,
19,23;39:2,4,10,17,
19,20;42:9,10;
43:5;87:18;100:17;
109:18;111:3;
114:1,11;115:7;
116:11;120:2,4,9,
20,24;122:17,21;
131:10,12;146:21;
150:2;157:19;
183:20
**courthouse (4)**
25:9;26:6;
106:10,12
**courts (1)**
149:4
**cover (2)**
6:18;83:10
**covers (1)**
14:4
**coward (2)**
30:2,3
**cracked (1)**
131:16
**crawl (1)**
97:7
**crawled (1)**
97:7
**craziness (1)**
62:24
**crazy (5)**
62:24,25;152:3;
155:4;181:12
**created (1)**

129:6
**creates (1)**
18:7
**credible (2)**
79:2,7
**credit (2)**
15:19,20
**credits (1)**
15:22
**criminal (3)**
19:7;129:19;
178:18
**crooked (2)**
65:14;80:21
**cruelty (2)**
24:3,10
**crushed (5)**
30:20;64:12,14;
74:24;76:7
**CSR (1)**
5:1
**CST (1)**
5:8
**cube (1)**
105:25
**cubital (2)**
180:19,19
**cuffed (1)**
100:4
**cure (2)**
118:11;159:9
**curious (1)**
169:9
**current (3)**
10:2;24:14;
155:18
**currently (4)**
5:21;10:5;12:6;
171:1
**cuss (2)**
103:19,19
**cussing (5)**
29:13;30:22;
48:15;62:9;123:6
**customers (1)**
170:19
**cut (8)**
18:17,18;21:14;
148:23,24,24;
186:12;188:24
**cuts (7)**
38:20;56:19;
57:3;67:3;85:22;
154:5,7
**cutting (4)**
28:24;29:1;
32:15;103:22

**D**

**DA (8)**
143:18;145:7,11,
13,14;146:11,12;

147:16
**daddy (1)**
117:14
**damage (3)**
73:18;174:3;
184:25
**damages (8)**
65:19;168:10,16;
170:3;179:14;
184:4;187:13,18
**damaging (1)**
167:11
**damn (3)**
75:9;143:18;
150:22
**dark-skinned (3)**
33:4;155:3,4
**Darryl (3)**
144:13,14;151:5
**Darryl's (2)**
149:22;151:2
**DA's (3)**
146:16;177:18,
20
**date (25)**
5:3,25;21:6,10;
22:8,8;25:17,18;
37:8;88:15;95:13;
106:16;112:11;
113:22;115:1,19,
20;116:15,17;
117:1;119:11,11;
144:21;154:15;
178:13
**dated (1)**
92:21
**dates (4)**
37:19;39:20,21;
116:20
**daughter (2)**
22:24;24:2
**Dauphin (2)**
2:6;5:6
**David (3)**
63:12,23;66:15
**day (25)**
2:7;37:23;42:17;
47:3;54:24;60:12;
63:11;66:2,3,11;
67:23;86:15;96:20;
108:20;113:16;
115:11,12;117:23,
24;129:6;137:6,20;
143:14,15;187:19
**days (7)**
25:9;59:3;94:24;
109:15;110:1,23;
136:25
**dead (1)**
181:6
**deal (6)**
57:25;86:12;
119:3,4;128:2;

129:14
**dealt (1)**
119:4
**Dean (1)**
14:16
**death (1)**
148:12
**deceased (2)**
13:19,21
**deception (1)**
162:12
**deceptions (1)**
162:17
**decision (1)**
170:21
**declined (3)**
118:14;130:3;
153:2
**defendant (1)**
19:10
**defendants (1)**
6:15
**defending (1)**
157:18
**define (2)**
125:6;176:12
**defined (1)**
92:19
**definite (1)**
162:7
**definitely (1)**
118:4
**definition (2)**
172:11;175:17
**deformity (1)**
156:8
**defying (1)**
102:9
**degree (1)**
74:15
**deliveries (1)**
16:25
**demand (1)**
27:13
**demeanor (1)**
109:22
**denied (2)**
171:8,11
**denies (1)**
155:22
**dense (1)**
148:3
**Dental (2)**
154:12,16
**dentist (9)**
64:15;16;68:16;
76:19,24,25;79:20,
25;155:18
**deny (2)**
72:12;171:10
**department (7)**
39:11;41:1;
54:25;66:7,8;

82:20;133:18
**departments (1)**
130:15
**depends (1)**
15:21
**deponent (19)**
26:24;58:1,3,5,8;
95:15,18;131:10;
144:1;162:1,9,14,
24;163:5,17,21;
168:3;178:5;
190:10
**deposition (15)**
2:5,10,11,19,22;
5:17,23;6:4,19;8:6,
9,20,23;96:5;
166:22
**depositions (1)**
2:14
**depressed (3)**
159:1,6,6
**depression (7)**
78:4;117:8,13,
15;118:17;127:23;
159:19
**deprivation (1)**
85:10
**deprived (2)**
85:6,9
**Deputies (12)**
6:16;26:16;46:6;
74:2;83:24;89:6;
97:22;98:24;101:7;
112:7;123:8;130:8
**deputy (19)**
25:14;35:15;
40:18;42:2;43:3;
73:23;84:3;89:25;
90:4,6,6;91:4,12,
12,21;106:25;
112:19;129:21;
178:3
**deputy's (1)**
112:13
**describe (2)**
112:10;113:4
**description (1)**
16:24
**desk (6)**
28:2;32:5;89:13;
90:7;102:4;178:25
**despite (1)**
44:5
**detail (1)**
17:3
**details (1)**
150:25
**detector (10)**
44:17,21;45:10,
23;46:25;47:12;
83:25;84:2;161:16,
18
**detention (1)**

42:2
**devices (1)**
89:4
**diagnosed (6)**
57:10;117:5,17;
127:23;128:3,13
**diagnosis (3)**
93:23;128:11;
159:12
**dial (1)**
150:18
**die (5)**
117:9,14,14,14;
160:1
**died (5)**
93:12;117:8,11,
11,23
**difference (2)**
80:13;135:22
**different (13)**
37:19;39:20,21;
53:22;61:8;62:13;
66:10;67:22;68:19;
89:4;117:21;
153:15;173:2
**difficult (3)**
7:25;89:5;162:5
**difficulties (1)**
146:20
**difficulty (3)**
91:10;120:19;
161:3
**digit (1)**
156:16
**dilemma (1)**
114:18
**dinner (1)**
89:21
**direction (1)**
181:16
**disagree (1)**
33:21
**disappears (1)**
124:3
**disassociated (1)**
19:2
**discharged (2)**
43:21;44:6
**disclose (1)**
189:10
**discovery (3)**
37:13;43:22
**discuss (1)**
131:18
**discussed (2)**
22:13;188:6
**discussing (2)**
54:23;59:5
**discussion (2)**
92:16;96:2
**disgust (1)**
31:25
**dishwasher (1)**

17:12
**dismissed (1)**
20:22
**disorder (1)**
117:17
**disparage (1)**
139:24
**dispatcher (1)**
153:3
**Disposition (1)**
154:9
**distress (4)**
56:20;69:13;
154:5;156:8
**District (11)**
5:22,22;14:4;
129:19,21;130:19,
22;131:3;148:25;
177:16;178:3
**dizziness (1)**
155:23
**dizzy (3)**
96:15,15,18
**DJV (1)**
16:17
**DMV (1)**
19:13
**DOC (1)**
179:15
**doctor (7)**
63:11;76:2;86:9;
182:14,16;184:3;
186:23
**doctors (1)**
56:3
**document (13)**
34:15;36:15,20;
73:15;136:2;
140:13;156:3;
160:23,25;161:9,9;
163:16,20
**documentation (1)**
156:4
**documents (7)**
8:22,25;37:2;
92:19;136:1;188:6,
9
**dollar (5)**
187:22,23,24,25;
188:2
**dollars (1)**
151:17
**Donald (1)**
15:1
**done (5)**
17:19;52:12;
69:7;151:10;
153:17
**door (10)**
107:5,11,24;
108:1;135:17;
136:18;138:16,17;
151:21,22

**doorway (4)**
52:21;121:6,7,9
**dorsal (1)**
156:16
**doubt (1)**
136:18
**doubts (1)**
169:22
**down (120)**
7:14,21;8:1;
10:11;15:5,15;
16:7;20:19;25:21,
22,22;26:10;27:6,
18;30:20,21;31:12,
14,17;32:22;35:23;
38:24;39:5,8;
49:23;50:14;52:21;
53:8;57:8;61:22;
64:8,12,14;68:20;
76:7;80:14,23;
86:8;89:14;96:10,
13,15,16,17,22;
97:8;98:4,7;99:11;
100:8,10,10;102:3;
105:2,6;106:14,15;
108:24;115:18;
118:17;119:19,20,
22;120:9,10,16;
122:2,18,24;123:8,
9,11,15,17,22;
124:10,12;126:4,7,
8,21;127:1,3,4,6,9,
10,18;128:6;136:3,
4,5,6;138:13;
145:13;152:20,21,
24;154:10;155:12,
21;156:23,25;
157:1,19;158:12,
25;164:3,10,16,25;
166:19;171:2;
174:14;182:25;
183:8,10;187:11;
188:1,20
**download (1)**
37:4
**downstairs (7)**
61:2;66:9;67:8;
72:21;83:24;86:6;
97:14
**drag (4)**
29:3;49:19;60:1;
103:23
**dragged (5)**
52:24;119:14;
123:24;124:9;
173:1
**dragging (13)**
28:19,22;29:3;
47:23;49:11;50:8;
52:23;54:1,4,9;
171:19;172:7;
181:21
**drags (5)**

29:12;30:5;
122:11;124:8;
180:4
**drastic (1)**
184:12
**dressed (9)**
99:1,2,3,22;
100:24;101:1,4,7;
112:12
**dressing (1)**
101:3
**drive (3)**
152:18,19;
186:24
**driver (3)**
152:25;153:2;
165:10
**driving (1)**
152:12
**drop (1)**
187:5
**drug (30)**
28:16;29:6;
38:12;47:23;48:3;
49:5,7,16;50:6,14;
51:4,22;52:3,9,19,
20;53:5,24;59:9,
24;99:16;100:13;
101:10,11;103:17,
21;121:23;122:14;
181:16,17
**drugs (2)**
9:5;25:23
**DUI (1)**
187:1
**duly (1)**
5:13
**dummy (2)**
152:5,7
**during (15)**
16:19;20:24;
43:1,1;68:4;72:2,4;
86:17;97:21;
119:14;131:19;
133:16,18;147:6;
173:5
**duty (1)**
48:11
**dying (4)**
22:21;157:15;
158:11;160:2

**E**

**earlier (13)**
18:23;49:1;63:6;
64:2;66:11,25;
67:1;97:21;103:25;
160:4;164:1,24;
170:25
**Earth (1)**
163:9
**Eastern (2)**

6:1;60:19
**eat (1)**
187:5
**eating (2)**
187:6,7
**edema (1)**
156:9
**education (2)**
154:8,8
**effect (2)**
2:12;138:13
**effective (1)**
62:5
**eight (6)**
16:12;43:21;
70:8,8;85:15;
185:16
**eighty (1)**
55:6
**either (9)**
19:10;30:17;
54:25;60:7;66:15;
94:13;148:21;
181:24;188:15
**elbows (1)**
164:11
**electronically (1)**
154:17
**elevator (3)**
104:5,11;107:25
**elevators (1)**
104:8
**eleven (1)**
113:17
**else (11)**
8:19;43:7;48:17;
49:10,10;59:7;
111:9;149:8;
168:24;176:20;
185:23
**email (3)**
71:18;143:12;
145:14
**emails (1)**
143:16
**emblazoned (1)**
112:21
**emotion (2)**
118:1,1
**emotions (1)**
117:22
**emphatically (1)**
80:12
**employed (1)**
171:1
**employers (1)**
165:9
**employment (1)**
15:24
**employment-wise (1)**
17:9
**enamel (6)**
64:10;65:10,10,

12,13;72:7
**encounter (1)**
155:13
**encountered (1)**
101:6
**end (5)**
47:2;54:24;93:4;
109:16;159:1
**enjoyment (1)**
30:8
**enough (6)**
136:17;153:7;
156:10;165:16;
175:5;186:21
**entrance (3)**
52:21;107:10,13
**Enzell (49)**
60:13,13;61:14,
17,21;62:6;63:14,
24;65:1,4,7,7;66:4,
14;67:22;68:1;
70:21;72:12,14;
73:8,15,15,17;
75:18;76:4;77:7,
18,18,21,22;78:3,
13,17,18;79:1,15;
83:6,9,10,20,22,23;
86:13;89:24;90:4,
20,24;91:1;97:11
**escorted (1)**
69:3
**especially (4)**
48:10;86:2;
138:20;188:9
**essentially (1)**
46:12
**estimate (1)**
132:2
**estranged (1)**
12:6
**evaluation (1)**
158:18
**even (37)**
17:14;22:21;
23:11,18;25:21;
30:14;43:15,17;
46:23,23;50:20;
52:5,6,7,8;54:22;
56:24;60:9;72:14;
79:2;83:17;86:14;
97:6;100:24;
108:13;111:21;
118:25;124:19;
127:7;129:6;
135:16;146:23;
152:7;161:17;
166:18;179:14;
189:16
**everybody (17)**
25:12;46:15;
47:9,12;91:13,17,
18;108:24;118:4;
149:19;152:2;

**Min-U-Script®**

**Bain & Associates Court Reporting Services, Inc.**   **(197) dismissed - everybody**
**1-888-326-0594   depos@bainandassociates.com**

159:16;161:11;
175:25;176:3,8;
177:1
**Everybody's (1)**
116:23
**everyone (3)**
19:3;91:15;96:5
**Everything's (1)**
20:17
**everywhere (1)**
151:24
**evidence (10)**
2:20;41:22,25;
54:25;56:1;71:15;
79:19;80:18;
111:20;184:4
**evulsion (4)**
63:25;70:23;
155:16;156:9
**exact (7)**
21:7;68:15,25;
80:3;94:7;120:3;
130:14
**exactly (9)**
54:18;67:10;
79:8,10;120:5;
128:22;164:4;
165:21;174:16
**exam (1)**
154:6
**examination (3)**
5:9,16;154:4
**examined (2)**
5:13;63:23
**example (1)**
169:1
**except (2)**
2:16;6:21
**excessive (2)**
55:9,12
**excuse (8)**
25:7;37:10;
109:13;154:11;
171:18;180:18;
184:15;186:3
**excuses (1)**
25:6
**ex-girlfriend (1)**
11:2
**ex-girlfriend's (1)**
12:2
**Exhibit (1)**
153:11
**existed (2)**
132:22;135:13
**exonerate (1)**
55:21
**exonerated (3)**
55:9,14,20
**expect (2)**
83:2;150:14
**expedited (1)**
154:12

**experience (2)**
128:18,23
**experiencing (1)**
170:15
**explain (8)**
63:22;65:8;73:3,
14;101:19;125:16;
138:4,6
**explained (1)**
154:14
**exposed (1)**
31:23
**express (1)**
89:9
**extend (1)**
164:8
**Extreme (2)**
117:13,15
**extremely (1)**
29:1
**extremities (1)**
156:18
**eye (5)**
24:18,18;30:7;
105:21,21
**eyes (1)**
156:11

## F

**face (25)**
26:19;31:12,14,
17;41:10,11;48:18,
19;50:14;51:8,24;
54:12;64:10;84:19,
22;100:8,10,10;
119:16,17;122:2;
124:5,5,10,12
**Facebook (23)**
116:4,4,5,6,13,
14,17,19,21,25;
117:3;150:10,11,
12,15,17,17,18,20,
23,24,25;151:3
**Facebooked (1)**
134:2
**faces (3)**
28:19;42:22;
54:18
**facial (1)**
54:11
**facilities (1)**
133:2
**facility (5)**
25:20;70:11;
100:23;110:20;
175:13
**fact (14)**
45:7,18,19,25;
46:12,21,21;65:3;
80:14;94:7;105:15;
111:21;138:9;
185:8

**failed (8)**
44:17,21,21;
45:18,22;59:14,17;
163:9
**failing (1)**
47:12
**fairly (1)**
9:3
**fake (11)**
31:16;32:6,17;
39:24;42:14;47:18;
50:17,19;54:21;
84:4;148:12
**fall (15)**
7:17;95:14,18;
96:7,10,12,22;97:7,
8;124:4,20;125:6,
20;142:13;189:4
**fallen (4)**
124:25;125:1,22;
156:23
**falling (6)**
75:23;96:15,16,
17,22;125:25
**falls (5)**
95:11;124:6;
156:23;187:7,7
**false (1)**
41:19
**familiar (4)**
133:6;139:20,21,
22
**family (3)**
10:6,12;13:11
**far (11)**
11:25;15:12;
53:23;123:17;
127:4,5;152:12;
156:22,24;177:2;
181:11
**fast (1)**
7:20
**faster (1)**
34:23
**father (7)**
13:21;117:11;
118:5;157:16,20;
158:12;159:20
**fat-lipped (1)**
39:2
**fear (2)**
153:8,8
**fearful (1)**
128:7
**fears (1)**
128:1
**Federal (2)**
5:4,25
**feed (1)**
176:22
**feel (16)**
17:24;51:21;
103:15,15;117:23,

