# ATTACHMENT D

# (DEFENDANTS' OUTLINE OF THE CASE)

On May 2, 2016, Plaintiff William Robinson appeared before a Fulton County State Court Judge to address allegations that he was in violation of the terms of his misdemeanor probation. At the conclusion of Plaintiff's hearing, the Judge found that Plaintiff had, indeed, violated the terms of his probated sentence, and revoked thirty days of his probation, and then terminated the balance. Immediately upon receiving his sentence, Plaintiff was transported to the Fulton County Jail. At approximately 1800 hours (6:00 pm) on May 2, 2016, Fulton County Sheriff's Deputy Leon Brooks, who was assigned to the Fulton County Jail's (FCJ) New Intake Area, encountered Plaintiff, who had just arrived to the FCJ male receiving pod. As Deputy Brooks was attempting to search the back of Plaintiff's right leg, Plaintiff, who smelled of alcohol, became combative and began cursing at Deputy Brooks. Deputy Brooks ordered Plaintiff to turn around and keep his hands positioned on the glass in front of him. Plaintiff refused to comply with Deputy Brooks' lawful commands and attempted to turn and face Deputy Brooks. Plaintiff yelled at Deputy Brooks, "you're not going to search me." Deputy Brooks immediately turned on his body camera and commanded Plaintiff to calm down and turn around so he could complete his search and get Plaintiff through the booking process. Plaintiff still refused to comply and

continued to yell, curse and make attempts to turn and face Deputy Brooks. Deputy Brooks believed that he was in danger of Plaintiff striking him, so Deputy Brooks placed his hands on Plaintiff's left arm and placed Plaintiff in a straight arm bar compliance hold, escorting Plaintiff to the floor. Deputy Brooks was then assisted by Fulton County Detention Officers Brian Martin and Anthony Williams in gaining control of Plaintiff. Thereafter, Plaintiff was escorted to isolation pod 165 in an attempt to calm him down. However, within fifteen minutes, Plaintiff started to slam his head on the pod's glass wall and curse loudly. To keep Plaintiff from harming himself, Officers Martin and Williams placed him in a safety restraint chair. While in the chair, Plaintiff violently began rocking the chair, eventually tipping it over on its side, all while cursing and disrupting intake operations. Plaintiff was placed right side up in the chair, and Deputy Brooks asked Plaintiff to calm down and stop the disruptive behavior. At 1955 hours (7:55 pm), Plaintiff was finally able to be released from the restraint chair. Detention Officer Frank Jones found Plaintiff sitting on a bench in New Intake after he came on duty at 6:45 am on May 3, 2016 to begin his 7 am to 3 pm shift. Officer Jones' and his colleagues' first responsibility immediately upon coming on duty was to conduct headcount of the inmates. After Officer Jones encountered Plaintiff, around 7:22 am, sitting on the bench in New Intake, he instructed Plaintiff to step into cell 164 with the other inmates, so he and his fellow officers could properly

conduct headcount. Plaintiff, as he had been with Deputy Brooks the day before, was non- compliant, refusing to follow lawful commands. However, this time, the officers decided to immediately address the situation, in order to avoid having other inmates follow Plaintiff's lead and become disruptive. Plaintiff continued to refuse to comply with the lawful command that he was given—to enter cell 164. And as Officer Jones, along with Officers Rafferty Fuqua and Markennis Jackson, who were working with him in New Intake, tried to help him off of the bench, and escort him to the cell, Plaintiff yanked away in an aggressive manner. Officer Jones and his colleagues then placed Plaintiff on the ground and put handcuffs on him. The officers then asked Plaintiff to stand up so they could attempt to escort him back to the cell until they finished headcount. Plaintiff again refused, and instead, sat down on the floor and told the officers that he was not going anywhere. Ultimately, the officers had to physically pick Plaintiff up and carry him to the property area because he said that he wasn't going to move. Plaintiff continued to struggle; as a result, the officers were unable to continue to hold him, so they let him go and pulled him into the property room, where they took him to dress him out in his FCJ uniform. At the same time that Officers Fuqua, Jones and Jackson were attempting to regain control of Plaintiff, Deputy Saunders was coming from medical, going towards the IBM fingerprinting area. Deputy Saunders heard the commotion and started walking towards the noise, ending up at the property room

door. Deputy Saunders then witnessed Officer Fuqua dragging Plaintiff back to the property room. Deputy Saunders had encountered Plaintiff on his previous shift and remembered that Plaintiff was brought into the jail between 6 and 7 pm, and was so irate and belligerent that the restraint chair had to be used to calm him down. As Officer Fuqua was dragging Plaintiff back to the property room, Plaintiff was cursing at all of the officers, but none of them responded. With Deputy Saunders assistance, Officers Jones, Fuqua and Jackson managed to get Plaintiff back to the shower. Deputy Saunders then went back into the property area, got Plaintiff a uniform, and rejoined Plaintiff and the officers. Plaintiff, still cursing at the officers, had to be forced to put his uniform on. Eventually, Plaintiff relented and finally got dressed. Plaintiff still refused to walk under his own powers, so Deputy Saunders grabbed his right arm, and Officer Jones grabbed his left arm. The officers lifted Plaintiff up so they could take him to medical for his intake screening. Because of Plaintiff's continual cursing, his gold front, pull-out teeth covering fell out on the ground. Neither Deputy Saunders nor his colleagues knocked out Plaintiff's actual teeth, but instead, while Plaintiff was struggling, his gold teeth covering fell out of his mouth, but his actual teeth were not impacted. After Plaintiff's gold teeth covering fell out, the officers continued taking him to the medical screening. Plaintiff still noncompliant and resistant to the officers' efforts on the way to the medical screening. Upon Licensed Practical Nurse

Ronald Sanders seeing Plaintiff in medical, he noted that Plaintiff had a loose tooth, abrasions on his lip and multiple cuts on his arms, but his general appearance was of no apparent distress. After Plaintiff was seen in medical, Officer Jones and Officer Fuqua took him to the medical clinic in another area of the jail due to Plaintiff's complaints about his treatment by the officers. Deputy Saunders came up later with Plaintiff's medical form. Neither Officer Jones or Deputy Saunders saw Plaintiff again. At approximately 2:50 pm, Plaintiff was involved in an altercation with another inmate, Emzell Woods. This altercation resulted in both Plaintiff and inmate Emzell Woods being tased and Plaintiff's teeth being knocked out. Both Plaintiff and Mr. Woods were taken to medical following the altercation. Physician's Assistant David Didier, who saw Plaintiff following the incident with Emzell Woods, noted that Plaintiff had a swollen lip, an upper tooth avulsion, which is the complete displacement of a tooth from its socket, and an abrasion on his left small toe. Inmate Woods later gave Sgt. Philip Dunn a napkin containing one or two of Plaintiff's teeth. Further, Plaintiff spoke with Sgt. Dunn, and he advised Sgt. Dunn that an inmate knocked his teeth out. Plaintiff also advised Sgt. Kemdrick Jones, the officer assigned to investigate Plaintiff's complaint against Deputy Fuqua, that one of his teeth fell from his mouth during the physical altercation with inmate Woods.