24;118:6;130:13;
157:10;180:11,21,
21;183:11;184:9;
185:15;187:8
**feeling (3)**
17:18;117:21;
181:4
**feels (4)**
181:6,14;183:12;
187:9
**feet (13)**
29:15;30:12;
49:7,11,16;50:7,8;
51:3;84:15;97:25;
99:4;103:18;
119:15
**fell (5)**
31:18;95:2;
124:7;125:24;
126:1
**felt (2)**
103:11;187:9
**female (2)**
31:19;181:9
**few (6)**
28:25;94:24;
127:5,7;178:14;
180:20
**fifteen (6)**
12:18,18,25;
25:9;59:3;136:25
**fifth (1)**
156:16
**fight (16)**
30:1;50:15;
54:14;57:7;66:22,
23;68:1;72:5,15;
77:18;86:6,10;
123:7;138:21;
155:15;175:12
**fighting (4)**
62:11;78:8;
123:9;157:16
**fights (1)**
110:21
**figure (4)**
116:13,17;117:1;
163:2
**figured (2)**
115:25;159:5
**File (8)**
5:20;64:7;127:3,
10,11,19;134:21,23
**filed (4)**
7:2;80:16;127:4,
6
**filing (1)**
2:22
**Filipovits (60)**
6:6,12,20,23;
34:13,18,21,24;
35:3,7,12,18,25;
36:6,10,16,23;

24;46:17;57:20;58:2,
10;71:17,21,25;
72:3;87:4,6;88:2,3,
10,14,20;93:21;
144:5;153:19,22;
161:20,23;162:2,
10,16,19;163:1,10,
13;166:21;168:5,
25;169:4,12,17;
178:7;188:21,23;
189:1,9,13,15,24;
190:6
**fill (1)**
136:17
**filled (1)**
137:4
**finally (4)**
25:1;27:22;
28:12;30:19
**find (9)**
60:6,9;95:21;
119:10;141:7;
142:23;183:11,13;
184:4
**findings (2)**
154:5,7
**fine (4)**
25:25;58:12;
157:9;168:17
**finger (2)**
21:14;186:13
**fingers (2)**
180:17,20
**finish (4)**
7:24;8:3;102:17;
126:25
**fired (2)**
45:4;145:18
**first (29)**
5:13;6:21;9:2;
29:16;32:6;33:5;
42:18,23,25;49:8;
59:23;65:15;79:2;
83:17;98:14;101:6;
111:2;122:7;
135:14,18;144:9;
146:23;158:24;
161:12;162:24;
163:6,8;164:2;
188:18
**fist (1)**
84:13
**fit (2)**
103:21;127:8
**five (8)**
60:23;113:8,8,8;
132:3,4;134:19;
139:6
**fix (3)**
166:16,16,17
**fixed (1)**
19:23
**Fixodent (1)**

Min-U-Script®

Bain & Associates Court Reporting Services, Inc. (198) Everybody's - Fixodent
1-888-326-0594   depos@bainandassociates.com

124:8
**flawlessly (1)**
9:3
**flexing (1)**
18:2
**floor (34)**
32:23;37:23;
50:6;65:5,8;66:19;
68:2,20;79:12,14,
15,19;85:17;86:2;
89:19;135:23,23,
24;136:9;137:24;
138:16;140:9;
174:6,19,20,21;
175:9,25;176:4,8,
13,13,17;177:1
**floors (1)**
86:2
**Florida (1)**
12:21
**Flying (1)**
160:14
**focal (1)**
93:3
**focus (1)**
139:18
**follow (1)**
150:7
**followed (3)**
133:20;152:4;
153:6
**following (4)**
5:9;133:20;
148:22;153:4
**follows (2)**
5:14;6:25
**follow-up (2)**
188:6,9
**food (1)**
138:18
**foot (9)**
124:4;156:15;
167:4,9,12,16,18,
21,23
**force (5)**
2:11;55:9,12;
101:13;177:14
**foregoing (1)**
5:5
**forget (2)**
128:5,9
**form (11)**
2:17;6:21;18:13;
46:17;136:4;137:4;
141:4,13;142:16,
18;162:6
**formation (1)**
116:7
**forms (1)**
137:18
**forty-eight (1)**
71:9
**forty-five (1)**

74:15
**Forty-four (1)**
9:24
**forward (6)**
6:19;51:24;
101:4;129:25;
179:1,3
**forwarded (1)**
143:10
**found (6)**
89:2;92:15;
115:22;142:19,21;
169:9
**four (24)**
8:7;15:9,12;
33:12;34:5,9,11;
35:17,24;39:23;
40:13;49:24;60:23;
81:25;82:4,6;
114:20;126:11;
173:11,15,19;
174:3;178:15;
179:14
**fourteen (1)**
59:3
**fourth (1)**
173:24
**fracture (5)**
92:24;94:5,6,8,9
**fractured (2)**
87:15,17
**frame (2)**
113:20;146:4
**frames (1)**
113:13
**Frank (23)**
41:1,2;44:10,11,
13,13,14,19,23;
50:19;69:4;100:9;
116:3;143:23;
148:8,13,13,15,19;
151:6;160:13,13;
162:15
**friends (1)**
10:6
**front (21)**
21:20;51:2;
52:16,17;61:22;
81:24;87:5;89:3;
97:19;113:21;
118:11;122:9;
149:10;152:18,19,
19,23;156:9;
172:25;173:3;
186:3
**frustrated (1)**
25:1
**fuck (1)**
61:25
**fucking (2)**
143:4;147:4
**fuel (1)**
16:25

**full (2)**
2:12;9:9
**Fulton (15)**
5:19;24:16;
106:24;130:8;
131:19,20,24;
135:19;137:15,16;
138:3;139:4,5,20;
177:16
**Fuqua (97)**
29:9,11,21,23;
31:16;32:6,17;
35:15;37:11,19;
38:9,16,19,25;39:3,
8,22,24,24;40:12,
14,18;41:4,4,7,8,
14,20;42:4,8,14,14,
16,19,20,20,21,24;
43:4,4,5,6,16,17;
44:12,12,14,20,20,
23;45:2,17;46:4,
12,25;47:4,19,22;
48:4;50:18,19;
84:4,5;104:1,8,8;
106:1,2;109:1,3,7;
110:1;111:16;
112:10,24;113:3;
114:9,12,13,14,21;
115:4,16,25;116:1,
4;119:16;120:13;
122:6;123:25;
124:11;133:17;
135:16;143:10,19,
23;188:10
**F-u-q-u-a (1)**
32:8
**Fuquas (2)**
114:10,12
**Fuqua's (13)**
38:13,21,21;
40:11;41:7;42:4;
43:20;46:14;47:18;
117:1;133:19;
134:1;163:11
**FURTHER (7)**
2:9,15,21;27:6;
39:12;69:6;190:10

## G

**gang (1)**
62:23
**gap (1)**
156:23
**gas (1)**
133:20
**gave (32)**
22:6,7;23:9;
41:25;42:4;57:21;
59:24,25;65:5;
73:23;96:24;97:3;
98:22;104:16,19,
23;107:18,19,21,

21;108:6;110:6;
115:19;129:1;
134:7;141:20;
142:4;151:6;160:9;
167:4,12;184:11
**gavel (2)**
115:12,18
**GBI (7)**
161:7,7,8,9,9,10;
163:8
**general (2)**
56:20;69:12;
154:4;156:7
**genitals (2)**
187:16,16
**gentlemen (2)**
55:9;120:22
**Georgia (10)**
5:19,22;10:4;
12:20,22,22,24;
13:20;14:7,20
**gets (4)**
28:13;122:10;
130:17;148:21
**Gettier (3)**
63:12,23;66:15
**gift (1)**
129:1
**girl (3)**
122:8;133:22;
134:3
**girlfriend (2)**
12:6;18:22
**gist (1)**
151:7
**given (8)**
102:8,12;131:21;
147:8;165:11;
167:21;185:3;
189:18
**giving (9)**
25:6;37:4;89:20;
140:8,16;142:6;
180:22;185:22;
186:14
**glenohumeral (1)**
93:2
**globally (1)**
139:19
**glue (6)**
64:8,9;126:5,8,
21;127:2
**Gmail (1)**
36:1
**God (4)**
118:10,12;
128:24;187:21
**God's (2)**
129:14;160:1
**goes (5)**
82:25;143:5;
144:11;154:10;
167:9

**gold (26)**
64:7,7,8;65:9,9,
9;81:13,14,15,17;
125:22,25;126:1,2,
8,15,16,17,18,19,
21;127:1,9,13,15,
19
**golds (1)**
126:9
**good (10)**
41:11;42:22;
82:13,15;93:1;
129:8;164:21,22;
165:9;177:20
**googled (6)**
115:24;116:2,3,
3,4,5
**grabbed (7)**
26:20;101:16,17,
18,20,22;102:24
**grabbing (1)**
101:19
**grabs (2)**
25:14;28:14
**graduate (1)**
15:10
**Grady (30)**
57:10,10,11,15,
15;71:1,1,3,4,6,7;
86:16;89:2;92:13,
15;127:22;159:11,
17,18;165:12,19;
180:16,16;182:2,5;
185:23,25,25,25;
186:15
**Grand (2)**
131:8;143:5
**grandfather (2)**
10:9;15:5
**grass (1)**
18:17
**green (1)**
62:15
**grew (1)**
62:10
**grievance (30)**
133:7,10,11,17,
18,25;134:4,15,21,
23;135:5,15,24,24;
137:18;138:3,4,11,
11,12,19,25;139:8,
12;140:1,4;141:10,
10,13;154:14
**grievances (4)**
140:8,16;141:24,
25
**Grill (2)**
17:12;18:9
**gripped (2)**
28:22,23
**grips (1)**
118:10
**ground (13)**

25:15;26:14,21;
51:11;53:12,20;
61:24;62:5;73:22;
76:10,21;80:15;
125:25
**grounds (1)**
2:18
**group (4)**
32:16,18;78:5;
175:4
**groups (2)**
128:7;177:6
**grown (1)**
172:9
**guard (2)**
31:19;141:19
**guards (2)**
141:16;142:6
**guess (8)**
8:15;21:18;27:3;
29:25;31:24;105:8;
166:16;182:23
**guilty (2)**
22:16;23:14
**gums (1)**
125:18
**gun (2)**
62:4;97:16
**guns (1)**
133:3
**guy (62)**
28:2,13,22;
31:15;32:25;33:1,
4;38:17,19;39:2,3;
40:11;41:3;42:3;
50:2,2,5,11,15;
51:1,25;52:19;
53:4,13,14,14,16,
19,20;54:17;60:25;
61:7,15,16,18;
62:11,22;66:22,24;
85:13;86:3,14;
102:4;115:23,24;
116:8,13;123:22;
128:24,25;131:6,7;
143:7,8,18,23;
146:11;147:1,2;
148:16;151:11;
175:6
**guys (13)**
50:17;52:8;
59:23;60:23,23,24;
71:18;103:14;
119:19;120:8;
130:4;143:11;
177:23

---

**H**

**hair (1)**
53:21
**haircut (2)**
33:4;113:5

**half (14)**
15:19,21;31:12,
20,22,22;60:24,25;
98:19,19;122:1;
146:24;180:21,22
**halfway (2)**
151:14,15
**halls (1)**
52:21
**hallway (5)**
27:5;104:4,7;
106:3;109:17
**hand (11)**
26:15,17,18;
51:16,19;84:14,21;
122:4,23;124:5;
164:12
**handbook (3)**
131:21;132:5,22
**handbooks (1)**
132:17
**handcuffed (15)**
28:17;29:25;
30:2,4,13;31:13,14,
16;48:11;99:5,6;
120:16;123:12;
124:10,12
**handcuffs (12)**
26:6;30:1,15;
41:3,3;48:13;50:3,
6,21;99:4;103:15;
123:5
**handheld (1)**
97:13
**handle (2)**
17:5;189:25
**handouts (1)**
18:21
**hands (20)**
25:12,13,13;
28:17;29:14;30:11;
31:20;41:13;50:13;
51:3;85:12;97:25;
98:3;100:8;123:14;
129:14;164:12;
172:10;179:16;
187:6
**hanging (5)**
81:10;98:4;
124:19;125:12,20
**happen (7)**
67:5,12;72:20;
95:19;110:19;
180:7;183:13
**happened (36)**
20:21;51:23;
52:15;61:2,16;
64:9;67:19;68:2;
72:21;78:15,20;
90:20,24;91:2,7,8;
106:20;108:20;
109:12;110:9;
115:3;129:4;141:4;

145:4,17,17;
150:19;153:6;
180:2;181:2,23;
183:1,14,18,19,23
**happening (1)**
57:18
**happy (5)**
117:23,25;118:5;
169:6;179:18
**hard (5)**
23:19;30:20,21;
84:7;164:12
**harder (1)**
29:18
**hardest (1)**
165:9
**harm (3)**
83:24;143:12;
151:10
**harmed (1)**
83:23
**harm's (1)**
84:11
**hate (1)**
129:2
**hazard (1)**
53:9
**head (6)**
7:16;51:20;
52:14;62:12,21;
72:10
**headache (2)**
155:22;185:12
**heal (4)**
27:12;71:3,10,12
**healing (5)**
97:1;117:25;
167:6;183:3,3
**heals (1)**
71:12
**health (11)**
57:25;117:5,7;
128:15,16;154:7,
12,17;158:18;
164:22;171:11
**healthy (1)**
157:9
**hear (19)**
7:5,9,22;94:4,11,
11;101:16;102:23;
103:1,5;118:20;
121:19,19,20,22;
151:14;154:2,21,
25
**heard (8)**
38:4;61:5;94:17;
131:7;133:5;
151:11;162:25;
170:19
**hearing (12)**
33:11;34:4,8;
39:22;40:18;42:16;
47:6;115:7;119:9,

14;129:20;161:13
**heart (1)**
156:11
**heartbeat (1)**
27:1
**heavy (1)**
183:9
**height (2)**
33:4;53:21
**held (1)**
122:24
**hell (2)**
62:10;145:22
**help (7)**
27:9;31:22;73:3;
144:5;157:5;
184:10;185:13
**helped (1)**
101:3
**helping (1)**
141:6
**here's (8)**
40:3,3;73:21;
85:23;114:18;
135:7;138:18,19
**hesitate (1)**
7:10
**hey (14)**
41:25;48:11;
52:22;85:4;86:5;
91:15;96:25;102:5;
124:6,7;151:22;
153:1;155:9;172:1
**high (2)**
16:4,5
**higher (1)**
42:8
**himself (5)**
41:5;47:5,7;
48:13;133:24
**hip (5)**
96:11;179:25;
180:2;181:13;
183:25
**hips (1)**
18:7
**history (2)**
15:24;155:15
**hit (26)**
16:7;26:21;
29:14,17;30:3,14,
15,18;50:4;51:13;
52:10,13;59:21;
62:1,2;64:10;
65:11;76:21;82:17;
84:3,9,11;122:13;
127:15;158:15;
172:13
**hits (5)**
29:18;30:19;
74:13;122:8;124:3
**hitting (7)**
29:13;30:12;

14;129:20;161:13
**Hold (20)**
35:21;37:25;
58:2;67:6;68:24;
70:2;120:16,17;
123:22,23;137:12;
140:7,7;142:23;
144:3;166:6,6;
168:5,25;178:7
**holding (12)**
44:11;95:17;
119:19,20,21;
120:8;122:18;
123:8,11,15,16,17
**hole (4)**
86:12,13;177:3,6
**hollering (3)**
27:2,2;54:13
**home (6)**
6:9;15:16;
110:23;128:10;
149:11;167:23
**honestly (3)**
8:18;18:17;
130:7
**Honor (3)**
39:16;114:10,17
**hook (1)**
164:7
**hooks (2)**
164:7,10
**hope (1)**
187:2
**hopefully (2)**
7:12;9:3
**horror (1)**
72:11
**hospital (13)**
58:19;94:17,20,
22;96:14,18;157:3,
4;182:12;183:15,
24;184:7,7
**hour (1)**
17:2
**hours (15)**
8:7;15:20;17:15;
27:8,21;69:1,4;
71:10;85:15,15,18;
183:1,2;187:5,5
**house (17)**
11:15,20,24;
12:2,7,7,8;114:10,
12;143:9;145:19,
23;148:21;149:12;
12;143:15,15;152:3
**housed (1)**
175:8
**huddled (2)**
32:16,17
**hugged (1)**
134:3
**Huh (2)**

Case 1:18-cv-02350-MHC   Document 120   Filed 11/23/20   Page 201 of 216
William Robinson vs.
Frank Jones, et al.

William Robinson
May 19, 2020

81:4;112:16
**hundred (1)**
157:7
**hundreds (2)**
185:17,17
**Hurricane (1)**
16:7
**hurt (6)**
17:5;86:11;
157:6;181:12,12;
186:22
**hurting (6)**
17:7;28:7;30:22;
31:17,18;165:16
**hurts (6)**
71:14;91:16;
181:9,11;183:25,
25
**husband (3)**
36:22;157:24,25
**hygiene (1)**
154:8
**hyper-extends (1)**
180:5
**hypervigilant (1)**
128:8
**hypotheticals (1)**
172:6

**I**

**ibuprofen (1)**
185:16
**idea (5)**
42:17;49:22;
109:3,4;134:20
**identification (1)**
41:19
**identified (3)**
33:12;43:9,14
**identify (2)**
35:16;56:25
**ignorance (1)**
126:18
**ignorant (1)**
108:16
**illiterate (1)**
149:5
**illness (2)**
117:5,7
**imagine (1)**
18:24
**immediately (7)**
27:11,12;56:7,
13;71:8;83:11;
183:15
**immobilized (1)**
62:2
**impersonate (1)**
42:2
**impersonating (2)**
38:25;40:14
**imply (1)**

20:6
**important (1)**
13:9
**impossible (5)**
42:5,8;140:9;
149:19;187:24
**impressed (5)**
178:20,22;179:5,
6,11
**impression (2)**
102:4;175:12
**impressionable (1)**
179:12
**improper (1)**
39:13
**inability (1)**
138:25
**inaccurate (1)**
120:11
**inappropriately (1)**
123:3
**Inaudible (3)**
40:2;79:9;
118:20
**incarcerated (4)**
20:6,8;22:7;
131:23
**incarceration (1)**
24:16
**incarcerations (1)**
131:19
**incident (55)**
10:23;31:9;
32:20,21;37:20;
47:13;56:8,14;
59:6;60:11,15;
61:1;63:24;64:2,9;
65:1,21;66:3,4,12,
14;67:3,20,21;
68:4,25;69:3,10;
70:21;73:7;76:4;
77:7,9;81:17;89:5,
24,25;90:4,4,20;
91:2,20,21;94:23;
96:23;97:10,22;
98:22;101:21;
154:20;164:21;
165:3;172:25;
173:23;181:4
**incidents (1)**
67:12
**including (1)**
9:5
**inclusive (1)**
161:4
**inconclusive (12)**
160:5,7,9,12,12,
13;161:10,13,24;
162:7,13;163:6
**incorrect (2)**
117:18;159:13
**incorrectly (4)**
71:11;120:10;

122:17;123:10
**indeed (1)**
123:23
**indicate (4)**
85:8;88:11;
92:22;155:23
**indicated (8)**
55:2;74:18;82:7;
95:1;97:10,21;
164:15,24
**indicates (3)**
43:20;92:23;
159:11
**indication (2)**
86:18,19
**indications (1)**
85:21
**indigent (6)**
136:17,18,24;
137:3,7,25
**individual (2)**
59:11;94:20
**individuals (4)**
35:24;53:22;
66:10;85:20
**industry (1)**
165:5
**ineffective (1)**
97:12
**influence (1)**
9:5
**information (14)**
8:1;35:24;96:4;
116:18,23;130:6,
17,17,20;136:3;
143:10;147:16;
151:4;154:15
**initial (3)**
32:21;66:1;
119:9
**initially (3)**
49:18;99:9;
189:16
**initiated (3)**
86:11;130:8;
154:11
**injured (2)**
26:11;95:4
**injuries (17)**
56:5;64:1;73:16;
89:22;91:13,14,15;
164:22;165:10;
168:12,14;170:4;
175:6;179:13;
182:18,19;184:4
**injury (8)**
25:15;93:17;
155:18;156:20,21;
164:11,13,15
**inmate (13)**
60:12;61:4;
131:21;132:5,17,
22;134:18;136:21;

141:18,18,19,23;
155:25
**inmates (9)**
31:25;78:10,11,
16,19,22;79:4,5;
110:21
**inside (18)**
21:16;26:25;
43:13;72:9;73:24;
74:1;75:3;81:8;
83:4;106:4;110:24;
122:1;127:16;
133:2;141:12;
150:4;175:12;
184:20
**instead (1)**
7:17
**institution (1)**
110:24
**instruction (2)**
102:9,11
**insurance (11)**
57:17;165:14,15,
20;166:3,4,9,10;
186:19,20,21
**intake (15)**
25:21,22;27:5;
38:12,14;67:11;
69:1;73:6,13;
100:8;119:15;
148:16,17;153:17;
154:15
**intaked (1)**
85:14
**intend (2)**
168:15;177:17
**intentionally (2)**
26:13,14
**interacted (1)**
33:6
**interaction (3)**
33:7;174:15;
175:2
**interfering (1)**
105:13
**internal (1)**
177:12
**internet (2)**
116:22,23
**interpret (1)**
183:21
**interpretation (3)**
119:24;120:3;
163:16
**interrogatories (1)**
15:8
**interrupt (9)**
44:1;51:18;
52:11;67:20;79:3;
80:11;102:16;
126:23;137:1
**interruption (1)**
120:20,24;

146:21
**interviews (1)**
147:9
**into (47)**
7:17;9:20;16:9,
23;19:13;21:16;
24:20;25:5,20;
28:23,23,24;29:3,6,
12,24;30:5;42:16;
45:13;48:3;49:5;
52:8,24;64:18;
66:21;69:5;77:18;
78:21;99:16,22;
103:15,22;110:2,
21,22;121:23;
122:9,11,14;
140:24;145:23;
149:23;153:16;
155:2;157:16;
163:15;175:12
**intoxicant (1)**
9:6
**investigate (1)**
130:25
**investigation (6)**
43:14;114:25;
129:25;133:19;
177:13,16
**investigative (1)**
117:3
**involved (4)**
19:9,11;54:24;
138:5
**involving (1)**
150:4
**iron (1)**
49:12
**irrelevant (2)**
90:25;137:15
**isolation (1)**
68:22
**issue (14)**
37:3;41:17;
54:20;85:5;100:19;
101:3;128:1,21;
130:18;164:19;
168:2,4;182:13;
189:22
**issued (1)**
21:2
**issues (5)**
57:25;104:25;
164:19;180:17;
181:21

**J**

**jacked (2)**
64:12;181:18
**Jackson (26)**
21:16,19,22:5;
30:23;31:3;32:6,
17;39:1,1,4;41:10;

42:14;44:25;47:24;
50:20;54:16;
108:14,15;114:15;
116:5;120:13;
121:8;122:4,10;
123:22;125:23
**jagged (13)**
65:14;72:6,22,
23;74:5,9,11,21;
75:1,9,16;77:17;
173:13
**jail (52)**
9:20;20:15;
21:15;22:3;24:16;
25:2,8;58:19,25;
59:3;61:8,9;67:13;
69:22;85:19;86:18;
98:9,22,23;106:22;
108:20,23;110:2;
131:19,20,24;
133:7,13;134:20;
135:1,19;137:15,
16;138:3;139:4,5,
20,23;140:22;
141:7,8,9;142:10;
153:14;157:21,21;
158:17;171:20;
172:8;185:23,24;
186:1
**jailhouse (20)**
21:16;22:5;
25:11;26:7;37:22;
56:15;57:14,15;
61:13;70:11;85:2;
105:6;109:4,23,24;
136:20;140:25;
159:16;184:18,20
**Jan (2)**
2:6;5:1
**January (6)**
37:9;42:17;47:5;
113:22;115:3,4
**jaw (5)**
54:12,15,16;
116:6,7
**JB (1)**
16:18
**Jeff (9)**
58:5;71:20;88:7;
144:1,4;153:24;
161:22;168:4;
178:5
**jerked (1)**
181:18
**job (13)**
16:24;24:25;
57:18;107:6;129:8;
145:17;146:1;
165:16;170:16,18;
171:4;186:21,22
**jobs (2)**
171:7,9
**Joiner (3)**

6:11;95:22,22
**joining (1)**
6:10
**joints (6)**
17:25;18:1,3,4;
92:24;93:3
**joke (4)**
30:23;119:19;
120:9;122:15
**jokes (2)**
39:1;108:15
**joking (2)**
120:15;122:15
**Jonathan (4)**
6:11;71:24;72:1;
92:18
**Jones (71)**
6:16;38:13,20,
25;39:4;41:2,2,6;
42:14;43:8,8,8,8,8;
44:10,11,13,13,14,
19,23;46:4,23;
47:16,19,19,20,21,
22,23;48:1,2,3,4;
50:19;54:1,3,10;
59:8;61:14,17,22;
62:6;69:4;84:4,5;
100:9;114:1,4,7,9,
15;115:7;116:1,3,
9,11;120:12;
121:12;122:6;
143:10,23;148:8,
13,14,15,19;151:7;
160:13,13;162:15
**Jonesboro (2)**
10:3;145:18
**Jones's (2)**
41:4;54:11
**judge (37)**
23:8;25:8,9;
33:12;35:15;37:7,
9,10;60:5,6;83:14,
14;109:19,21;
113:21,24;114:3,
17;115:2,9,11,12,
17,17,20;116:16;
119:10,23;125:19;
129:20;134:7;
160:20;161:16,17;
163:7;173:9,20
**jump (4)**
16:20,25;71:17;
124:2
**jumped (11)**
31:2,3;78:10,11,
16,20;79:4,5;
104:11;139:16,17
**jumpsuit (6)**
98:10,22,23;
99:10,15;100:20
**June (1)**
10:1
**junior (2)**

15:13,14
**junk (1)**
62:12
**jury (3)**
13:10,11,13

## K

**Katrina (1)**
16:7
**keep (12)**
8:10;25:6;36:14;
56:4;76:22;113:12;
126:5,6;139:18;
148:19;150:16;
151:24
**keeping (1)**
123:16
**Kennis (1)**
32:5
**kept (10)**
24:18,22;32:1;
76:20;96:15;
107:19;128:25;
155:5,6,9
**kick (2)**
30:18;82:22
**kicked (8)**
22:5;23:6;38:14;
65:12;82:23;84:18,
22;119:16
**kicking (1)**
121:13
**kicks (2)**
74:13;121:20
**kids (1)**
179:20
**kill (1)**
150:3
**killer (1)**
136:18
**kind (12)**
9:21;17:18;47:9;
49:2;75:22;104:18;
112:3;118:7;
139:13;155:3;
158:3;170:14
**King (3)**
14:8,8,9
**kiosk (1)**
132:7
**kit (3)**
136:24;137:3,7
**knee (1)**
50:21
**knees (15)**
17:7,22;18:6;
31:17;56:2;171:13;
179:24;180:2;
181:11;183:7,8,10,
12,25;187:14
**knew (5)**
30:21;31:3;78:7;

139:7;158:13
**knocked (41)**
31:6;38:15;49:6;
50:5,9;51:6,7,9,10;
53:2;62:3;63:8,13,
18;64:20,21;65:9;
72:12;73:9,21;
74:2,7;75:14,14;
76:9,16;77:10,19;
80:8,17,24;81:5,21,
24;82:5;83:7,20;
173:5,6,19,21
**knocks (1)**
51:15
**knowledge (8)**
22:1;44:18;45:7;
138:2,4,7,9;140:1
**known (1)**
144:18
**knows (6)**
110:13;148:7,7,
8;149:18,18

## L

**labels (1)**
168:20
**laceration (2)**
155:17;156:15
**lacking (1)**
15:18
**ladies (1)**
94:24
**lady (10)**
14:17;19:13;
29:18;89:17,18,19,
23;110:17;111:5;
165:13
**landed (1)**
80:15
**Langford (1)**
10:25
**Las (1)**
12:23
**LaShaundra (7)**
40:25,25;43:15;
47:20;48:2;54:4,7
**last (23)**
9:2;14:9;15:2;
17:16;33:2;71:21;
104:6;105:10;
111:1,10,13;
115:16;133:10,14;
137:10;144:15;
158:20;165:4;
173:11,12;178:11,
17;186:20
**late (2)**
22:8;106:21
**later (6)**
57:24;60:12;
63:10;76:2;111:17;
143:17

**laugh (1)**
30:23
**laughing (6)**
119:19;120:9,15;
121:16;122:15;
123:1
**law (3)**
104:10,12;172:2
**lawful (2)**
5:24;189:11
**laws (1)**
2:13
**lawsuit (4)**
7:2;19:11;24:14;
130:9
**lawsuits (1)**
19:10
**lawyer (8)**
8:18;58:4;147:7;
160:10,19,21,22;
161:14
**lay (1)**
187:11
**laying (1)**
172:10
**layman (1)**
56:24
**layperson (1)**
56:25
**leading (1)**
2:17
**leaning (1)**
32:5
**learned (3)**
16:20;23:14,19
**least (2)**
139:5;147:11
**leave (3)**
99:4;157:21,23
**left (9)**
64:1;70:23;
71:16;92:25;
107:24;157:24;
161:7;179:2;186:9
**left-hand (3)**
30:25;104:9;
122:4
**leg (1)**
187:15
**Legacy (1)**
16:17
**legal (1)**
172:11
**legs (9)**
18:4;31:21;99:7,
7;122:2,10;180:11;
181:6,7
**lesion (1)**
93:1
**less (2)**
17:2;180:5
**letting (1)**
129:7

Case 1:18-cv-02350-MHC    Document 120    Filed 11/23/20    Page 203 of 216

William Robinson vs.                                                      William Robinson
Frank Jones, et al.                                                         May 19, 2020

**level (1)**
93:18
**licensed (3)**
56:6,11;68:8
**lick (3)**
72:15,19;77:19
**lie (22)**
23:7,8;44:17,21;
45:6,10,19,22;
46:25;47:1,2,9,12;
76:18;83:25;84:1;
95:8,10;123:6;
143:15;161:16,18
**lied (7)**
39:20;45:2,9,9,9,
18;46:11
**life (15)**
49:14;86:15;
100:11;105:13;
108:13;117:13;
145:8,22;159:25,
25;164:20;179:18,
20;182:15;184:13
**lifestyle (1)**
16:8
**lift (8)**
17:6,21,25;
91:16;164:10,12;
166:17;171:12
**lifting (1)**
156:24
**light (2)**
54:17;113:1
**limbo (3)**
21:7,8,9
**line (1)**
62:17
**lines (1)**
158:18
**link (1)**
36:1
**lip (13)**
54:15;56:19;
63:25;67:2;69:12;
70:22;72:16;73:10;
77:23;78:8,19;
154:6;156:9
**listed (3)**
111:3;154:16;
163:14
**Listen (4)**
58:4;86:7;
137:12,13
**listening (3)**
37:25,25;148:14
**lists (1)**
161:1
**literally (1)**
75:7
**little (12)**
7:20;27:6;51:21;
64:17;72:8;110:23;
127:6;158:1,16;

**177:**3,6;181:14
**live (9)**
10:24;12:19;
14:6,22;158:1,16;
159:4,9;179:19
**lived (1)**
42:12
**lives (1)**
14:15
**living (1)**
13:20
**LOC (1)**
155:22
**located (5)**
6:7,8,9;7:7;106:9
**location (1)**
6:8
**locations (1)**
6:10
**lock (4)**
54:12;57:8;86:8;
149:12
**lockdown (2)**
86:3;89:19
**locked (4)**
54:18;70:18;
105:11;174:14
**lodge (3)**
97:18,18,20
**Loegel (11)**
6:11;87:2;89:2;
92:14,18,18;93:5;
95:12,16,20,24
**long (16)**
10:14,17;15:4;
22:3;98:21;118:23;
129:23;136:17;
149:15;152:7,11;
159:6;165:15;
167:13;179:21;
186:20
**longer (12)**
11:3;16:8;17:5,6,
21;57:18;125:7,9;
158:1,16;164:10;
177:17
**longest (1)**
16:11
**look (36)**
28:9,9;40:24;
51:4;54:18,25;
57:23;58:17;72:15;
81:16,19;89:15;
91:15;101:24;
104:16,18,19,19,
20,21,23,23;
107:18,19,21,21;
110:6;113:3;
118:18;125:2;
126:7;155:10;
182:7;184:22
**looked (17)**

**30:**7;31:1,25;
43:3;61:24,25;
72:10,10;80:21;
104:9,20;107:18;
138:17;148:18;
155:4;161:17;
163:12
**looking (14)**
35:22;36:8,14;
55:1;62:1,20;
66:16;101:4;
103:10,11;110:10,
11;122:3;160:16
**looks (3)**
31:23;62:6;
69:19
**loose (30)**
56:18;67:2;
69:11,14,14;72:5,
6;74:17,18;75:20,
21,21,22,23,25;
76:1,2,8;77:17;
80:4,5,13,22;82:8,
9,10,16;124:16,21,
24
**Loosen (1)**
52:24
**loosened (2)**
84:3;173:22
**lose (2)**
25:5;187:6
**losing (1)**
24:25
**loss (2)**
119:2;187:22
**lost (3)**
80:20;118:4;
181:4
**lot (12)**
16:18;20:7,19;
56:9;128:1,2,3;
139:23;168:6;
179:6,9;180:6
**loud (1)**
93:7
**love (1)**
143:5
**low (4)**
33:4;53:21;
154:6
**lower (1)**
30:9
**lucency (1)**
92:25
**luck (1)**
181:17
**lunch (1)**
8:8
**lungs (1)**
156:11
**lying (9)**
37:21,21;40:22;
55:24,25;63:18;

**64:**3;95:7;114:22

## M

**ma'am (80)**
7:4,6,8;10:7,16,
22;11:4,7,25;
12:10,13,22;13:15,
21,25;14:18;15:3;
16:14;18:10,12,15;
19:2;20:4;22:2,11;
26:9;34:2;46:3,9;
48:17;54:3,8;57:7;
58:21,23;59:14,17;
60:5,14,16,20;63:5,
9,15,20;65:2;
67:24;69:14;73:11;
76:13;77:8,12;
80:19,19;81:1;
86:1;89:8,11;
108:4,8,10;118:22;
121:5,5;127:3,24,
24;129:11;130:3;
132:6;133:8;137:6;
139:9;140:3;156:2,
20;171:5;182:1;
184:20;187:19
**machine (1)**
141:25;187:6,7
**mad (1)**
62:12
**maintained (1)**
122:23
**majority (1)**
18:2
**makes (4)**
26:24;57:2;
96:12;156:22
**making (3)**
39:1;108:14;
150:13
**males (1)**
78:5
**mama (7)**
48:21,23,25;
117:14,14;157:18;
158:16
**man (34)**
27:18;28:4,8,8;
29:2,20,22;30:2;
32:8;38:14,22;
39:12;52:22;59:12;
81:11;85:4;86:5;
95:18;102:5;105:5;
108:13;122:25;
123:7;124:7;
140:18;145:15;
148:11;150:2,2,5;
151:22;155:5,10;
183:11
**Mann (2)**
2:6;5:1
**many (12)**

**14:**20;15:20;
25:4,5;70:13;84:6;
117:21;119:17;
124:1;126:9;
131:23;158:20
**Marines (1)**
12:21
**Markennis (13)**
21:16,19;22:5;
30:23;32:16;44:25;
47:24;50:19;54:16;
108:14,15;116:5;
125:23
**married (1)**
12:12
**material (1)**
92:20
**matter (4)**
5:18;6:15;9:7;
185:8
**matters (3)**
6:18,25;140:7
**max (1)**
185:18
**maximum (1)**
175:9
**may (41)**
2:5,8,18;5:7,25;
8:25;11:6;24:14,
16;25:24;26:1,2,4,
4;33:21;41:8;
55:13;58:25;59:6;
66:13;69:2;83:19;
86:25;88:15;94:25;
95:13,20;105:12;
106:20;109:12,13,
13,13,15;110:7;
123:16;154:18;
155:13;158:17;
163:19,21
**maybe (27)**
10:18;16:12;
17:4,15;18:18;
50:8;53:14;60:23;
61:1;74:14;110:7,
7,9,13;113:8,8,17;
127:5,11;139:6;
143:17;164:7;
166:19;178:14,14,
15,15
**mean (48)**
13:13;14:3;
15:13,25;16:1,3;
20:10;26:19;28:23,
25;29:23;31:23;
48:20;51:13;52:11;
55:20;56:12;75:1,
2;81:9;88:4;96:19;
97:12;107:8;
108:21;112:15,17,
25;116:2;121:20;
133:9;139:3;153:4;
163:14;169:5;

172:11;174:6,7,12,
13;175:1;178:22;
179:6,8,9,11;
183:16;188:24
**meaning (1)**
64:13
**means (12)**
74:10,11;125:6;
139:10;147:24,25;
163:2;172:10,10;
176:21;178:25;
183:18
**meant (4)**
55:21;75:9;
125:20;158:3
**meat (8)**
81:10,11;125:13,
13,14,17,18,21
**mechanics (2)**
16:21;17:1
**Medical (106)**
10:13;27:23;
28:1,10,13;32:2,5,
18;57:9,9;58:16;
65:15,17,18,19,21,
22,23,25;66:3,6,6,
8,8,18,23;67:7,9,
14,24,25;68:1,3,4,
5,5,21,22,22;69:3;
70:11,15,17;71:15,
18;72:2,4;73:5;
75:7,8,16;77:5,6,
16,16;78:4,22;
82:19;83:15;84:23;
85:4,6,7,11,16,18,
19;86:25;87:5;
88:11;89:17,18,24;
90:17;91:13,24;
92:2,6,21;93:23;
94:14;95:6,9;
100:24,25;101:2,4,
5;102:7,7,10,12;
153:12,13;164:19,
19;165:25;167:25;
168:6,13;184:10,
11,24;186:21;
189:2,10
**medicate (2)**
159:8;187:2
**medicated (1)**
128:6
**medication (6)**
9:5;118:7,14,23;
129:10;185:23
**medications (2)**
129:12;185:4
**medicine (4)**
89:20;118:11;
119:3;159:8
**meditate (1)**
187:20
**meds (1)**
158:21

**meeting (1)**
36:1
**members (2)**
13:11;130:2
**memo (1)**
143:5
**memory (2)**
9:6;53:10
**men (1)**
99:24
**menacing (1)**
104:22
**mental (9)**
57:25;117:5,7;
118:3;128:15,16;
154:16,17;158:18
**mention (3)**
57:2;92:5;190:3
**mentioned (5)**
18:22;91:24;
155:24;156:16;
165:17
**mentioning (1)**
156:1
**Mercy (4)**
159:23,23,23;
168:21
**message (9)**
142:19,21;
143:20,21,22;
144:21;148:5;
150:22;151:8
**messaged (1)**
150:17
**messages (1)**
146:14
**messed (3)**
72:17;122:21;
173:12
**Messenger (9)**
150:10,11,16,17,
19,20,23,24;151:3
**messing (1)**
131:3
**metal (1)**
127:17
**metastatic (1)**
93:1
**Metro (11)**
6:8;13:3,6,7,12,
14,24;14:3,4;
16:15,16
**middle (4)**
31:13;61:16;
92:23;157:17
**might (2)**
8:8;162:14
**Mild (1)**
156:17
**military (3)**
60:18;69:2,5
**Mims (11)**
24:18;110:13,15;

111:7,8,11,11,16,
18;188:16,19
**M-i-m-s (3)**
111:2,12,14
**mind (4)**
33:3;95:16;
172:13,17
**mine (1)**
160:14
**minor (1)**
127:11
**minute (7)**
88:18;120:1;
131:16;142:9;
163:23;165:17;
180:1
**minutes (3)**
27:20;33:24;
176:23
**mirror (1)**
80:21
**misdiagnose (1)**
159:20
**misdiagnosed (3)**
56:21;57:4;
159:22
**misheard (1)**
160:14
**misreading (1)**
163:18
**misrepresenting (1)**
46:22
**miss (2)**
111:1;131:10
**missing (12)**
56:1;64:25;
72:17;74:22,24;
76:3,4;126:14;
168:1;171:3;
173:15,24
**mistake (1)**
169:7
**mistaken (1)**
164:18
**Mobile (5)**
2:7;5:7;6:7;10:5;
15:5
**mom (4)**
11:10,10,14;
15:16
**moment (4)**
18:25;88:3;
95:17;178:8
**money (3)**
17:12;151:9;
186:20
**Monster (1)**
144:11
**Montana (2)**
17:11;18:9
**month (4)**
109:6,9;150:21;
178:16

**months (6)**
117:11;118:24,
25,25;119:1;
167:14
**mood (1)**
49:13
**more (21)**
15:16;20:7;97:2,
3;100:23;105:17;
112:8;122:15;
130:5;132:3,4;
139:6;149:2;
153:20;157:11,12;
169:5,22,25;170:1;
184:23
**morning (8)**
73:5,13;74:19;
91:7;152:14,16,17,
25
**most (2)**
58:1;89:12
**Mostly (1)**
20:18
**mother (27)**
11:9,16,17,18,19,
20,23;12:3,7;
13:18;14:8;15:15;
22:20;93:12;117:8,
9,10,23;118:4;
157:15,16,21,25;
158:11,24;159:5,
20
**motor (5)**
133:19,22,23,24;
134:3
**Motrin (1)**
155:19
**mouth (56)**
61:23;62:18;
64:18,20,20,22,25;
65:7,16;72:9;
73:16,22,25;74:2,3,
4,8,8,9,11;75:10,
23;76:10,17,19,20,
21,23,23,25,25;
77:14;78:9;79:22,
23;80:2,25;81:2,7,
8;82:4,6;102:24;
103:9;124:15,20;
125:7,8,9,13;
126:10,18;127:2,
16;149:8;174:3
**move (12)**
6:19;24:14;
60:11;75:4,6,8;
83:3;92:9;127:16;
129:25;155:6;
186:24
**movement (1)**
127:16
**movie (2)**
32:3;72:11
**movies (1)**

145:21
**moving (6)**
8:10;75:2,3;
103:9;156:18;
179:2
**MRI's (1)**
96:24
**much (3)**
127:12;166:20;
180:5
**multiple (7)**
56:19;93:1,12;
154:7,23;158:25;
159:1
**murder (1)**
135:23
**Musculoskeletal (1)**
156:14
**must (2)**
160:13;166:9
**myeloma (5)**
93:1,11,13;
158:25;159:2
**myopically (1)**
139:18
**myself (10)**
6:5;7:21;84:10;
97:5;124:10,14;
149:12;165:16;
174:23;187:19

## N

**Nadja (2)**
14:16,19
**naked (5)**
31:22;97:22,23;
99:10;124:18
**name (71)**
6:14;9:10,16;
14:15;15:2;21:19;
32:7,24;33:1,3;
38:13,16;40:11,11,
16;41:4,8,10,14,17,
19,22,25;42:4,7,20,
21;43:7;44:14;
47:11,18;50:17;
52:7;53:7;54:21;
66:14;84:5;90:10;
105:9;106:8;108:6,
14;109:8;110:3,16;
111:1,2,7,10,13,17;
112:21;114:15,22,
24;128:9;136:10;
143:9;144:10,11,
12,15;148:12;
149:17;151:11;
158:23;163:13,13;
178:5,9;188:18
**named (6)**
20:1,1;29:8;
60:12;66:10;68:8
**names (10)**

14:25;32:4;
39:11;41:11;
114:16,25;115:13,
19,20;136:5
**Nancy (1)**
6:11
**napkin (1)**
73:23
**narcotics (1)**
186:15
**natural (1)**
118:2
**nature (1)**
156:20
**naval (1)**
158:13
**navigate (1)**
9:1
**near (1)**
75:9
**necessary (1)**
2:16
**need (34)**
8:5,10;27:8,10,
19;36:21,24;45:15;
73:2;85:4;86:23;
88:15;97:2;105:20;
114:23,23,24;
115:2,13;120:17;
124:8;136:5,13;
161:14;165:21;
179:17;181:9,10;
183:16,20;188:9,
12;189:24;190:5
**needed (4)**
118:10;120:15;
165:18;167:1
**needs (2)**
27:15;165:23
**negativity (1)**
130:11
**neighbor (1)**
145:20
**Neither (2)**
97:18,19
**network (1)**
112:7
**neurologist (1)**
180:17
**neuropathy (1)**
180:11
**new (3)**
24:19;144:19;
189:6
**news (3)**
147:12,14,17
**next (9)**
52:20;106:12;
115:14;121:10;
131:15;136:18;
143:14,14;162:19
**nice (1)**
49:16

**nickname (1)**
9:18
**nicknames (1)**
9:22
**nigga (2)**
143:4;147:4
**nine (17)**
66:11;69:9,19,
20,21,22;70:9;
73:5,12;74:18;
82:8,14;85:9,15;
90:11,15;113:8
**ninety (1)**
55:7
**nobody (19)**
47:11;48:23,24;
51:19;76:9;85:6;
86:7;95:5;101:11;
115:19;120:5,6,15;
149:11,20;150:4;
151:23;176:5;
179:17
**nodding (1)**
7:15
**noise (1)**
38:3
**nolo (13)**
20:24,25;22:14,
16,23;23:9,10,11,
13;24:3,9;133:15,
16
**None (19)**
47:1;49:22;
50:24,25;80:15;
85:18;103:20;
107:20;129:15;
130:13;149:1,1,4,
21;159:24;181:4;
182:18;185:18;
187:1
**nontender (1)**
156:12
**nor (3)**
168:14,14;
186:20
**normal (3)**
118:19;126:7;
179:20
**normally (1)**
179:21
**Northern (2)**
5:22;14:4
**nose (2)**
62:3,20
**Notary (1)**
5:2
**noted (9)**
15:7;63:25;
69:11;162:13,17,
18,20,22,23
**notes (1)**
63:17
**notice (3)**

2:22;5:24;18:2
**noticed (1)**
43:3
**notified (1)**
21:3
**November (1)**
169:1
**no-win (1)**
31:4
**nude (4)**
98:6,7,20;99:11
**numb (2)**
180:20,21
**number (31)**
5:20;35:19,22;
37:15;39:9,9;
43:19;46:7;61:3;
78:1,3;119:8;
143:9;144:17;
149:22;150:9,14,
15,23;151:2;
153:11,15,20;
160:4,16,23;
161:15;168:22;
169:13;171:18,19
**numerous (4)**
17:19;153:6,7;
168:1
**nurse (9)**
56:6,11;68:8;
74:18;76:1;82:7,8;
85:9;86:4

## O

**oath (3)**
34:10;35:16;
48:9
**Object (4)**
46:17;158:3,6,7
**objection (2)**
93:22,23
**objections (3)**
2:16,18;6:21
**observed (1)**
70:22
**obvious (2)**
71:7;156:8
**obviously (5)**
13:11;93:24;
169:6
**occur (1)**
77:4
**occurred (4)**
60:17,17;66:12;
69:1
**o'clock (13)**
24:24;70:8,8,9,9;
73:5,13;91:7,8;
152:14,15,16,24
**off (48)**
16:11;17:24;
18:21;25:4;29:16;

30:1,16,17;32:13;
38:20;42:19,21;
61:12,23;64:12;
65:4,8,12;69:9;
73:22;76:10;79:12,
14,15,19;95:24;
96:3;99:4,19,20;
100:5;116:18;
122:7;123:5;
124:19;126:1;
127:8;129:12;
148:24,24;150:10;
156:22;157:7;
167:11;185:6,8,16;
188:24
**off-duty (1)**
107:6
**offense (1)**
88:23
**offered (1)**
2:20
**offering (1)**
151:9
**office (36)**
21:4;24:21;25:5;
39:6;43:3;46:5,11,
15;48:9;104:2,6,7;
105:2,24,25;106:2,
3,9;107:1,11,15,23;
108:2,9;110:15;
111:23;113:13;
128:1;129:19;
130:2;146:16;
148:25;177:13,17,
18,20
**officer (20)**
24:17,19;32:22;
38:13;42:1,2;43:2;
65:5;105:3,11,16,
20;108:23;109:1,2,
19,20;136:9;
139:16;188:11
**officers (28)**
26:10;33:6,8,9;
34:5,9,10,11,12;
42:6;46:24;48:16;
52:5;62:13;63:7;
64:21,23;65:21;
66:4,12;67:4,21;
78:9;107:12;112:6,
6;171:20;172:8
**officer's (4)**
43:3;78:6;104:2;
111:1
**offices (2)**
2:6;5:6
**Off-the-record (1)**
96:2
**often (1)**
150:21
**old (9)**
9:23;13:1;29:18;
53:16;61:1,15,17,

18;147:3
**older (3)**
53:13,14;60:25
**Once (13)**
44:7,10;46:3;
66:3,4;67:20;
84:17;94:14;100:5;
116:7;152:1;
153:20;186:9
**one (144)**
12:18,23,24,25;
14:23,24;16:10;
18:18,18,19;19:12;
20:7;21:9;25:3,7,7;
30:8,17;31:15,24;
32:7;35:14,15,20,
21;36:5;37:23;
39:2;40:15,15,16;
43:20;44:6;45:11;
47:14,21,22,23;
48:1,2;50:17;51:5,
5;52:6;53:1,2,11;
54:1;55:11;56:10;
58:2;59:8,9;60:8;
66:7,10,19,21;
67:24;68:4,20;
70:2,11;76:1;
77:19;82:1,2,3,8,9,
10,16,18;83:7,20,
23;84:3,9;86:15;
91:7,7;94:24;
95:17;97:18,19;
100:23;105:21;
111:2;113:18;
114:23;117:23,23;
118:1;121:7;124:7,
15,24;125:1;
132:14,19,25;
133:5,5,14;141:15,
20;142:24;151:11;
152:22,23;153:7;
155:1,16;156:5,14,
15;157:7,22;
158:18;160:11,12;
162:19,22,22;
163:14;164:12;
167:23;168:5,25;
169:25;170:1;
171:5,24;172:21;
173:11,13,21,22;
175:4,4,5;176:20,
22;179:15
**ones (9)**
38:12,13;57:24;
81:21;82:12,17;
163:1;173:13;
188:8
**One's (3)**
12:21,22,22
**ongoing (1)**
177:15
**only (35)**
7:14;11:8;23:13;

Case 1:18-cv-02350-MHC   Document 120   Filed 11/23/20   Page 206 of 216
William Robinson vs.
Frank Jones, et al.
William Robinson
May 19, 2020

34:10;47:23;48:1,
2;54:20;66:18,21,
22;67:24;68:4,19,
19;70:11;82:7;
84:5;103:1;110:12,
14,17,18;111:25;
115:3;129:13;
147:7;149:7;
152:20;159:5;
175:23;177:3;
181:23;184:2;
186:23
**open (11)**
  21:9,25;26:22;
  36:3;84:14,21;
  98:3;138:17;
  151:21,22;179:2
**opened (3)**
  16:23;36:1;
  177:13
**opening (3)**
  36:18,19,20
**operate (1)**
  166:10
**opiate (3)**
  157:5,6,7
**opiates (2)**
  157:8,11
**opinion (9)**
  46:20,21;160:5;
  161:2,3,4;162:6,7,7
**opposite (2)**
  180:5;181:16
**OPS (11)**
  43:13;44:5;
  46:13;55:1,4,8,16;
  60:2;73:19;162:25;
  163:6
**opted (1)**
  85:3
**option (1)**
  157:20
**options (2)**
  162:16;163:14
**oral (3)**
  5:9;154:5,8
**orally (1)**
  150:14
**ordeal (3)**
  45:24;103:13,13
**order (5)**
  100:23;105:9;
  154:11;165:13;
  166:8
**ordered (3)**
  39:10;115:21;
  116:16
**orgasm (2)**
  181:8,10
**Orleans (1)**
  144:19
**out (184)**
  16:5,6;21:2;22:5,

20,22;23:1,9;25:3,
20;27:16,22;28:5,
19;30:8;31:7,10,
10;38:15;40:12;
43:2;49:6;50:5,9;
51:6,7,9,10,15;
53:2;56:23,25;
57:14;60:8;62:3,
17;63:8,13,18;
64:20,22;65:9;
72:13;73:9,21;
74:3,4,7,8;75:10,
11,12,14,14,15,18,
23;76:9,17,20;
77:11,13,19;80:9,
17,22,25;81:2,5,21,
24;82:2,5,23;83:3,
7,12,21;84:10;
86:8,13;87:2;
89:11,12,16,21,21,
23;90:3,12,13,16,
17;91:2,14,17;
92:7;93:7;96:11;
98:18;99:22;100:6,
6,10,24;101:1,3,5,
7;102:6,23;104:7;
105:24;106:1;
107:17;114:9;
115:22,25;116:13,
17;117:1;118:16,
16;119:4;121:8,9;
124:4,6,7,9,15,20,
25;125:1,6,14,15,
17,17,20,22,24;
127:13,14;128:22;
132:17;133:11;
136:17;137:4;
140:8,16;141:7;
142:13;148:23;
152:17,18,22;
154:20,22,22;
155:1,5,6;159:5;
163:2;168:21;
173:6,7,12,18,20,
21;175:2,3,4,5,6,
21,23;181:5,15;
187:4;188:3,12
**outside (13)**
  13:6,7,12,13,23,
  24;106:3;145:21;
  149:12;169:19;
  185:15;189:4,15
**over (19)**
  8:2;17:19;33:19,
  22,25;56:3;58:16;
  80:6;81:9;85:1;
  99:7;100:17;
  116:16;119:1;
  129:5;152:8;
  166:22;167:25;
  173:23
**overall (1)**
  171:11

**over-medicate (1)**
  185:9
**overseer (1)**
  48:7
**own (2)**
  16:23;43:22

## P

**paces (1)**
  28:25
**pack (1)**
  142:1
**packs (1)**
  129:2
**padded (2)**
  27:6,17
**page (11)**
  78:1;87:20;
  92:19,19,20,23;
  95:23;168:22;
  169:10;171:14,18
**pages (4)**
  168:1,2,19;169:9
**paid (1)**
  170:11
**pain (42)**
  17:18,24,25;
  18:1,3,7;26:24;
  27:1,2,8,8,15,19,
  20;28:14;42:13;
  49:8;85:16;86:17;
  101:11;102:25;
  129:16;155:17,23;
  157:10,12;170:12,
  14;182:16;184:8,9;
  185:9,12,15,19,21,
  23;187:8,8,10,11;
  188:3
**painful (1)**
  89:12
**paining (1)**
  27:21
**pair (1)**
  99:21
**PALMER (62)**
  5:16;6:14,20;
  34:16,19,22;35:2,4,
  9,14,20;36:4,7,12,
  18;37:1;57:23;
  58:4,7,12,14;71:19,
  23;72:1;87:6;88:1,
  6,13,17,22,25;
  92:13;93:5,25;
  95:12;96:1;153:21,
  23;161:21,25;
  162:4,12,18,21;
  163:3,12,19,23;
  164:1;168:18;
  169:3,8,14,24;
  188:22,25;189:8,
  12,14,21;190:2,7
**pants (1)**

99:21
**paper (12)**
  61:10;73:15;
  78:9;135:25;136:7,
  11;138:6,11;
  140:12,15;149:9;
  161:17
**paperback (1)**
  133:3
**paperbacks (1)**
  133:4
**papers (2)**
  94:18,18
**paperwork (4)**
  43:13,13,21;
  160:8
**paragraph (2)**
  173:4;177:11
**paragraphs (1)**
  162:10
**pardon (2)**
  126:18;154:24
**parents (4)**
  119:2;158:10;
  160:2;181:24
**Park (4)**
  14:24;106:13,13;
  108:2
**parking (2)**
  24:21,25
**parlance (1)**
  7:18
**part (18)**
  18:19,19,20;
  27:4;30:9,9;32:2;
  35:10;39:8,8;
  64:11;74:21;93:4;
  114:25;117:24;
  120:14,15;171:5
**participants (1)**
  172:2
**participated (4)**
  171:21,23;172:4,
  8
**participating (1)**
  171:25
**particular (1)**
  37:15
**parties (3)**
  2:4,18;6:5
**partition (1)**
  121:6
**parts (1)**
  181:5
**pass (1)**
  163:5
**passed (15)**
  11:18;44:25;
  46:25;83:25;160:7,
  8,14;161:12,16,18;
  162:1;163:4,7,7,8
**passively (1)**
  172:16

**password (4)**
  71:20,23,24;
  131:13
**past (8)**
  52:20;104:8;
  123:13;144:18,20;
  149:14;153:24;
  167:5
**pat (4)**
  25:21,22,22;
  26:10
**path (1)**
  118:12
**patient (4)**
  154:8;155:15,17;
  158:19
**patiently (1)**
  28:11
**pause (1)**
  57:20
**pay (3)**
  24:21;186:19,20
**paycheck (1)**
  17:14
**paying (1)**
  24:25
**PDF (3)**
  36:18,19,20
**Peachtree (1)**
  106:12
**peers (1)**
  43:9
**pen (14)**
  53:8;136:2,3,7,
  11,16,19,21;137:3,
  4;138:18;140:11,
  11,15
**pending (1)**
  5:21
**pens (3)**
  53:10;136:14,19
**people (39)**
  35:16;39:23,25;
  40:4,4,10,10,13,15,
  16;42:11,14;49:24;
  66:16;67:10;69:25;
  114:19,20;115:4;
  116:24;128:3,7;
  136:5;139:22;
  150:3,4;151:8,9;
  153:1;154:23;
  159:23,25;165:19;
  170:23;172:18;
  174:15;175:2;
  184:25,25
**people's (1)**
  139:21
**Percocet (15)**
  56:4;71:14;97:3,
  3,4;129:13,15;
  185:19,20,20;
  186:11,11,13,24,25
**Percocets (1)**

57:16

**perfected (1)**
37:8

**perform (1)**
165:20

**Perhaps (2)**
146:19,22

**period (11)**
28:15,15;68:18;
70:5,7;91:5,6,9;
146:5;147:6;
174:14

**Perkins (1)**
151:12

**person (23)**
11:1,8;40:15,16,
17;66:13;70:14,14;
101:8;110:12,18;
130:25;144:10,20;
152:8;155:1,2,4;
163:6,8;172:21;
175:5;177:25

**personal (3)**
103:6;116:18;
145:8

**personally (2)**
148:8;178:3

**personnel (1)**
142:11

**person's (2)**
32:24;144:10

**phone (11)**
55:5;77:22;
131:6;144:16;
148:10,13;149:22;
151:2;152:8,9,13

**physical (1)**
55:25

**physically (5)**
31:1;37:24;38:8;
40:6,8

**physicians (1)**
67:22

**physician's (5)**
63:12,17,22;
64:3,24

**pick (2)**
65:7;71:16

**picked (7)**
62:11;65:4;
73:22;76:10;79:11,
18,20

**picture (1)**
32:18

**pictures (4)**
32:12;81:18;
116:6;167:15

**piece (3)**
130:17;138:6;
140:12

**pieces (3)**
64:13,17;81:10

**pierce (1)**

97:16

**pill (2)**
128:4,9

**pills (1)**
180:12

**pink (2)**
133:19;134:3

**pinky (1)**
155:16

**pins (1)**
181:7

**pipe (2)**
51:16,19

**pissing (2)**
124:9,14

**place (15)**
56:8;59:6;60:12;
65:16;80:22;83:3;
96:11;98:15;108:2;
123:17;126:5,6;
172:15;181:13,15

**placed (2)**
69:5;174:6

**placement (1)**
154:9

**plain (2)**
100:14;101:2

**plaintiff (8)**
5:18;6:6;19:10;
168:15;171:19,21;
172:7;177:15

**plaintiff's (9)**
37:16;39:9;
43:18;119:8;
153:11;160:3,16;
168:22;173:5

**plan (1)**
160:1

**planet (1)**
163:9

**played (1)**
114:9

**plea (2)**
23:14,19

**please (14)**
7:10,11,16,19,
24;8:5,13,15;9:9;
49:12;78:1;81:22;
87:3;138:3

**pleasurable (1)**
129:3

**pled (7)**
22:14,16,16,20,
22;24:3,12

**pm (6)**
60:19;63:11,19,
23;85:10;155:13

**point (28)**
30:13;44:4;60:8;
70:22;75:10;78:23;
85:10,13;86:23;
87:2,7;89:9,10,12,
16,21,21;90:25;

99:14,15;100:6;
125:3;138:12,14;
158:11;159:12;
175:6;189:25

**pointed (14)**
89:23;90:3,12,
13,16,17;91:2,14,
17;92:7;154:20,22,
22;155:1

**pointing (5)**
89:11,14;91:14;
155:5,6

**police (5)**
23:1,5;42:6,8;
151:21

**policies (1)**
55:14

**policy (1)**
67:13

**polygraph (3)**
162:4,8;163:11

**polygraphed (1)**
160:5

**polygrapher's (1)**
161:2

**pool (2)**
13:10,12

**pop (7)**
81:10;115:16;
125:16;181:12,13,
13,13

**popped (1)**
116:6

**popping (2)**
61:23;151:24

**pops (2)**
96:11;181:14

**portion (3)**
37:6,12;162:3

**portions (1)**
153:15

**pose (1)**
187:21

**positive (2)**
112:8;156:12

**possession (1)**
98:21

**possible (2)**
92:25;93:15

**Possibly (4)**
12:4,10;90:21;
181:3

**post (3)**
16:4;17:10;
116:24

**posts (1)**
127:6

**pounds (1)**
164:8

**practical (3)**
56:6,11;68:8

**practiced (1)**
9:2

**pray (2)**
129:16;187:20

**precipitated (1)**
59:18

**precisely (1)**
170:10

**preliminary (5)**
6:17,24;33:11;
34:4,8

**preparation (2)**
8:19,23

**prescribe (3)**
71:13;118:13;
186:11

**prescribed (3)**
9:5;155:18;
186:10

**prescription (3)**
97:4;157:5,6

**present (14)**
37:9;38:10;40:7,
8;59:12;105:3;
111:22;115:4,8,13;
120:25;121:1,2;
152:25

**presented (1)**
182:4

**presume (2)**
56:7;169:14

**pretending (1)**
124:11

**pretty (3)**
112:8;142:8;
150:24

**prevent (1)**
167:11

**prevents (1)**
156:21

**previous (2)**
63:7;113:25

**previously (3)**
6:6;96:6;116:12

**printed (2)**
132:12;169:15

**prior (11)**
2:20;104:25;
113:22;114:7;
115:5;131:18,20;
134:19;182:2,8,9

**prison (37)**
20:14,24,25;
21:1,2;23:17,21;
61:7,8,10,12;82:2,
3;128:12,14,14,15,
16,18,19;129:2;
133:14;134:7,8,9;
137:9,15;138:10;
139:3;141:5,6,11,
11,12;151:13;
173:25;174:2

**prisoners (1)**
129:7

**private (1)**

187:25

**privileged (2)**
69:24;90:19

**probably (8)**
88:22;101:24,25;
102:18,20;112:5;
184:8;188:12

**probation (42)**
22:15,19;23:12,
17;24:17,19,22;
43:2,2;104:1,2,6;
105:2,11,16,20,24;
106:2,3,9,25;107:9,
11,15,23;108:2,9,
22,25;109:2,19,20;
110:6,8,17;111:1,
22;112:5,6;113:13;
188:9,11

**problem (2)**
34:21;146:18

**problems (2)**
37:4;145:25

**Procedure (2)**
5:4,25

**proceedings (2)**
5:10;111:3

**process (11)**
9:4;117:25;
126:20;133:7;
134:15;138:3,4;
139:1,8;140:1;
183:4

**processed (1)**
27:13

**produce (1)**
169:18

**produced (3)**
37:13;153:13;
189:16

**production (2)**
189:6,7

**professional (2)**
57:1;112:5

**prompted (1)**
128:15

**Pronounce (5)**
32:8;108:14,16,
17;155:19

**proper (2)**
163:16;189:19

**properly (3)**
17:22,23;171:12

**propounded (2)**
15:8;37:14

**prosecute (2)**
23:10,13

**protect (4)**
48:9,13;59:15,17

**prove (3)**
55:21,22;111:20

**provide (1)**
180:15

**provided (7)**

5:3;92:20;
153:12;154:8,15;
166:1;178:18
**provider (1)**
153:13
**providers (1)**
56:9
**provision (1)**
154:16
**pry (1)**
151:20
**prying (1)**
151:22
**psychiatrist (1)**
128:14
**psychiatrist's (1)**
127:25
**PTSD (3)**
127:23,25;128:3
**Public (1)**
5:2
**pull (16)**
28:14,15,16;
34:16,19;35:13;
57:22;77:24;87:2;
95:12;125:18;
131:9,12,15;
156:22;180:5
**pulled (23)**
50:2;51:25;52:1,
1,2,2,19;53:1,15;
75:11;101:9,10,20,
21;102:25;103:12,
12;125:14;179:15;
181:18;183:9,12,
24
**pulling (7)**
35:14;68:24;
103:2,2;156:24;
182:21;183:11
**pulls (2)**
156:25;157:1
**Pumpkin (1)**
72:10
**punch (5)**
50:5,16;51:20;
122:9;172:3
**punched (3)**
65:12;84:22;
119:16
**punches (6)**
29:23,24;51:8;
121:20;124:3;
173:1
**punching (4)**
83:11;100:4;
121:13;123:17
**purple (5)**
71:5;89:15;92:9;
155:4;185:1
**purpose (1)**
26:11
**purposes (1)**

5:24
**pursuant (2)**
5:23;67:16
**push (4)**
74:14,14;156:22,
24
**pushed (5)**
62:8;72:22,24;
85:4;127:17
**pushes (1)**
164:10
**put (74)**
25:11;26:6;
27:17;28:3;41:2,3,
12;43:17;47:5,7,
14,15;49:18;50:6;
53:25;57:15;61:4,
11,12;63:17;64:8,
8,18,19;73:22;
75:7;76:19,24,25;
83:2;99:5,24;
100:2,3,20;115:1;
117:14;118:11;
122:23;123:21;
126:5,17,21;127:1;
128:4,9;129:14;
133:10,11;135:3,
11,13,16;137:5,18;
138:17;140:4,18;
141:4;143:12;
149:9;150:14;
157:1;158:10;
177:24;179:16;
183:8;187:17,22,
23,24,25;188:2;
189:22
**puts (2)**
43:22;50:11
**putting (5)**
43:22;50:21;
56:4;62:19;64:16,
16;100:3;138:6

**Q**

**qualifications (1)**
93:22
**qualified (1)**
46:23
**quick (3)**
57:22;58:6;
95:21
**quit (1)**
17:3
**quoting (1)**
93:4

**R**

**Rafferty (17)**
29:9,11,21,23;
37:11;43:16,17;
46:25;50:18,19;

116:4;117:1;
133:17,19;134:1;
143:19,23
**rage (1)**
103:21
**ran (3)**
19:13;118:16,16
**random (1)**
108:7
**randomly (1)**
106:25
**rapport (1)**
177:20
**rate (1)**
156:12
**rather (4)**
25:2,6;36:20;
160:7
**ratting (1)**
147:24
**Ray (8)**
143:9,9,21;
145:13,13,14;
147:17;151:4
**reaching (1)**
188:12
**reaction (1)**
181:1
**reacts (1)**
152:8
**read (30)**
36:25;37:6;55:6;
73:20;77:21;78:2;
89:2;92:15;95:14;
96:4;119:13;
122:20;124:23;
131:9;144:21;
146:23;149:5,6,9,9,
10;153:14,16;
154:1,19,25;162:2,
10,16;185:6
**reading (5)**
2:10;38:7;
113:22;160:22;
162:15
**real (15)**
26:25;35:15;
39:24;43:4;57:22;
81:12,15,16,19;
126:2,21,25;
127:14;144:12;
174:1
**realistically (1)**
40:14
**realize (5)**
21:18;27:10;
28:25;43:6;151:19
**realized (2)**
22:4;50:9
**really (10)**
18:21;22:20;
30:22;72:14;73:1;
93:10;109:21;

113:12;128:2;
143:16
**rear (1)**
152:18
**reason (12)**
26:18;44:16,16;
45:17;47:1;54:20;
65:15,17;85:17;
114:21;145:12;
171:1
**reasons (2)**
170:22,23
**recall (24)**
19:12;34:4;
47:21;49:6;53:23;
56:8;59:19;60:13;
66:15,17,19;69:18;
70:19,21;83:18;
90:10;93:6,10;
113:21,25;127:22;
129:21;132:20;
178:13
**recalls (1)**
41:1
**received (4)**
94:14;132:5;
168:11;180:8
**receiving (1)**
153:17
**recess (3)**
58:13;88:24;
163:25
**reciprocate (1)**
139:14
**reciprocated (1)**
146:17
**recognized (1)**
22:4
**recommended (1)**
166:1
**reconcile (2)**
12:4,9
**reconvene (1)**
189:25
**record (12)**
6:13;7:22;9:10;
37:8;39:14;40:21;
70:6;92:21;95:24;
96:3;153:16;156:3
**recordings (1)**
162:5
**records (64)**
44:5;46:1,7;
57:13;58:16;65:3;
67:16,22;68:7,24;
71:18;75:17;84:23;
85:8,19;86:19,23,
25;87:1,5,7;88:4,7,
11,19;91:24;92:3,
6,14,15;94:14;
95:1,6,9;96:5;
109:7;117:16;
119:6;153:13;

155:13,15;159:11,
17,18;162:6;
165:25;166:21;
167:20;168:1,6,9,
20,23;169:14;
180:14;181:20,22;
182:8,10,22;185:3;
188:13;189:2,10
**recovery (5)**
16:9,10,23;
17:13;152:6
**re-enact (1)**
145:16
**refer (7)**
37:14;43:18;
78:1;87:23;88:1;
119:5;153:10
**reference (4)**
48:21;95:21;
114:4;157:14
**referenced (2)**
32:22;160:4
**referral (3)**
154:10,11,12
**referring (4)**
38:9;63:2;116:9;
164:14
**reflect (7)**
65:3;117:16;
166:22;167:20;
181:20;182:8;
185:3
**reflected (2)**
87:1;91:23
**reflecting (1)**
68:7
**refusal (2)**
130:1;140:14
**refused (6)**
132:24,25;136:3,
4;140:13;146:16
**refusing (1)**
100:20
**regard (1)**
189:1
**Regular (4)**
99:18,21;156:11;
159:2
**relate (1)**
58:18
**related (2)**
20:17;168:14
**relating (1)**
2:13
**relation (2)**
56:7;59:9
**relationship (4)**
111:16,24;112:3;
188:11
**relatives (1)**
13:20
**relax (1)**
128:9

**released (4)**
23:25;58:19,25;
59:2
**relevant (6)**
6:3;169:5,19;
188:7;189:4,17
**religiously (1)**
129:17
**relocate (1)**
10:8
**rely (2)**
88:20;168:15
**remaining (1)**
6:15
**Remember (54)**
7:13;19:12;
20:20;21:22;25:17,
25;30:19;31:6,7,7;
33:3,11;41:9,10,11,
12,12;50:3,12,12,
13,20;51:10,13,14,
23;52:4,5,8,9,17,
20;53:7,17;54:7,
10,11,15;58:24;
89:13;96:19;97:3;
98:18;103:2,17;
113:24;119:17;
132:19;135:21;
136:11,12;143:4;
147:7;167:22
**remembering (1)**
33:3
**remind (1)**
33:5
**removed (3)**
82:3;173:24;
174:2
**rendered (3)**
160:6;161:4;
162:8
**repeat (1)**
7:10
**rephrase (1)**
7:12
**replaced (1)**
17:16
**report (11)**
7:15;43:19;
46:13;55:1,4,16;
60:2;89:3;94:3;
113:15;129:19
**Reporter (15)**
5:1;6:7,16;7:14,
22;8:1;120:2,10,
20,24;122:17,21;
131:10,12;146:21
**reporting (2)**
105:13;107:9
**represent (3)**
59:11;63:4;
178:2
**representing (1)**
6:14

**request (12)**
105:12;136:23;
137:2;150:13;
168:7,17;169:20;
189:2,5,6,11,20
**requested (2)**
21:6;189:5
**requesting (1)**
188:7
**required (1)**
166:3
**reserve (1)**
6:21
**reside (3)**
11:3;14:1;117:2
**resided (5)**
10:14,17,20;
11:5,20
**resides (2)**
11:23;12:3
**respective (1)**
2:4
**responded (1)**
31:1
**response (1)**
37:13
**responses (1)**
15:8
**responsive (2)**
168:7;169:20
**rest (2)**
82:2;127:9
**restroom (1)**
163:21
**result (6)**
17:19;20:16;
168:12;170:4,15;
180:23
**Resulted (1)**
155:16
**retaliation (1)**
130:7
**retracting (2)**
124:4,5
**return (2)**
11:13;12:1
**returning (1)**
11:14
**revenge (1)**
145:17
**review (6)**
8:22;88:16;
169:6,9,21;170:1
**reviewed (1)**
154:14
**revocate (1)**
108:22
**revocation (10)**
20:16;25:2;
104:5,13;105:12;
106:18,22;108:21;
109:10,18
**revocations (2)**

20:13;24:19
**revoked (1)**
138:21
**Reynolds (1)**
162:8
**rhythm (1)**
156:12
**Rice (4)**
26:8;77:1;
124:18;138:15
**right (124)**
7:5,9,9;10:15;
11:4;12:5,9,11;
13:8,14,17;14:1,5;
15:4,7;20:5;21:8;
24:21;25:25;26:1,
5;27:16,19,24;
28:5,8,9,9;29:12;
31:10,23;34:1,1,1,
3,6,24;35:5,22,25;
36:13;37:5,18,20;
38:6;39:4;41:16,
24;45:1,25;51:15,
25;52:1;53:4;
54:23;58:6,9,24;
59:5;61:22;62:11;
63:6;64:11;65:25;
71:12,20;73:17,18;
74:12,15;75:5;
77:22,24;78:23,25;
88:7,23;89:15;
91:16,16,20;92:11;
93:14;96:10;
105:22;106:14;
109:25;115:23;
116:8,13;122:3;
126:24;128:5,12;
131:14;133:15;
134:6;141:11;
142:22,23,25;
143:2;147:1,7;
148:2,16;150:7;
151:23;153:5;
155:6;163:4;
169:12,16,17;
178:9;179:13;
182:20;183:22,22;
184:1;186:9;188:5;
190:4,7
**right-hand (2)**
30:24;122:5
**ringworm (1)**
169:2
**ringworms (1)**
169:10
**ripped (3)**
99:19,20;125:15
**risking (1)**
22:21
**Road (2)**
10:3;145:18
**roadside (7)**
16:23,24;24:20;

145:24;165:7,7,8
**Robert (2)**
178:7,9
**ROBINSON (55)**
2:5;5:8,12,18,19;
6:12,24;9:11;15:1,
2;33:18;34:23;
37:5,10,21,24;
38:12,16,19,22,24;
39:18;58:22;62:16;
69:3;71:25;72:1;
75:24;78:7,8,24;
79:17;80:7;87:25;
88:25;92:17;95:14;
96:4,6;102:16;
117:4;118:20;
119:5;138:24;
147:8;153:10;
154:2;160:3;161:1;
162:8;164:2;
169:25;170:3;
178:12;190:8
**Robinson's (1)**
58:15
**rock (1)**
30:20
**Ronald (11)**
56:6,11,21;57:4;
66:11;67:1;68:9,
14;69:7;90:8;
154:18
**room (25)**
27:6,17,22;
28:18;50:14;54:14;
70:18;119:15,16;
121:10,14,15,25;
151:13,15;172:23;
173:1,2;174:22,23;
175:7,19;176:24;
177:3;186:4
**rooming (1)**
151:12
**roommate (11)**
141:15,16;142:4,
5;174:8,9,11,12;
176:5,7,11
**roommates (1)**
176:17
**root (5)**
64:17;72:8;76:7;
80:23;127:20
**roots (1)**
127:21
**routine (1)**
154:12
**Rowan (1)**
6:11
**rules (3)**
2:13;5:4,25
**run (3)**
103:19,19;
179:20
**running (3)**

54:13;81:8;
123:8
**runs (1)**
124:11

## S

**sad (4)**
117:24,25;118:5,
5
**SAITH (1)**
190:10
**same (25)**
2:11;7:23;21:24;
30:17;37:3;53:11;
63:1,2;68:13,18;
70:5,7;71:21;
72:25;78:6;83:13;
91:5,6,9;96:9;
109:20;112:7;
118:6;121:9;130:6
**Sanders (12)**
56:7,11,21;57:4;
59:10;66:11;67:1;
68:9,14;69:8;90:8;
154:18
**sane (1)**
128:25
**sat (6)**
28:10;39:20;
61:22;90:6;123:1,
22
**Saunders (36)**
6:16;30:24,25;
31:2;32:6,17;39:3;
41:5,9;42:15;
47:25;48:3,5;
50:20;54:15;59:9,
10;62:6,7,12,20,20;
63:2,4;69:23;72:4;
114:15;116:5;
120:13;121:7,8;
122:3,9,23;123:2,
21
**saw (34)**
31:10;52:16;
56:13;57:3;63:12,
19;64:25;66:11,13;
68:8,14;73:6,13;
75:18;76:2;82:8;
83:14;85:9,20;
106:1,24;108:7;
112:24;116:6,7;
122:13,13;125:20;
143:17;182:14,16;
184:14,16;186:10
**saying (71)**
20:7;32:10;
33:10,13,15;37:24;
38:7,9,14;40:21;
43:12,21,25;45:6,
12,16;46:13;47:10;
51:14;53:17;56:21;

57:3;59:13;63:22;
64:2,4,6;67:5;
68:11,18;74:19;
76:11,18;77:13,15;
78:19,20;79:4;
80:16,24;92:5;
93:9;94:11;95:7;
102:25;103:1,4;
114:19;120:2;
130:15;132:9,10;
137:5;138:24;
139:19,24;152:1;
153:1;156:19;
168:23;171:3,21;
172:14;174:17;
176:7;180:23;
182:20,22,23;
184:8;189:3
**scapula (1)**
92:25
**scare (1)**
170:18
**scared (3)**
96:19;123:7;
145:22
**scheduled (5)**
166:2,5,7,7,9
**scheduling (2)**
57:16;166:8
**schizophrenia (3)**
159:12,14,18
**schizophrenic (2)**
159:21,24
**Schollmeyer (1)**
178:9
**S-c-h-o-l-l-m-e-y-e-r (1)**
178:10
**school (4)**
16:4,5;108:17,18
**Schwall (17)**
33:12;35:15;
37:7,10;60:6,6;
83:14,14;113:22,
24;119:10;129:20;
161:17,17;163:7;
173:10,20
**scope (3)**
169:19;189:5,16
**scratch (1)**
71:4
**scratches (2)**
69:11;71:14
**screaming (1)**
26:23
**screen (7)**
34:23,25,25;
36:8;131:16;
160:18;171:16
**screening (8)**
66:9;67:7,10;
69:6,7,8;153:17;
154:5
**Screenshot (2)**

142:24;143:1
**screenshots (1)**
142:24
**screws (1)**
17:6
**scroll (1)**
35:23
**scrolling (1)**
153:24
**search (1)**
34:22
**seat (1)**
27:24
**second (30)**
6:3;32:6;34:13,
19;35:21;36:13;
39:9;40:6;43:1;
57:21;58:2;63:16;
66:13;68:24;69:17,
18;79:4;87:25;
89:3;95:25;119:10;
120:1;142:25;
168:6,20,25;
169:25;170:7,25;
178:8
**Secondly (1)**
48:8
**seconds (2)**
154:18;163:22
**secure (4)**
17:22,23;164:6;
171:13
**security (1)**
175:9
**seeing (10)**
24:18;36:9;
47:21;48:9;67:1,
23;69:18;73:4;
83:18;105:21
**seek (1)**
128:15
**seeking (2)**
170:4;187:13
**seem (1)**
152:3
**seemed (3)**
30:7;32:3;
105:17
**see-through (1)**
61:10
**send (5)**
58:16;143:19;
149:20;160:19;
161:14
**sending (1)**
153:3
**sent (14)**
23:20;35:20;
119:6;134:8;
143:13,23,24;
145:1,14;147:16;
160:10,21;166:21;
167:25

**sentence (1)**
173:18
**separate (5)**
62:6;85:20;
130:15;171:20;
172:7
**separated (10)**
11:4;53:19;62:5;
85:13;87:17,21;
88:2,8,12;121:5
**separation (8)**
71:8;87:10,11,
13;94:5,6,15,21
**September (1)**
24:1
**sergeant (11)**
53:6,6,15;86:2;
101:9,11,13,18,23;
102:8,13
**sergeant's (1)**
21:4
**series (1)**
45:11
**serious (2)**
182:18,19
**set (5)**
43:11;62:13;
106:19;169:18,18
**seven (6)**
16:12;85:15;
91:7;109:15;110:1;
175:9
**Several (3)**
131:25;132:1;
185:3
**severe (1)**
185:9
**severely (1)**
159:1
**Sex (1)**
181:8
**sexual (1)**
31:24
**shackled (16)**
29:15;30:11,14;
31:13,21;48:3,11;
51:4;97:25,25;
99:4;100:9;120:16;
123:12;124:10,12
**shackles (26)**
28:22;32:12,13,
14;47:14,15;48:14;
49:7,17,19,25;50:4,
6,11,12,21;52:10;
53:24,25;54:9;
99:6;103:16,18,22;
119:15;183:24
**shaking (3)**
7:15;62:12,20
**shall (1)**
2:16
**shape (1)**
164:22

**shard (1)**
65:13
**share (7)**
9:1;36:13,14,19;
119:7;136:19;
171:15
**sharing (6)**
9:2;35:1;36:5,5,
8;37:3
**sharp (1)**
187:10
**shave (4)**
126:4,7,20,25
**shaved (1)**
126:8
**shaven (1)**
113:6
**sheet (1)**
149:9
**shell (1)**
30:21
**sheriff (1)**
42:7
**sheriff's (17)**
39:11;42:1;46:5,
11,15,24;91:11,12;
106:6,7,25;112:6,
12,19;130:8;
133:17;177:13
**shield (1)**
84:10
**shift (5)**
27:24;28:12;
101:24,25;139:21
**ship (1)**
158:13
**shipped (1)**
186:3
**shirt (6)**
51:25;52:7,7;
99:18,19,21
**Shock (4)**
30:9;180:24,25;
181:1
**shocked (1)**
97:14
**shocking (2)**
30:8,10
**shocks (1)**
181:2
**shoe (1)**
167:23
**shoot (1)**
62:4
**shooting (1)**
145:23
**short (1)**
113:5
**shortly (1)**
58:17
**shot (4)**
97:16,20;148:21;
152:4

**shots (3)**
145:18;180:10,
22
**shoulder (43)**
25:15;26:11;
28:5,6,7;51:21;
52:2;53:19;56:1;
65:17,18;71:6,16;
77:16;85:13;86:6,
17;87:9,11,13,20;
88:12;89:6;96:17;
102:5;155:7,10,10,
11;164:13,14;
165:12,23,23;
166:13,19,19;
170:6;183:5;186:8,
9;187:7,14
**shoulders (2)**
18:6;179:25
**show (11)**
34:15;42:13;
44:5;46:1,7;75:17;
81:22;89:13;145:3;
160:17;186:5
**showed (8)**
28:2,3;59:22;
89:19;91:13;102:4;
155:2;186:9
**shower (38)**
29:3,6,12;30:5;
31:9;48:4;49:6;
52:25;53:5;67:25;
68:5,21;70:15;
80:20;98:17,25,25;
99:16,22,23;
101:12;119:25;
120:6,12,14,21;
121:24,24;122:2,2,
11,14,16;175:3,7,
23,24;176:23
**showers (3)**
49:8;136:12,13
**showing (2)**
155:9;177:12
**shows (3)**
80:18;186:7,8
**shut (2)**
62:16,18
**siblings (3)**
13:22;14:20,21
**sic (4)**
5:20;54:17;
63:12;159:7
**side (8)**
30:24,25;51:1,
20;92:16;104:9;
122:4,5
**sidetracked (1)**
69:17
**sideways (1)**
54:12
**Sierra (2)**
10:25;20:18

sign (1)
131:12

signature (1)
2:10

signed (2)
23:11;154:13

significant (1)
86:24

silently (1)
171:25

simple (4)
20:19;21:11,23;
22:12

Simply (1)
176:11

Sims (1)
110:13

sing (2)
143:4;147:4

singing (4)
147:20,21,24,25

single (1)
121:7

sit (8)
27:7,24;28:8;
59:25;75:22;85:17;
102:3;104:8

sits (2)
54:12;105:25

sitting (5)
49:23;61:15;
82:21;85:16;89:13

situation (4)
19:17;31:4;
139:15;148:6

situations (1)
61:4

six (6)
118:24,24,24,25;
119:1;185:17

sixteen (2)
15:25;24:7

sixty-five (1)
61:1

skin (4)
97:17,20;113:5;
154:6

skinned (1)
54:17

skin-to-skin (1)
97:15

skip (1)
39:7

skull (2)
83:1,4

slammed (6)
26:14;52:13,14;
53:20;115:12,17

slamming (1)
53:16

slams (1)
25:15

slang (1)

62:23

slap (4)
29:16,19;48:18;
122:7

slapped (1)
84:21

slapping (3)
48:18;100:4;
173:2

slaps (1)
29:24

slave (3)
49:17;103:23,24

slaves (1)
103:23

sleep (3)
56:3;181:6;
188:3

slid (3)
135:17;138:17,
18

slip (6)
95:11,13,15,18;
96:7,22

slipped (1)
95:1

slot (1)
176:23

slow (1)
7:20

small (5)
16:21;17:1;37:9;
64:1;70:23

smaller (1)
37:2

smudged (1)
28:19

snap (1)
117:20

snapped (3)
117:19,20,20

SOB (1)
155:23

Soft (2)
93:3;156:12

Solitaire (1)
176:21

solitary (20)
68:6;70:15,16;
86:3;174:5,7,8,9,
13,20,21;175:10,
15,17,20;176:3,8,
12,19,20

somebody (23)
43:7;45:20;
47:14;51:8;69:18;
70:3;73:4,6,13;
74:13;82:22;92:12;
108:6;109:8;145:1,
23;148:21;149:8;
151:22;153:4;
172:13,15,16

somebody's (3)

48:21;112:3;
151:25

someone (14)
48:10;51:15;
54:24;111:9;
130:12;147:2;
151:20;158:4;
170:17;172:10;
180:4;184:14,16;
187:9

someone's (1)
49:11

sometime (2)
106:20,21

Sometimes (1)
96:11

somewhere (6)
8:7;92:10;
113:19;142:12,14;
166:23

song (6)
143:4;147:4,20,
21,23,25

songs (1)
147:24

soon (12)
25:16,19;52:2;
57:12,14;86:8,10,
10;100:3;101:10,
20;135:12

sooner (1)
71:2

sophomore (1)
15:13

sorry (13)
13:19;34:2;
52:11,12;63:2;
119:6;144:2,5;
153:19;160:17;
168:19;183:23;
188:23

sort (1)
128:8

sought (5)
128:16;168:9,10,
10,11

sound (2)
25:24;26:24

sounds (3)
93:14;156:13;
189:3

source (1)
79:2

space (1)
103:7

speak (12)
7:19,20,21;88:4;
91:18;93:19;
111:24;130:1,11;
146:7;147:6,7

speaker (1)
148:15

speaking (16)

8:2;56:10;60:25;
83:13;112:3;
129:21;130:4,13;
143:18;144:3;
146:4,6,10,12,14;
152:23

specific (2)
25:3;35:23

specifically (5)
14:6;59:10;
63:24;88:11;189:5

spell (4)
110:25,25;
111:10,13

spending (1)
15:16

spin (1)
123:13

spinning (1)
152:20

spitting (1)
124:16

spoke (18)
6:25;61:19;
91:18,20;128:20;
136:5;145:5,7,10;
146:9,11,17;147:5;
149:13;178:3,11,
17;179:1

spoken (3)
8:19;143:8;
149:14

spot (1)
133:21

stabbing (2)
187:9,10

staff (2)
86:1;110:22

Stage (1)
10:10

stamp (5)
37:16;39:9;
43:19;119:8;
168:22

stand (6)
28:24;52:6;
107:22,23,24;
124:17

Standard (3)
6:1,2;60:19

standing (8)
51:10;59:11;
107:5,10,11,13;
120:22;121:25

staples (4)
132:15,16,25;
133:1

start (11)
14:5;16:4,20,25;
32:21;37:15,16;
99:14;119:7;
169:10;171:19

started (21)

15:15,16,16:6;
26:22;29:13,16;
49:9;57:16;71:3,
10;122:1,7,7;
129:7;152:1;164:2;
165:6;166:22;
167:6;173:2;183:3

starters (1)
17:1

starting (1)
153:15

starts (3)
27:12;111:8;
168:21

State (4)
5:2;9:9;93:21;
172:6

stated (8)
38:11;73:16;
89:5;93:6;96:6;
158:19;161:24;
186:19

statement (10)
40:25;47:20;
54:5;73:19,20;
79:11,13,18;80:16;
128:21

statements (1)
43:9

States (1)
5:21

station (1)
133:21

stay (4)
130:10;149:16,
19;165:15

stayed (1)
70:18

staying (1)
14:8

stays (3)
11:9;14:23,24

steadily (1)
61:23

S-t-e-p-h-e-n (1)
9:13

Steven (5)
9:11,12;151:11,
12,16

S-t-e-v-e-n (1)
9:12

stick (1)
47:8

sticking (11)
28:4,5;44:4;
56:23,25;93:17;
94:1,3,10;102:6;
173:6

still (29)
11:10,10,23;
14:3;21:9,25;22:9;
25:5;30:11;31:21,
21;32:15;35:10;

43:25;44:4;46:19;
51:18;100:4;108:1;
128:1;129:10;
137:1;156:18;
157:6;167:18;
173:6;174:1;184:8;
185:15
**stint (1)**
18:9
**STIPULATED (5)**
2:3,9,15,21;6:6
**stipulation (1)**
5:5
**stitch (3)**
77:2;79:21;80:2
**stitched (1)**
77:1
**stomped (1)**
84:16
**stood (2)**
52:22;172:21
**Stop (19)**
34:13;36:13,14;
45:15,15;48:12;
49:13;59:12,24;
63:16;87:25;120:1,
1;135:10;144:9;
170:7,25;172:1;
180:1
**stopped (13)**
16:22;28:19;
52:22;57:17;83:11;
131:3;132:13,13;
146:5,6,10,12;
171:24
**story (3)**
50:10;111:19;
130:5
**straight (8)**
37:22;64:13;
72:23;74:12,13;
82:21;103:10,11
**straighten (1)**
82:23
**strange (1)**
181:5
**strapped (2)**
27:7,7
**Street (12)**
2:7;5:6;26:8;
77:1;96:13;106:13;
124:18;131:5;
138:15;143:11;
145:25;188:1
**streets (5)**
130:21;145:16;
151:7,9,9
**strictly (2)**
43:12;53:10
**strike (1)**
84:6
**struck (2)**
28:14;84:13

**structure (3)**
54:11,15,16
**stuck (1)**
152:19
**stuff (15)**
22:25;36:24;
53:8;57:16;117:2;
129:1,4,15;135:13;
139:22;149:6,20;
156:24;160:2;
189:20
**subdue (1)**
60:3
**subdued (1)**
48:13
**subject (5)**
7:2;160:25;
162:5,8;177:15
**submit (2)**
83:12,13
**subpoena (1)**
115:15
**Subsequent (2)**
69:2,10
**subsequently (1)**
75:13
**substantiate (2)**
41:23;84:23
**sudden (1)**
51:21
**suddenly (1)**
49:23
**sue (6)**
19:20,20,21,22,
23,24
**sued (1)**
150:12
**sufficient (1)**
185:22
**suggested (1)**
71:11
**suing (1)**
48:6
**suit (1)**
124:19
**Suite (2)**
2:7;5:7
**suits (1)**
26:16
**sung (1)**
147:23
**super (3)**
127:10;136:20;
159:6
**superficial (1)**
156:15
**supervisor (1)**
105:19
**support (5)**
18:16;36:21;
83:2;168:10,15
**supported (1)**
65:9

**supposed (8)**
78:18;98:5;
113:15;136:15;
166:11,15,18;
182:25
**supposedly (1)**
21:4
**sure (19)**
6:18;8:14;36:6;
37:1,8;54:17;58:7;
60:16;83:17;90:14;
112:8;142:8;
150:25;153:21;
163:15;169:21;
170:2;188:18;
189:8
**surgery (12)**
165:14,18,21,24;
166:1,5,7,8,11,14,
24;186:18
**surreal (1)**
32:3
**surrounding (2)**
82:18;177:14
**survive (1)**
17:14
**surviving (1)**
18:21
**sustained (1)**
170:5
**swap (1)**
105:9
**swapped (2)**
110:16;114:22
**swelling (3)**
155:20,21;
156:10
**swing (1)**
78:7
**switch (2)**
89:4;110:3
**switched (1)**
111:17
**swollen (5)**
63:25;70:22;
72:16;73:9;186:12
**sworn (2)**
5:13;6:17
**swung (1)**
62:1
**syndrome (3)**
180:18,19,20
**synopsis (1)**
15:24
**system (3)**
138:12;139:12;
141:2

---

**T**

---

**tab (1)**
36:11
**tag (28)**

21:19;29:8,20,
22;31:16;38:13;
40:11,11,16;41:4,8,
10,14,22,25;42:4,
21;43:7;44:14;
47:11,18;52:7;
84:5;106:8;108:6;
109:8;111:17;
149:17
**tagged (3)**
41:16;54:21,22
**tags (9)**
41:17,19;42:7;
54:21;105:9;110:3,
16;114:22;148:13
**talk (18)**
33:21,24,25;
40:6;56:5;69:17;
93:22;109:21;
127:24;129:18;
147:1;149:11,20;
156:10;169:22;
175:6;188:13;
189:25
**talked (5)**
66:25;67:1,4;
129:20;189:18
**talking (51)**
33:8,18;37:7,19;
39:2,19;40:5;43:4;
51:19;61:15;62:12,
23;63:1;65:20;
67:9,11,12;72:7,8;
81:12,14;83:18;
87:25;90:22,23,24;
94:2;96:9,21;
97:24;98:9;123:9,
25;125:25;131:2;
132:12;139:19;
141:6;147:5;148:4,
6,11;149:25;
151:20;164:25;
165:2;172:5;
177:21,23;183:5,7
**talks (1)**
95:13
**tall (1)**
113:7
**tape (3)**
42:12,13;55:23
**Target (1)**
15:25
**targeting (2)**
151:25;152:2
**tase (1)**
30:18
**tased (4)**
59:8;97:11;
119:17,18
**taser (27)**
31:13;43:19,20;
44:6,11,13,15,18,
18,19;45:2,7,20;

46:1,4,7,12,14,23;
62:4;97:13;100:12;
108:6;109:8;110:3;
111:17;124:1
**tasered (1)**
31:15
**tasering (2)**
44:11;124:1
**tasers (2)**
46:6;181:2
**tases (2)**
100:10;124:12
**tasing (4)**
30:6;59:18;
100:2;124:2
**tasted (1)**
30:20
**tattoo (1)**
133:2
**tattoos (2)**
132:16;154:7
**taunted (1)**
29:17
**tear (1)**
157:11
**tears (3)**
27:8;157:1;
180:6
**tech (1)**
36:21
**Technical (5)**
91:9;120:18;
146:19;161:3;
162:5
**technically (2)**
40:13;114:20
**Ted (1)**
18:9
**Ted's (1)**
17:11
**teeth (171)**
30:20;31:10;
38:15,15;56:1;
63:8,13,18;64:6,7,
7,7,9,11,16,18,19,
20,21,25;65:4,6,7,
10;72:5,6,7,7,9,13,
17,22,23,23;73:2,9,
17,21,24;74:1,3,3,
5,7,8,9,12;75:12,
13,18,20,21,22,23;
76:3,4,6,9,12,16,
19,20,23,24,25;
77:11,13,17,17;
79:12,14,15,18,20,
21,23;80:2,5,8,13,
15,17,20,24;81:1,1,
7,8,13,14,15,15,16,
17,19,20,21,24,25,
25;82:1,4,6,18,19,
20;83:7,20;84:3;
89:7;91:17;124:4,
6,7,15,16,20,24;

William Robinson vs.
Frank Jones, et al.

William Robinson
May 19, 2020

125:2,4,6,8,12,14,
17,20,20,22,24;
126:1,4,5,7,8,14,
15,16,17,19,19,21;
127:1,1,8,9,13,14,
16,18;154:6;170:6,
8,11,12,15,16,18,
23;171:3,5,8,10;
173:5,15,19,23;
174:3;179:14,17,
23;187:14
**telephone (1)**
150:23
**telling (22)**
38:20;50:22;
61:2;62:9;76:3,6;
78:9;89:14;102:2,
18,20,21;109:6;
127:2;139:7,25;
144:25;150:16;
168:16,18;170:22;
185:19
**tells (1)**
62:6
**temper (1)**
62:8
**ten (12)**
22:14,19;53:14;
70:9;84:11;85:15,
17;88:18;113:17;
159:3,3;163:23
**tend (3)**
7:17,20;16:8
**terminal (2)**
10:9;157:22
**terminologies (1)**
93:9
**terminology (2)**
21:8;94:7
**terrorist (1)**
21:17
**terroristic (2)**
21:21,23
**test (6)**
44:17,22;45:10,
23;47:1,12
**testicles (2)**
119:18;124:2
**testified (20)**
5:13;45:17;59:7;
63:6;64:21;74:2;
87:14;103:25;
119:14;125:19;
150:6,6;163:3;
164:2;170:25;
173:9,19,21;174:5;
177:17
**testify (5)**
9:7;49:1;79:22;
80:1;157:20
**testifying (1)**
34:9
**testimony (20)**

45:21,22;46:14;
79:5;80:11,12;
83:6,8,9,19,21,22;
106:24;125:8,10,
12;137:17,19,20;
160:7
**Thanks (1)**
153:22
**therefore (2)**
161:3;162:7
**thereto (1)**
2:20
**thinking (1)**
172:12
**third (1)**
32:7
**thirty (1)**
27:20
**thorough (1)**
169:5
**thoroughly (1)**
55:6
**though (7)**
6:18;19:15;
23:18;52:10;
162:16;179:14;
189:16
**thought (19)**
21:18;29:25;
31:24;52:12;57:21;
102:6,7,12;104:1;
115:14;135:2;
143:3;146:1;147:3;
157:8;158:9;
161:23;170:20;
177:21
**thousand (6)**
117:10;130:5;
134:6;151:17;
154:23,23
**threat (3)**
21:17,21;130:21
**threatened (2)**
38:8;131:5
**threatening (1)**
150:7
**three (58)**
12:15;13:18;
15:6;32:4;33:8,9,
10,17;34:10,12;
40:4,4,9,14,15;
42:11,14;49:24,24;
50:16,18;63:7;
65:21;74:2;75:24;
81:25,25;91:8;
98:24;99:1,24;
101:7;113:18,19;
114:19,20,23;
115:12,18;141:25;
142:8;143:17;
147:11;152:14,15,
16,24;163:14;
171:14,18,20;

172:8,18;173:10,
10,23;178:14,15
**threw (5)**
26:23;32:22;
49:24;53:11;100:2
**throb (3)**
26:25;27:1,1
**throbbing (2)**
18:7;26:25
**throughout (1)**
87:14
**Throw (3)**
27:4;50:5,16
**throwing (3)**
22:24;23:2,9
**thrown (1)**
172:3
**thrust (1)**
127:18
**thugs (2)**
131:1,1
**thumbprint (1)**
28:3
**ticket (2)**
19:15;21:24
**tie (3)**
112:13,15,17
**tight (7)**
28:25;29:1,1;
32:13,14,15;52:23
**tilted (1)**
64:14
**Timberland (1)**
183:8
**times (45)**
20:5;25:4,5;
43:21;55:6,7;
66:18,19,20,24;
68:3,10,12,17,19,
23;70:10,10,13,19;
84:6,9,11;94:23;
105:2;119:17;
124:1;130:6;
131:20,23;132:4;
134:19;135:18,22;
137:16;139:6,6,19,
23,25;153:7;
154:23,23;157:7;
180:12
**tip (1)**
128:5
**tire (1)**
16:25
**tires (1)**
17:6
**tissues (1)**
93:3
**titles (1)**
139:22
**today (3)**
9:4;92:20;
189:19
**Today's (1)**

5:25
**toe (43)**
38:16;56:22;
57:3,6;64:1;70:23,
25;71:4;72:17;
73:8;86:17,20,25;
87:8;89:10,12,13,
14,16,23;90:3,12,
13,16,17;91:2,20,
25;92:7;95:4;
154:20,20;155:3,
10,11,16,24;
156:16;165:12;
167:2,8,11;183:6
**toes (2)**
56:2;180:21
**together (8)**
11:15;77:2,3;
78:2;117:15;
133:24;143:24;
144:8
**told (21)**
8:15;22:7;38:18;
45:14;78:15;86:3,
4,21,22;130:19,19;
132:18;134:16;
141:3;145:13,21;
148:16;149:1;
153:2;178:4;181:2
**tongue (5)**
75:4,6,7;81:9;
128:6
**tons (1)**
186:25
**took (19)**
17:7;30:16;56:8;
59:6;60:11;70:13;
76:20;78:7;99:7;
118:15,15,25;
120:10;123:9;
157:24;158:14;
172:15;185:8,16
**tool (1)**
117:3
**tooth (43)**
56:18;63:25;
65:14;67:2;69:11,
14,17;70:23;72:11,
11,24,25;74:17,17,
22;75:2,8,25;76:1,
2;80:12;81:9,9,12;
82:8,9,10,16,18,25;
83:1,3;124:21,25;
125:1,15;126:2,3;
155:16,18;156:9;
173:24;174:1
**top (12)**
35:7,10;61:13;
64:9;82:4,6;92:21;
100:3,4;123:15;
126:2,12
**topical (2)**
185:11;186:12

**touch (8)**
26:18;47:24,25;
48:1,5;103:12,14;
157:2
**touched (5)**
48:1;50:2;
122:24;179:18;
189:18
**tow (3)**
19:13,23;165:10
**towards (2)**
28:18;49:7
**towed (2)**
16:11;145:24
**towing (19)**
16:9,9,10,17,17,
17,18,18,22;17:3,
13,19;152:6;164:4,
25;165:5,8;171:9,
10
**traffic (2)**
19:16,18
**trained (1)**
57:1
**training (1)**
16:20
**transcribed (2)**
120:2;122:18
**transcript (9)**
34:8;35:12;36:9,
25;37:6,12;113:23;
119:9;124:25
**translate (2)**
146:19,22
**transpired (1)**
33:2
**treat (1)**
184:24
**treatment (7)**
39:13;154:13;
165:11;167:2,3;
168:11;180:8
**trespassing (1)**
24:11
**trial (4)**
2:19;13:9;
115:14,16
**trick (1)**
8:17
**tried (11)**
17:11;28:21;
33:1;77:2;79:21;
80:14;83:10,12,13;
151:20;171:9
**trigger (1)**
23:16
**triplicate (1)**
142:15
**trooper (1)**
45:14
**trophies (1)**
125:23
**trouble (2)**

47:9;141:1
**truck (3)**
19:13,23;165:10
**true (7)**
15:10;55:2;65:6;
68:11;76:1;88:23;
175:25
**Trust (5)**
52:15;118:12;
130:12,16,23
**truthfully (2)**
8:13,18
**try (6)**
7:20;18:17;62:4;
73:3;116:17;187:4
**trying (30)**
10:8;20:6;27:11,
13;35:13;36:19;
46:16;54:14;57:8,
8;60:3;70:1;73:3;
78:5;79:1,11,13;
84:10;86:7;89:4;
97:7;99:8,13;
101:13;103:8;
124:1;125:5,16;
139:18,24
**tumor (1)**
93:15
**tunnel (3)**
180:18,19,20
**turn (4)**
8:2;17:6;116:15;
185:1
**turned (4)**
29:24;40:12;
71:5;122:8
**turns (1)**
155:4
**twelve (1)**
85:18
**twenty (6)**
33:24;164:7,8,
21;165:6;185:14
**twenty-five (1)**
151:17
**twice (5)**
66:1,3;67:17;
70:3;84:17
**twinge (1)**
51:21
**two (72)**
8:7;12:17;14:21;
15:6;18:18;24:24;
25:4;37:19;39:19,
21,25;40:10,10;
52:6;53:21;57:24;
65:4;66:10,18,19,
20,24;67:22;68:3,
18,23;70:10,10,19;
72:16;73:8,21;
76:3,4,9,10,12,16;
79:12,14,15,20;
81:24;84:9;85:20;

111:21;114:10,12,
23;117:10;120:22;
123:7;124:16,24;
127:11;130:15;
134:6;142:8;
153:14;156:14;
162:10;163:22;
164:12;172:21;
173:5,6,10,16,20,
21;187:5,5
**Tylenol (11)**
185:5,7,7,7,8,10,
11,11,12,18,21
**Tylenols (1)**
185:14
**type (17)**
19:16;27:1;
31:25;50:10;54:17;
61:10;71:15;98:1;
104:22;111:25;
123:23;128:4;
131:17;151:14,15;
180:24;181:1
**typically (3)**
8:8;107:12;
139:22

## U

**Uh (1)**
80:10
**umpteen (1)**
149:4
**unable (3)**
121:14,17;
129:25
**unaware (2)**
45:19;137:17
**unbuttoned (2)**
98:14;99:10
**unchecked (1)**
184:10
**uncuffs (1)**
30:11
**under (13)**
5:24;9:4,21;
34:9;35:16;81:15,
17;102:3;135:17;
141:15;156:7;
164:9;175:11
**Understood (5)**
15:23;19:4;
93:25,25;121:12
**undress (1)**
123:25
**unemployable (1)**
57:19
**unemployed (2)**
17:17;18:8
**unemployment (1)**
18:11
**unh-unh (15)**
7:17;67:15;

82:21;97:9,9;
104:16;107:7,7;
123:21;142:17;
149:23;157:11,12;
164:22;187:12
**uniform (16)**
38:21,21;61:11,
13;100:2;106:5,7,
7,8;112:13,14,19,
19,20,20;113:1
**uniforms (4)**
61:8,8,9,10
**Unintelligible (4)**
115:10;125:11;
140:6;156:17
**Union (5)**
10:3,14,15,17;
12:1
**United (1)**
5:21
**unless (5)**
42:4;139:23;
165:20;189:11;
190:4
**unlock (2)**
16:20,24
**unlocking (1)**
17:13
**unmute (1)**
92:14
**unnamed (3)**
33:9;50:17,18
**unnecessary (1)**
85:15
**untruthful (2)**
45:23,25
**up (153)**
16:23;17:4,12,
25;21:1,23;23:8;
26:22;28:4,13,20,
21,24;31:17;34:17,
20,23;35:13,14;
36:1,19,20;41:16;
43:15;49:6,8,12,13,
14;50:3,14,23;
51:3,11,11,20,22;
52:6,22;57:22;
61:21,25;62:10,16,
19;65:4,7;66:18;
68:19,24;69:23;
70:7,18,18;71:3,10,
12,12,16;72:17;
76:10;77:20,24;
79:12,19,20;82:19;
83:1,10;85:14,17;
87:2;91:13;93:17;
94:1,3,10;95:13;
96:20,21;97:1;
98:1,1,2,5,6,7,16,
18,20;99:2,24;
100:7;101:1,10,11,
22;102:14,15,17;
103:17,20,21;

105:11;115:16;
116:6;118:17;
122:3,21;124:11,
13,14,19;126:12;
127:20;130:11;
131:9,15;134:2,3;
137:12;138:15,20;
140:7,7;142:23,24;
145:23;146:10;
148:15,17,21;
149:2;150:8;
151:20,24;152:4;
156:22,24;157:11,
17;162:4;164:10,
12;170:17;173:12,
25;174:1;181:5;
187:20,20;188:3;
190:3
**update (1)**
178:18
**upon (2)**
15:8;37:14
**upper (6)**
63:25;70:22;
155:16;156:8,9;
186:4
**upset (1)**
49:4
**upstairs (2)**
66:7,8
**urgent (2)**
154:11;155:13
**use (19)**
6:22;7:16;41:14,
22;42:7;43:7;
44:17;46:23;47:11;
58:8;75:3;79:1,11,
13,17,18;141:1;
163:21;177:14
**used (17)**
9:18;44:19;45:8,
20;46:1;48:25;
79:15;87:15;94:20;
96:12;116:25;
158:3,19,21;
159:25;164:3;
179:4
**using (8)**
35:19;44:19;
46:4;117:2;143:11;
145:16;151:7,8
**usually (2)**
51:14;61:3

## V

**Valerie (10)**
110:13,13,15;
111:5,7,8,9,11;
188:15,15
**value (1)**
187:17
**various (1)**

6:10
**Vegas (1)**
12:23
**vehicle (1)**
171:13
**V-e-n (1)**
9:14
**verbal (1)**
85:24
**verbally (1)**
94:15
**verifies (2)**
54:4,7
**Veronica (2)**
111:11;188:15
**version (1)**
35:19
**versus (1)**
93:1
**via (1)**
6:4
**victim (1)**
161:1
**Victor (1)**
5:20
**video (17)**
6:4;8:9;28:18;
31:11;35:17;39:17,
18,23;40:4,5;
83:12,13;96:5;
114:18,19,21;
142:24
**videos (1)**
39:14
**videotape (3)**
51:5;60:9;72:15
**view (1)**
35:1
**violated (1)**
20:23
**violating (1)**
172:2
**violation (6)**
23:12,17;55:13;
104:10,12;133:13
**Visible (1)**
154:6
**visit (2)**
88:15;169:1
**visited (1)**
70:11
**visiting (2)**
10:6;127:22
**visits (4)**
168:13;169:13,
23;182:2

## W

**waist (2)**
98:7;99:11
**wait (7)**
7:24;8:2;71:11;

120:1;153:1;
165:17;180:1
**waiting (4)**
105:6,8;109:24;
110:2
**waived (2)**
2:11,23
**wake (15)**
49:12,13;50:13;
51:11,22;98:18;
100:7;101:10,11;
124:13,14;181:5;
187:20,20;188:3
**waking (2)**
50:3;103:17
**walk (14)**
28:20,21,24;
29:2;96:11,13,18,
21,23;102:14;
106:1;181:11;
185:14;188:1
**walked (12)**
21:20;42:16;
43:2;61:21;101:22;
102:15,17;104:8;
105:24;107:17;
114:9;141:16
**walking (3)**
50:23;53:4;
181:11
**walks (1)**
31:19
**wall (10)**
23:6;25:12,13,
13;26:19;85:12;
123:13;124:17;
132:7,7
**wants (2)**
96:7;152:2
**warden (5)**
128:21,22,22,23,
24
**warrant (4)**
21:2,3;39:6;
115:1
**watched (2)**
172:22,23
**way (25)**
23:19;25:3;
27:14,15;32:14;
80:23;83:1;84:11;
85:14;98:4;99:6;
112:1;118:6;125:6,
7;129:13;130:6;
134:21;139:13;
145:2;146:9;149:7;
167:10;170:25;
180:5
**ways (1)**
23:11
**weak (1)**
22:20
**weapons (1)**

25:22
**wear (3)**
112:19;157:7;
167:13
**wearing (8)**
29:22;38:20,21;
40:16;47:18;54:21;
99:17;112:10
**web (2)**
35:8,10
**weed (4)**
151:18;187:4,5,7
**week (3)**
18:18;106:19;
111:17
**weekend (1)**
9:3
**weeks (5)**
15:6;143:17;
178:14,14,15
**weighs (1)**
164:7
**weight (1)**
113:9
**weird (1)**
36:12
**welcome (1)**
153:23
**Well-defined (1)**
92:24
**weren't (6)**
20:1;140:15;
142:6;164:25;
171:1;177:8
**whatnot (1)**
27:14
**What's (16)**
10:2;14:14;23:1;
32:4,23;58:10;
121:14,17;136:10;
144:12;149:22;
161:21;169:19;
171:16;178:5;
181:12
**wheel (3)**
27:4;152:18,18
**wheels (4)**
152:19,19,20,23
**Whenever (1)**
31:5
**whereupon (1)**
5:9
**wherever (1)**
105:25
**white (7)**
60:23;64:11;
65:10;82:20,21,21;
140:19
**whole (11)**
14:4;30:10;
36:16;62:18;65:15;
106:7;113:1;
119:18;120:8;

121:12;128:24
**who's (6)**
11:1;13:10,18;
38:10;39:2,3
**wife (2)**
133:19;134:2
**WiFi (1)**
131:11
**WILLIAM (7)**
2:5;5:8,12,17,18;
9:11;160:25
**winch (2)**
152:17,18
**window (2)**
22:25;124:17
**within (1)**
71:9
**without (5)**
41:10;42:3;
85:18;165:16;
174:14
**witness (6)**
2:11;5:8;19:25;
20:3;163:2,3
**witness's (1)**
93:22
**woke (6)**
49:6,8,14;51:3;
103:20,21
**woman (1)**
149:13
**wondering (1)**
79:10
**Woods (44)**
60:13,13;63:14,
24;65:1,4,7;66:5,
14;67:22;68:1;
70:21;72:12,14;
73:8,15,16,18;
75:19;76:5;77:7,
18,18,21,22;78:3,
13,17,19;79:1,15;
83:6,9,10,20,22,23;
86:14;89:24;90:4,
20,24;91:1;97:11
**word (9)**
49:1;87:15;
94:21;107:20;
125:4,5;149:8;
179:4,10
**words (10)**
80:3;108:11,12;
110:12;111:16,18;
120:3,8;130:14;
164:3
**work (12)**
17:11;18:23;
23:3;36:21;51:9;
112:7;129:15,15;
152:5,5;170:21;
179:20
**worked (6)**
15:25;16:16,18;

17:15;146:1;165:4
**working (9)**
15:17;16:22;
19:1;24:20;107:6;
146:5,6;165:9;
185:21
**works (3)**
9:4;109:4;
185:18
**world (2)**
128:24;158:25
**worse (5)**
97:6;140:8;
156:23;157:7;
187:11
**worst (3)**
49:13;117:12;
176:13
**worth (1)**
15:19
**wound (3)**
21:23;119:3;
157:17
**wow (1)**
101:17
**write (7)**
7:14;38:23;53:8;
135:2,3,11,13;
136:3,4,5,6,14;
138:13;141:10;
142:1;157:4
**writing (7)**
39:5;78:14;
138:5;150:14;
189:9,13,22
**wrong (5)**
23:18,19;28:7;
62:11;73:8
**wrote (12)**
43:10;73:15;
128:21;133:16,25;
134:4;135:15;
138:10,11;141:9;
188:17,20

## X

**x-ray (1)**
186:10
**x-rayed (2)**
186:17,17
**x-rays (4)**
184:21;186:1,5,
16

## Y

**y'all (9)**
12:11;104:24;
108:11;110:10;
116:15;131:2,11;
146:13;147:5
**yard (1)**

18:19
**yards (1)**
18:18
**year (11)**
12:18,25;15:18,
21;21:11;23:20;
117:9;132:20;
134:5,12;145:10
**years (13)**
15:9,12;16:12;
17:20;22:15,19;
53:14;57:24;61:1;
142:8;158:20;
159:3,3
**Yep (1)**
107:2
**young (2)**
14:17;53:20

## Z

**Zero (1)**
149:21
**zip (1)**
98:1
**zipped (1)**
124:19
**Zoom (1)**
36:1

## 0

**00054 (1)**
43:19
**00092 (2)**
153:11,21
**00093 (1)**
153:24
**00094 (1)**
153:25
**00095 (1)**
155:12
**00103 (1)**
163:10
**00105 (5)**
160:4,17;161:15,
20,21
**00847 (1)**
35:22
**00854 (1)**
37:16
**00857 (1)**
39:10
**00862 (1)**
119:8
**00888 (1)**
168:23
**02350 (1)**
5:21
**0733 (1)**
92:22
**0734 (1)**
69:1

William Robinson vs.
Frank Jones, et al.

William Robinson
May 19, 2020

## 1

**1:19 (1)**
5:20
**10:14 (1)**
6:1
**100 (2)**
2:7;5:7
**12 (1)**
24:23
**12:30 (2)**
113:18,19
**13 (1)**
171:19
**14 (2)**
17:4;171:18
**15 (2)**
10:19;173:4
**15th (4)**
59:1,2,3,4
**16 (1)**
164:18
**16034B (1)**
78:4
**16th (4)**
59:1,2,4,4
**170 (1)**
113:10
**17th (1)**
137:24
**18 (1)**
23:23
**180 (2)**
113:10,10
**18th (3)**
86:25;144:22,25
**19 (2)**
5:7;6:1
**1975 (1)**
10:1
**19th (4)**
2:7;94:25;95:13;
97:4
**1st (1)**
109:13

## 2

**2 (1)**
25:24
**2:30 (1)**
24:24
**2:50 (3)**
60:19;63:24;
91:8
**2011 (8)**
19:4;20:9,11,16,
17;22:13;139:4;
157:13
**2013 (1)**
17:4
**2014 (7)**

10:18;117:12,12,
16;139:5;165:6,7
**2015 (2)**
164:18;165:7
**2016 (29)**
10:18,21,24;
11:5,6;20:10;
24:14,16;25:24;
58:19,25;87:1;
105:12;119:12;
140:21;145:4;
154:19;155:14;
158:18;164:15,23;
165:2,8;182:3,3,9,
14;183:19,23
**2017 (13)**
17:4,10;21:13;
22:10;23:23;37:9;
42:17;47:5;113:22;
146:2,3,9;170:21
**2018 (9)**
23:22;127:22;
134:11,13,15,19;
139:2;141:14;
169:1
**2019 (7)**
144:24,24;145:1,
12;146:7,10,10
**2020 (3)**
2:8;5:7;6:1
**23rd (1)**
109:16
**24 (1)**
92:19
**24th (1)**
109:16
**26th (1)**
37:9
**285 (2)**
16:24;165:7
**2nd (3)**
26:2,4;109:13

## 3

**3 (1)**
154:18
**30 (2)**
95:23;176:23
**32 (3)**
168:19,22;
169:10
**33 (1)**
168:19
**34 (1)**
168:19
**35 (1)**
168:19
**3rd (9)**
26:2,4;59:6;
66:13;69:2;109:13,
15;155:13;158:17

## 4

**4 (1)**
10:10
**40 (1)**
17:15
**42 (1)**
154:18
**43 (1)**
177:11
**45 (1)**
176:23
**450 (1)**
60:18

## 5

**5/18/16 (1)**
92:21
**5/18/2016 (1)**
86:16
**5/3/16 (1)**
78:5
**5:41 (1)**
155:13
**5:44 (1)**
63:11
**5:54 (4)**
63:19,23;65:1;
85:10
**50 (1)**
17:15
**5191 (2)**
10:3;145:18
**5th (1)**
119:11

## 7

**7:34 (1)**
69:2
**7:45 (1)**
66:13
**7th (14)**
68:2;86:2;
135:23;137:24;
138:16;140:9;
174:6,19,20;176:4,
8,13,17;177:1

## 8

**80 (1)**
92:20
**84 (1)**
92:20
**88 (1)**
92:19

## 9

**9 (3)**

2:6;5:6;10:1
**9:14 (2)**
5:8;6:2
**9:18 (1)**
153:18
**9:27 (2)**
69:4,5
**9:28 (1)**
154:18
**9:30 (1)**
69:19
**9:45 (1)**
68:15